UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA, *ex rel.*
    TEITELBAUM,

                                    **Plaintiffs,**

*v.*

ALASKA AIRLINES, *et al.,*

                                    **Defendants.**

Civil Action No. 04-12450-MEL

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS BY ALASKA AIRLINES, INC., AMERICAN AIRLINES, INC., AIRTRAN AIRWAYS, INC., CONTINENTAL AIRLINES, INC., HAWAIIAN AIRLINES, INC., SOUTHWEST AIRLINES CO., AND <u>JETBLUE AIRWAYS CORPORATION</u>

Defendants Alaska Airlines, Inc., American Airlines, Inc., AirTran Airways, Inc.,

Continental Airlines, Inc., Hawaiian Airlines, Inc., Southwest Airlines Co., and JetBlue Airways

Corporation (the "Domestic Defendants")[1] submit this memorandum in support of their joint

motion to dismiss the *qui tam* complaint in this action.

### STATEMENT OF THE CASE

This motion involves a complaint filed by relator Jennifer L. Teitelbaum ("relator")

pursuant to 31 U.S.C. § 3730, the *qui tam* or "whistleblower provision" of the False Claims Act,

31 U.S.C. §§ 3729-33 ("FCA"). The original complaint was filed on November 18, 2004

(docket # 1). The United States declined intervention on September 14, 2005, and the complaint

was unsealed the following day (docket ## 12 & 13). On November 17, 2005 the relator filed

---

[1] Defendant Hawaiian Airlines, Inc. joins in this motion, but has also filed a separate supplemental motion to dismiss on other, additional grounds.

-1-

her present amended complaint (docket # 17).

This motion is filed on behalf of the Domestic Defendants.  The amended complaint's allegations relate to specified fees and charges assessed by the Domestic Defendants upon their passengers as mandated by federal law.  *See* amended complaint, ¶¶ 2; 5-12.  One category of these fees is "Passenger Facility Charges" ("PFC's") which the airlines are required to collect under 49 U.S.C. § 40117(a)(3), (b), and (e) and related Department of Transportation ("DOT") regulations.  These fees are used for eligible airport-related projects proposed by airport authorities and/or state governments.

A second category of user fees at issue are "Security Service Fees" ("SSF's") which have been mandated by the government since the September 11, 2001 tragedies.  *See* 49 U.S.C. § 44940.  These fees are designed to help finance the costs of enhanced airport and airline security.  The amended complaint also contains allegations relating to immigration user fees, agricultural inspection fees, and some unspecified foreign charges.  *See* amended complaint, ¶ 2.

Reduced to its fundamentals, the amended complaint asserts two central allegations against the Domestic Defendants.  First, it alleges that they collected certain government-mandated fees in conjunction with the sale of nonrefundable tickets, but failed to make appropriate refunds of those government-mandated fees to the customers who did not utilize, and thereby forfeited, the nonrefundable tickets.  As the Domestic Defendants demonstrate below, this is not a viable allegation under the FCA, because the FCA is only concerned with efforts to defraud the federal government, not claims made by private airline customers.  Second, the amended complaint further alleges that the Domestic Defendants failed to pay to the federal government the appropriate amounts of these fees and charges they had collected from their customers.

For a plethora of reasons, the amended complaint should be dismissed in its entirety. First, all of the allegations asserted in the amended complaint are based upon information that has previously been identified in the public record. The False Claims Act "is not intended to create windfalls for people with secondhand knowledge of the wrongdoing." *United States ex rel. Kinney v. Stoltz*, 327 F.3d 671, 674 (8th Cir. 2003). The "public disclosures" in this case therefore foreclose the Court's jurisdiction over this matter, under 31 U.S.C. §§ 3730(e)(4)(A) & (B), unless relator can establish that she is an "original source." However, relator has failed to allege that she qualifies as an original source and her claims thus are jurisdictionally barred.

Even if this Court had jurisdiction, other defects in the amended complaint mandate its dismissal. The vague and conclusory allegations that comprise the amended complaint cannot satisfy the stringent particularity pleading requirements imposed by Federal Rule of Civil Procedure 9(b). Furthermore, the entire amended complaint must be dismissed because it alleges nothing more than a failure by the Domestic Defendants to comply with regulatory schemes established by DOT and the other federal agencies regarding the fees at issue. It is well established that such allegations alone do not constitute violations of the FCA. In addition, Counts IV through IX, predicated upon common law causes of action, must be dismissed *with prejudice* because a relator has no standing under the FCA to assert common law causes of action. Equally defective and subject to dismissal are any allegations relating to the purported failure of the Domestic Defendants to make refunds to customers or make appropriate payments to foreign governments, since the FCA is only concerned with defrauding the United States government.

Likewise, Counts I, II, III and IV should be dismissed because they fail to assert viable FCA claims under 31 U.S.C. § 3729(a)(1)-(3) and (7). The amended complaint is also defective,

at least in part, because it includes claims barred by the FCA's statute of limitations provision.

Accordingly, the Domestic Defendants respectfully request that this Court dismiss all of relator's claims *with prejudice*.

## I.    THE FCA'S PUBLIC DISCLOSURE BAR MANDATES DISMISSAL FOR LACK OF SUBJECT MATTER JURISDICTION

The amended complaint asserts two core allegations: (a) the Domestic Defendants refused to refund to its customers the fees and taxes they collected on unused nonrefundable tickets; and (b) the Domestic Defendants failed to fully pay the government the fees and taxes they collected from airline customers.  Because both of these core allegations were publicly disclosed years ago, this Court is deprived of jurisdiction over this action pursuant to 31 U.S.C. § 3730(e)(4)(A).[2]

As this Court has noted: "The public disclosure bar is designed, in part, to prevent parasitic lawsuits – actions in which individuals leech off publicly available information in an effort to cash in on the generous awards available under the False Claims Act." *United States ex rel. LeBlanc v. Raytheon Co.*, 874 F. Supp. 35, 41 (D. Mass), *aff'd*, 62 F.3d 1411 (1st Cir. 1995), *cert. denied*, 516 U.S. 1140 (1996); *see also United States ex rel. McKenzie v. Bell South Telecomm., Inc.*, 123 F.3d 935, 940 (6th Cir. 1997), *cert. denied*, 522 U.S. 1077 (1998).  This Court most recently addressed the elements of the § 3730(e)(4)(a) "public disclosure bar" in

---

[2]  Section 3730(e)(4)(A) reads:

"No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information."

*United States ex rel. O'Keeffe v. Sverdup Corp.*, 131 F. Supp. 2d 87, 90-94 (D. Mass. 2001) (Saris, J.).

The *O'Keeffe* Court established a three-part test for deciding "public disclosure" challenges to *qui tam* complaints under 31 U.S.C. § 3730(e)(4)(A). *See O'Keeffe*, 131 F. Supp. 2d at 91. In applying the public disclosure bar, a court must determine whether (1) there has been a public disclosure; (2) if so, whether the lawsuit is "based upon" the public disclosure; and (3) if so, whether the relator is an "original source" of the information. *Id.* at 91. All three of these elements are satisfied in this case and therefore, dismissal is warranted pursuant to Rule 12(b)(6).

### A.    <u>Public Disclosures Have Occurred</u>

The first element of the *O'Keeffe* test is whether "there has been a public disclosure within the meaning of the statute, that is, 'in a criminal, civil or administrative hearing; or congressional, administrative or Government Accounting Office report, hearing, audit, or investigation or from the news media.'" *Id.* at 91. The "statute's catalogue of sources in which a public disclosure can occur is exhaustive" and includes judicial proceedings, government records and reports, press releases and news media. *Id.*; 31 U.S.C. § 3730(e)(4)(A). It is well-settled that a public disclosure can occur through state lawsuits as well as in federal litigation. *United States ex rel. Hafter v. Spectrum Emergency Care*, 190 F.3d 1156, 1161, n. 6 (10th Cir. 1999); *A-1 Ambulance Serv., Inc. v. California*, 202 F.3d 1238, 1243-4 (9th Cir.), *cert. denied,* 529 U.S. 1099 (2000).

Transactions are deemed publicly disclosed when they are placed in the "public domain." *United States ex rel. Doe v. John Doe Corp.*, 960 F.2d 318, 322 (2d Cir. 1992). It is well established that any information *in the public domain* can contribute to the overall context of a

-5-

"public disclosure." *United States ex rel. Findley v. FPC-Boron Employees' Club*, 105 F.3d 675, 681-82 (D.C. Cir.), *cert. denied*, 522 U.S. 865 (1997) (*various* reports and public statements constituted sufficient public disclosures); *Doe*, 960 F.2d at 322. Therefore, it is not necessary for all allegations to appear in a single document for a public disclosure under the FCA to have occurred. Rather, a district court can quite appropriately extract from each public disclosure facets corresponding to some (or on occasion all) elements of a *qui tam* complaint's allegations.

In other words, the allegations and transactions publicly disclosed do not have to be the "mirror image" of those asserted in the *qui tam* complaint, as long as the essential elements are disclosed and the allegations are "substantially similar." *Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 654 (D.C. Cir. 1994); *see also United States ex rel. Fine v. Advanced Scis., Inc.*, 99 F.3d 1000, 1005 (10th Cir. 1996). The "X+Y=Z" test first articulated in *Springfield*, 14 F.3d at 654, and adopted by Judge Saris in *O'Keefe* best explains this concept. Under the test, a public disclosure has demonstrated fraud if it identified (X) "a misrepresented state of facts" and (Y) a "true state of facts" (*i.e.,* the essential elements). If so, then "Z", or the conclusion that fraud has been committed, can be inferred. *O'Keeffe*, 131 F. Supp. 2d at 94.

Here, the public disclosures, as demonstrated below, clearly assert the two key allegations of the amended complaint: (1) that the airlines had failed to make appropriate refunds of PFC's, SSF's and other government-imposed charges to customers who failed to utilize their nonrefundable tickets and (2) the Domestic Defendants failed to fully reimburse the government for the fees and taxes collected from airline passengers.

    (i)    *Allegations Relating to Failure to Make Refunds to Passengers Were Publicly Disclosed*

Relator's first core allegation, refusal to make refunds of fees and taxes to airline customers who fail to use nonrefundable tickets, has been publicly disclosed through several

cases filed in both federal and state courts *before* the filing of the original complaint in this

action in November, 2004.[3]  For example, identical allegations to the instant complaint were

made in *Brown, et al. v. Delta Air Lines, Inc., et al.*, 2004 U.S. Dist. Lexis 28508 (W.D. Okla.

Oct. 8, 2004).[4]  In *Brown*, several class actions alleged that various airlines improperly had

declined to refund the PFC's and SSF's to passengers who failed to use their nonrefundable

tickets.  These are the same allegations as the amended complaint.  *See* amended complaint, ¶¶ 2;

5-12.

The allegations in the amended complaint were also publicly disclosed in the July 2004,

complaint served in *Hayes v. Am. Airlines, Inc.*, CV-04-3231 (CBA)(JMA) (E.D.N.Y.), prior to

its removal to federal court.  The Court may take judicial notice of this complaint, which is

attached hereto as Exhibit 2.  The *Hayes* complaint also asserts the same allegations as are found

in the present amended complaint in this action – that the defendant airline failed to refund

security fees and PFC charges to customers who failed to use nonrefundable tickets.

A third public disclosure of the present allegations occurred in this Court, in *Harrington,*

*et al. v. Delta Air Lines, Inc.*, Civil Action No. 04-12558-NMG (D. Mass.).  This complaint was

filed on November 4, 2004, and the amended complaint was electronically filed with this Court

---

[3]  As the Domestic Defendants demonstrate below at Section V, this allegation has no
applicability to the FCA because it alleges a liability to a private party, and not the government.
Nonetheless, we address this point out of an abundance of caution in the event it is deemed to
constitute an allegation of fraud purportedly predicated upon the FCA.

[4]  The Court may take judicial notice of this decision which is attached to this brief as
Exhibit 1.  In passing upon a motion to dismiss on "public disclosure" grounds, a district court
can take judicial notice of documents outside the record, including judicial proceedings,
government documents and newspaper accounts.  *See* Fed. R. Ev. 201; *United States ex rel.*
*Dingle v. Bioport Corp.*, 270 F. Supp. 2d 968, 971-3 (W.D. Mich. 2003), *aff'd*, 388 F.3d 209 (6th
Cir. 2004), *cert. denied*, __ U.S. __, 125 S. Ct. 1708 (2005); *see also Watterson v. Page*, 987
F.2d 1, 3-4 (1st Cir. 1993); *Locicero v. Leslie*, 948 F. Supp. 10, 12 (D. Mass. 1996).

on May 31, 2005, by relator's present counsel. In addition to alleging that airlines refused to

refund PFC's and SSF's, the District of Massachusetts complaint also contains similar

allegations respecting U.S. Customs user fees; "immigration user fees"; and agricultural

quarantine and inspection fees. For the Courts convenience, a copy of both the original and

amended complaints are attached to this brief as Exhibit 3. These are the identical allegations

contained in the present amended complaint. *See* original *Harrington* complaint at ¶¶ 36-40;

amended complaint at ¶¶ 5-12.

A further public disclosure occurred in December, 2002, when USTAR, an association of

travel agents, filed a complaint with the Federal Trade Commission, which is attached hereto as

Exhibit 4. In its FTC complaint, USTAR alleges that the air carriers refused to refund a variety

of fees and taxes to passengers who declined to use nonrefundable tickets, including "U.S.

Custom Fee, U.S. Immigration Fee, US APHIS Fee [i.e., Department of Agriculture inspection

fee], U.S. Passenger Facility Fee, U.S. Security Service Fee." *Id.* at ¶¶ 4, 6, 7 and 12. Once

again, these allegations are identical to those asserted in the amended complaint.

Therefore, the allegations related to failure to reimburse passengers for certain fees were

publicly disclosed prior to the filing of the original relator complaint in several federal court and

state court actions, and in one FTC public proceeding. As Judge Saris recognized, the term

"hearing," as it is used in § 3730(e)(4)(A), has been interpreted to encompass federal, state, and

local administrative proceedings, including judicial proceedings, that are open and available to

the public. *See O'Keeffe*, 131 F. Supp. 2d at 91. Therefore, *all* of these statements qualify as

public disclosures under the bar.

(ii)    *Allegations that Defendants Did Not Pay the Government Were Publicly Disclosed*

The second allegation of relator's complaint has also been in the public record for a

-8-

period of years.  For example, as early as July 1995, an article in *Airports* (attached hereto as

Exhibit 5)[5] reported threats by DOT and the Federal Aviation Administration ("FAA") to airlines

regarding failure to remit to the designated airports all collected PFC's.  The article references a

July 10, 1995, notice to U.S. and foreign carriers regarding this problem.  Resort to possible

criminal and civil sanctions is also mentioned.  Eventually, in July 1999, the FAA issued

guidance to attack this problem in a document entitled "Passenger Facility Charge Audit Guide

for Air Carriers" (copy attached hereto as Exhibit 6).  Section II E of the Guide deals with the

stringent procedures put in place to govern collection and remittance of PFC's by the airlines.

*See id.* at 11-12.  In August 2001, the FAA issued Order 5500.1 mandating further procedures

controlling the collection and remitting of PFC's (a portion of which is attached hereto as Exhibit

7).  These allegations also appear in the USTAR Complaint.  *See* Ex. 4 at ¶ 8.[6]

    Government reports and news media both can be judicially noticed and qualify as public

disclosures.  *See* Fed. R. Ev. 201; *O'Keeffe*, 131 F. Supp. 2d at 91.  The release by *Airports* and

the FAA therefore qualify as public disclosures under the FCA.  Thus the first prong of *O'Keeffe*

has been satisfied.

**B.**    <u>**The Qui Tam Complaint Is Based Upon Previous Public Disclosures**</u>

    Once it is determined that "allegations or transactions" have been publicly disclosed,

---

[5] *Airports* is a weekly newsletter published by *Aviation Week*, a division of The McGraw-Hill Companies.  It qualifies as "news media" under § 3730(e)(4)(A).  *See United States ex rel. Alcohol Found., Inc. v. Kalmanovitz Charitable Found.*, 186 F. Supp. 2d 458, 463 (S.D.N.Y. 2002).

[6] In fact, the PFC fees that are allegedly owed to the government are not even owed to the federal government, but state airport authorities.  There is a real question as to whether even failure to make payments to a non-federal state or airport authority could serve as the basis for a FCA cause of action.  *See, e.g., United States ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488 (D.C. Cir. 2004), *cert. denied*, __ U.S. __, 125 S. Ct. 2257 (2005).

*O'Keeffe* next requires that the district court determine whether the complaint is "based upon" that publicly-disclosed information. Although a minority of courts require that the relator "actually derive" her information from the public disclosure, a dominant majority of courts – that include this Court in *O'Keeffe* – require only a simple finding that "the supporting allegations are similar to or 'the *same as* those that have been publicly disclosed . . . *regardless of where the relator obtained his information.*'" (*quoting Doe v. John Doe Corp.,* 960 F.2d 318, 324 (2d Cir. 1992)) (emphasis added by Judge Saris). *Id.* at 92. Therefore the "based upon" standard is satisfied if the complaint's allegations are "supported by" or consistent with the public disclosures, but not necessarily derived from those disclosures. *Id.* at 92-3; *see also Minnesota Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.,* 276 F.3d 1032, 1044-45 (8th Cir.), *cert. denied,* 537 U.S. 944 (2002)("whenever the allegations in the suit and in the disclosure are the same, 'regardless of where the relator obtained his information'," the *qui tam* as a matter of law is "based upon" a public disclosure).

Relator's complaint therefore must be dismissed if the allegations are substantially similar to information that has already been disclosed. *See id.* As described above, relator's allegations that PFC's, SSF's, customs' fees, immigration fees, agricultural fees and other government-imposed charges have not been returned to airline customers or appropriately remitted to the government have been publicly disclosed in prior lawsuits, government reports and news media. Because the allegations are substantially similar to the publicly disclosed information, the second prong of the *O'Keefe* test is satisfied.

C.    **The Relator Is Not an Original Source**

Because it has been established that the amended complaint is "based upon" public disclosures, as defined in 31 U.S.C. § 3730(e)(4)(A), the Court must next determine whether,

-10-

despite this disablement, relator is an "original source" of the public disclosures and thus not
thereby deprived of her jurisdictional standing. 31 U.S.C. § 3730(e)(4)(B); *O'Keeffe*, 131 F.
Supp. 2d at 93-94.[7]

In order to qualify as an original source under the statute, a relator must demonstrate
direct and independent knowledge of the publicly disclosed information upon which the
allegations are based. *Id.* at 95-6. As a result, a relator cannot base her allegations on second-
hand information or information learned from other sources. *Id.* at 96. Here, the relator wholly
fails to even allege that she is an original source of the information upon which the allegations
are based. Nor does relator allege that she "voluntarily provided the information to the
government before filing an action under [the FCA] which is based on the information." 31
U.S.C. § 3730(e)(4)(B).

Relator's failure to allege she is an "original source" is fatal to her FCA claims. As one
Circuit has recognized: *"The False Claims Act* is intended to encourage individuals who are
either close observers or involved in the fraudulent activity to come forward, and is not intended
to create windfalls for people with secondhand knowledge of the wrongdoing." *Kinney*, 327
F.3d at 674. Or, as the Ninth Circuit tersely stated it, "A whistleblower sounds the alarm; he
does not echo it." *Hagood v. Sonoma County Water Agency*, 81 F.3d 1465, 1475 (9th Cir), *cert.
denied*, 519 U.S. 865 (1996).

Relator therefore is not an original source. Because the relator's complaint is "based
upon" information that already was publicly disclosed, and relator is not an original source, the

---

[7] This section reads: "For purposes of this paragraph, 'original source' means an
individual who has direct and independent knowledge of the information on which the
allegations are based and has voluntarily provided the information to the Government before
filing an action under this section which is based on the information."

*O'Keeffe* three-part test is satisfied and the amended complaint should be dismissed *with*

*prejudice* on the basis of the "public disclosure bar."

## II.    ALL COUNTS OF THE COMPLAINT SHOULD BE DISMISSED BECAUSE THEY LACK THE SPECIFICITY REQUIRED BY RULE 9(b).

This Court should dismiss all counts of the amended complaint because they fail to

comply with Fed. R.Civ. P. 9(b).[8]

### A.    Rule 9(b)'s Legal Standard.

Because the amended complaint asserts allegations predicated upon the FCA, it must

comply with Rule 9(b).[9] The purposes behind Rule 9(b) are "to discourage nuisance suits, to

prevent a plaintiff from sullying the reputation of a defendant with baseless allegations, and to

put a defendant on notice of the actions he must investigate and defend." *United States ex rel.*

*Grynberg v. Alaska Pipeline Co.*, No. Civ. 95-725, 1997 WL 33763820, at *3 (D.D.C. Mar. 27,

1997).

In order to satisfy Rule 9(b)'s mandate, a *qui tam* complaint must "specify the time,

place, and content of the alleged false or fraudulent representations." *United States ex rel.*

*Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 226 (1st Cir.), *cert. denied*, __ U.S. __, 125

S. Ct. 59 (2004). "Blanket statements" of generalized, but unspecific, allegations are entirely

---

[8] Rule 9(b) reads: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind may be averred generally."

[9] Clearly, on their face, Counts I-IV and VII are within the parameters of Rule 9(b). The Domestic Defendants respectfully submit that the remaining Counts are embraced within Rule 9(b) as well. This is because all of the allegations contained in ¶¶ 1-50 are "averments of fraud." These same paragraphs are re-pleaded in the subsequent Counts and, therefore, serve as the foundation for those Counts. If ¶¶ 1-50 violate Rule 9(b), as the Domestic Defendants assert, then Counts V-VI and VIII-IX are defectively pled as well and must be dismissed.

incompatible with Rule 9(b). *United States ex rel. Totten v. Bombardier Corp.*, 139 F. Supp. 2d 50, 52 (D.D.C. 2001), *rev'd on other grounds*, 286 F.3d 542 (D.C. Cir. 2002). A *qui tam* relator thus must identify "the time, dates, places, and identities" of the individuals involved in the fraud or "the specifics in the documents prepared and submitted by the defendant to obtain the funding, at the time the complaint is filed and prior to any additional discovery." *Karvelas*, 360 F.3d at 230; *PPM Am., Inc. v. Marriott Corp.*, 820 F. Supp. 970, 973 (D. Md. 1993) (specific documents should be identified which contain allegedly false statements). This obligation to plead allegations of fraud with specificity cannot be discharged by later discovery. *Id.* at 231. In short, plaintiffs are required to "describe the fraudulent conduct rather than merely make conclusory allegations of fraud." *United States ex rel. Long v. SCS Bus. & Technical Inst.*, 999 F. Supp. 78, 89 (D.D.C. 1998), *rev'd on other grounds*, 173 F.3d 870 (D.C. Cir. 1999).

### B. Rule 9(b) is Applicable to FCA Complaints.

"Rule 9(b) applies to all allegations of fraud, including actions brought pursuant to the False Claims Act." *United States ex rel. DeCarlo v. Kiewit/AFC Enters., Inc.*, 937 F. Supp. 1039, 1049 (S.D.N.Y. 1996). "The legislative history of the 1986 FCA Amendments and the Supreme Court's interpretations of the statute further support the conclusion that FCA claims involve 'averments of fraud' that must be pled with particularity under Rule 9(b)." *Karvelas*, 360 F.3d at 227.

### C. The Complaint Fails to Satisfy Rule 9(b).

The amended complaint fails in every way to satisfy the Rule 9(b) standard. For example, it is entirely silent as to what forms or records it alleges the Domestic Defendants were required to submit to the government. Moreover, it fails to identify *even one* purported false claim or false document submitted to the government. Rather, paragraph 41 simply asserts that

-13-

the Domestic Defendants submitted "false or fraudulent statements and records," while

paragraph 42 concludes that the Domestic Defendants "made or used false records or

statements." These general, conclusory allegations are not supplemented with any specificity.

As one district court has noted: "[w]ithout citing a single false claim arising from an allegedly

false invoice, [plaintiff] has not met even a bare bones Rule 9(b) test." *United States ex rel.*

*Obert-Hong v. Advocate Health Care,* 2001 WL 303692, at *2 (N.D. Ill. Mar. 28, 2001); *see also*

*United States ex rel. Walsh v. Eastman Kodak Co.,* 98 F. Supp. 2d 141, 147-148 (D. Mass. 2000)

(same). As the First Circuit has explained, "liability under the False Claims Act requires a false

claim." *Karvelas,* 360 F.3d at 232. *See also, United States ex rel. Clausen v. Lab. Corp.,* 290

F.3d 1301, 1311 (11th Cir. 2002), *cert. denied,* 537 U.S. 1105 (2003) (evidence of an actual false

claim is "the *sine qua non* of a False Claims Act violation").

 In short, the amended complaint is completely devoid of even the most minimal

specificity required by Rule 9(b). "To pass muster under Rule 9(b), the complaint must allege

the time, place, speaker, and sometimes even the content of the alleged misrepresentation."

*Ouaknine v. MacFarlane,* 897 F.2d 75, 79 (2d Cir. 1990). "Underlying schemes and other

wrongful activities that result in the submission of fraudulent claims are included in the

'circumstances constituting fraud or mistake' that must be pled with particularity pursuant to

Rule 9(b)." *Karvelas,* 360 F.3d at 232.[10] Pertinent individuals, dates, and facts regarding how

---

 [10] As the First Circuit noted in this Medicare fraud case, "[h]owever, the complaint never specifies the dates or content of any particular false or fraudulent claim allegedly submitted for reimbursement.... It provides no identification numbers or amounts charged in individual claims... It does not·identify or describe the individuals involved in the improper billing or allege with particularity any certification of compliance with federal regulations in order to obtain payments." *Karvelas,* 360 F.3d at 233. In addition, that court noted that the complaint failed to identify one "piece of paper that was sent to the Government to obtain funding." *Id.* The same (continued on next page)

-14-

the fraud was effected must be pled in a *qui tam* complaint in order to satisfy Rule 9(b). *United States ex rel. King v. Alcon Labs., Inc.*, 2005 WL 20372, at *2-*3 (N.D. Tex. Jan. 4, 2005).[11]

The Domestic Defendants can not even speculate as to how relator assumes they will be able to prepare answers to the amended complaint's allegations without knowing what claims and documents are at issue and why the amended complaint asserts these claims. Strict application of Rule 9(b) is thus necessary to provide the Domestic Defendants with fair notice of the allegations so that they may prepare an adequate defense. *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987). Since this basic standard has not been satisfied to even the most minimal extent, the amended complaint should be dismissed *with prejudice* pursuant to Rule 9(b) and 12(b)(6).[12] *See United States ex rel. Thompson* v. *Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 901 (5th Cir. 1997) (failure to satisfy Rule 9(b) warrants dismissal under Rule 12(b)(6)); *Alcon*, 2005 WL 20372, at *3.

## III.  COUNTS V – IX MUST BE DISMISSED WITH PREJUDICE BECAUSE RELATOR HAS NO STANDING TO ASSERT ANY COMMON LAW CAUSES OF ACTION.

Under 31 U.S.C. § 3730(b), relator's statutory standing is limited to litigating fraudulent

---

is true of the present amended complaint.

[11] Of course, allegations predicated upon the reverse false claims act provision (31 U.S.C. § 3729(a)(7)) likewise are averments of fraud and must satisfy the dictates of Rule 9(b). *See, e.g., United States ex rel. Vallejo v. Investronica, Inc.*, 2 F. Supp. 2d 330, 336 (W.D.N.Y. 1998). *See* Sections VI – VII.

[12] In the alternative, although the Domestic Defendants believe there are numerous other grounds warranting a complete dismissal with prejudice of the amended complaint, should the Court not agree, then movants request that this Court consider this motion as a Fed. R. Civ. P. 12(e) Motion for a More Definite Statement, because relator's pleading is so vague and conclusory that the Domestic Defendants cannot reasonably be required to frame a responsive pleading.

claims on behalf of the United States under the FCA. "A person may bring a civil action *for a violation of section 3729* for the person and for the United States Government." *Id.* (emphasis added). The FCA does not give relators the right to assert common law claims on behalf of the United States. *United States ex rel. Rockefeller v. Westinghouse Elec. Co.*, 274 F. Supp. 2d 10, 14 (D.D.C. 2003) (and the authorities cited therein); *United States ex rel. Phipps v. Comprehensive Cmty. Dev. Corp.*, 152 F. Supp. 2d 443, 451-52 (S.D.N.Y. 2001). *Accord, Eastman Kodak*, 98 F. Supp. at 140. The relator in this case only asserts standing based upon her status as a *qui tam* relator. Counts V through IX, which are predicated on just such common law theories, thus should be dismissed.

Counts V through IX are based on common law theories, including "unjust enrichment," which is common law and quasi-contractual in derivation, as well as common law recoupment, common law fraud, disgorgement, imposition of constructive trust, and civil conspiracy. *See also* amended complaint, ¶ 1. Relator has no jurisdictional standing to assert any of these common law theories. The statutory standing extended to relators does not embrace non-FCA causes of actions: "[w]hile the FCA effects a partial assignment of the government's damages to relators, thus conferring standing upon them, it effects no such assignment of non-FCA causes of action." *United States ex rel. Barrett v. Columbia/HCA Health Care Corp.*, 251 F. Supp. 2d 28, 37 (D.D.C. 2003) (*citing Eastman Kodak*). The amended complaint's invocation in ¶ 3 of supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) is to no avail because there is no jurisdictional predicate upon which to base supplemental jurisdiction. Therefore, Counts V through IX should be dismissed, *with prejudice*.

Nor can relator establish ordinary standing independent of the FCA. In order to bring an unjust enrichment claim, relator must demonstrate that: (1) she conferred a benefit upon the

-16-

defendant; (2) the defendant knew it was receiving this benefit; and (3) it would be inequitable for the defendant to retain the benefit. *United States v. Bouchey*, 860 F. Supp. 890, 894 (D.D.C. 1994). Nowhere in her amended complaint does relator allege any of these three elements – her sole jurisdictional foundation that is asserted is her status as a *qui tam* relator. Similarly, relator has failed to plead any independent jurisdictional basis supporting her common law fraud, disgorgement, common law recoupment or civil conspiracy allegations. All claims must therefore be dismissed *with prejudice*.

## IV.    FAILURE TO COMPLY WITH ADMINISTRATIVE REGULATIONS, STANDING ALONE, CANNOT CONSTITUTE A VALID CAUSE OF ACTION UNDER THE FALSE CLAIMS ACT

Reduced to its fundamentals, the amended complaint alleges (¶¶ 2; 5-12) nothing more than a purported violation of the FCA by the Domestic Defendants for failing to comply with various regulations or statutes promulgated by several government agencies. This is particularly evident in paragraph 11 which speaks in terms of "regulatory language." Such allegations standing alone do not assert a viable claim under the FCA.

It is well established that the mere failure to comply with administrative regulations or statutes does not constitute a violation of the FCA. *Karvelas*, 360 F.3d at 234 ("[A]lleged violations of federal regulations are insufficient to support a claim under the FCA."); *see also United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266-67 (9th Cir. 1996), *cert. denied*, 519 U.S. 1115 (1997) ("Violations of laws, rules, or regulations alone do not create a cause of action under the FCA"). If this distinction had not been made by the courts, every breach of a federal contract or regulation would be transformed into a FCA violation. The amended complaint's allegations to the contrary have been directly repudiated in numerous FCA actions.

For example, in *United States ex rel. Swafford v. Borgess Med. Ctr.*, 98 F. Supp. 2d 822

-17-

(W.D. Mich. 2000), *aff'd*, 24 Fed. Appx. 491 (6th Cir. Dec. 12, 2001), *cert. denied*, 535 U.S. 1096 (2002), the relator alleged that the defendant failed to comply with certain Health Care Financing Administration regulations pertaining to reimbursement of venous ultrasound procedures, and that this failure constituted the submission of a false claim.  The District Court rejected this argument, holding that "the FCA is not an appropriate vehicle for policing technical compliance with administrative regulations.  Mere violations of administrative regulations are not actionable under the FCA 'unless the violator knowingly lies to the government about them.'"  *Id.* at 828 (citations omitted).  "Indeed, the FCA is not a regulatory vehicle, and its scope should not be broadened to include every instance where a claimant fails to comply with all applicable regulations."  *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 200 F. Supp. 2d 673, 679 (S.D. Tex. 2002), *rev'd on other grounds*, 355 F.3d 370 (5th Cir. 2004).

*Only* under a "false certification theory" of liability, which is "predicated upon a false representation of compliance with a federal statute or regulation or a prescribed contractual term," could a FCA claim be based on breach of federal regulations.  *United States ex rel. Mikes v. Straus,* 274 F.3d 687, 696 (2d Cir. 2001).  But nowhere in the amended complaint does relator allege the so-called "false certification theory" or that the Domestic Defendants had certified compliance with pertinent regulations or statutes as a prerequisite to obtaining payment. *Thompson*, 125 F.3d at 902.  Without such allegations, Counts I – III are rendered legal nullities. *Luckey v. Baxter Healthcare Corp.*, 183 F.3d 730, 732-34 (7th Cir.), *cert. denied*, 525 U.S. 1038 (1999).  Counts I – III of the amended complaint thus merit dismissal, *with prejudice*, pursuant to Rule 12(b)(6).

**V.     PARAGRAPHS 5-12 SHOULD ALSO BE DISMISSED BECAUSE THEY EXCLUSIVELY INVOLVE ALLEGATIONS OF FAILURE TO MAKE REFUNDS TO NON-GOVERNMENTAL PARTIES.**

Paragraphs 2 and 5-12 also are defectively pled, and should be dismissed, because they assert that the Domestic Defendants failed to make refunds to airline customers, who in this case are, of course, private parties and not the government.  Moreover, the amended complaint also asserts that false statements, fraudulent inducements, and false claims were made "to people who have forfeited airline tickets and/or had nonrefundable tickets."  Amended complaint, ¶ 2.  All of these allegations in ¶¶ 2 and 5-12 are meaningless under the FCA, because the Act only focuses upon purportedly false statements and claims submitted to the United States government, which result in the government being defrauded, not failure to make refunds to private parties.  Every provision of 31 U.S.C. § 3729(a) speaks only in terms of false statements or claims submitted to the government; *see* amended complaint, ¶¶ 37 - 38.  For the same reason, the allegation contained in the amended complaint, at ¶¶ 40 - 41, relating to "ticket purchasers" should also be dismissed.  Therefore, any such private claims not relating to the government should be dismissed *with prejudice* because they cannot serve as any basis for establishing liability under the FCA.[13]  Similarly any allegations relating to "foreign charges" imposed by authorities "outside the United States" (*see* ¶ 5(d)) must also be dismissed since they do not relate to the United States government.

**VI.    COUNT III FAILS TO ASSERT A VIABLE SECTION (A)(7) ALLEGATION AGAINST DOMESTIC DEFENDANTS.**

Count III of the amended complaint, found at ¶¶ 47-48, is predicated upon 31 U.S.C.

---

[13]  ¶¶ 41 & 42 are the *only* paragraphs, with the exceptions of Counts I-IV, to allege a failure to pay the United States amounts to which it was entitled.

§ 3729(a)(7) of the FCA, the so-called "reverse false claims" provision.[14] Count III, however, fails to state a claim under the FCA, so it must be dismissed under Rule 12(b)(6) for failure to state a claim.

Section (a)(7) was added in the 1986 amendments to the Act. It seeks to penalize those who have control of money or property belonging to the United States, and submit false statements in order to decrease or avoid an obligation to pay or transmit money or property to the government. That is, an (a)(7) violation is a "reverse" false claim because it does not allege efforts to fraudulently secure money or property from the government, but rather to avoid or decrease an obligation to pay money or transmit property to the government.

A claim under § 3729(a)(7) must be based upon a specific "obligation" that was due and owing to the government as of the time the alleged false claim or document was submitted to the government. A complaint therefore must allege that "a specific, fixed debt" is due to the United States. *See United States ex rel. Graves v. ITT Educ. Servs., Inc.*, 284 F. Supp. 2d 487, 509 (S.D. Tex. 2003) (to sustain (a)(7) cause of action, the complaint must allege that defendant owed "a specific amount of money" to the government); *see also United States ex rel. Coppock v. Northrup Grumman Corp.*, 2003 WL 21730668, at *14 (N.D. Tex. July 22, 2003). Such a debt could arise, for example, from a contract's liquidated damages provision, a judgment, or a statutory directive to pay a fixed amount. *See, e.g., United States v. PEMCO Aeroplex, Inc.*, 195 F.3d 1234, 1237 (11th Cir. 1999) (obligation to transmit government property arose from

---

[14] Section (a)(7) allows recovery from any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transit money or property to the Government." The legislative history of the provision is found at S.Rep. No. 99-345, *reprinted in* 1986 U.S. Code Cong. and Admin. News 5266, 5283.

contract); *see also United States ex rel. Prawer v. Verrill & Dana*, 946 F. Supp. 87, 95 (D. Me. 1996) ("Money is not 'owed' without a specific contract remedy, a judgment or an acknowledgment of indebtedness").[15]

Moreover, the "obligation" owing to the government must be predicated upon some legal basis *other than* the FCA claims asserted in the complaint. *United States v. Q Int'l Courier, Inc.*, 131 F.3d 770, 772-3 (8th Cir. 1997). The complaint thus must plead some fixed sum that was due and owing to the government *prior to* the defendant's alleged submission of a purported false claim or false statement. *American Textile Mfrs. Inst., Inc. v. The Limited, Inc.*, 190 F.3d 729, 734-6 (6th Cir. 1999), *cert. denied*, 529 U.S. 1054 (2000); *see also United States ex rel. Lamers v. City of Green Bay*, 998 F. Supp. 971, 997-98 (E.D. Wisc. 1998), *aff'd*, 168 F.3d 1013 (7th Cir. 1999) (defendant must have "an immediate, recognizable obligation" to pay the government). In other words, the obligation to the government must arise from existing legal duties and not represent merely a potential liability. *United States ex rel. Drake v. Norden Sys., Inc.*, 2000 WL 1336497 at *11-12 & n. 8 (D. Conn. Aug. 24, 2000); *Graves*, 284 F. Supp. 2d at 508.

The amended complaint's (a)(7) allegations, therefore, are defective as a matter of law. The amended complaint fails to allege that the Domestic Defendants owe any "obligation" or specific debt that was due and owing to the government at the time the alleged "false or fraudulent statements and records" were submitted. Rather, it asserts a speculative theory for possible future recovery, but does not establish that a debt in a specific amount was due and

---

[15] The *Prawer* court noted: "In fact, the legislative history twice refers to 'money owed.'"*Id.* at 95; *See also, United States ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 313, 332 n. 108 (S.D.N.Y. 2004).

owing to the United States at the time of any alleged submissions. Count III thus fails and should be dismissed. *See United States ex rel. Am. Textile Mfrs. Inst., Inc. v. The Limited, Inc.*, 1997 WL 33421319, at *5 (S.D. Ohio, Nov. 13, 2997), *aff'd* 190 F.3d 729 (6th Cir. 1999), *cert. denied*, 529 U.S. 1054 (2000).

Allegations pursuant to section (a)(7) also are inappropriate here because the airlines are merely the collection agents on behalf of the government. The Domestic Defendants' relationship with the government is thus "purely regulatory," not economic, and cannot support an (a)(7) cause of action. *United States ex rel. Bain v. Georgia Gulf Corp.*, 386 F.3d 648, 657 (5th Cir. 2004); *United States ex rel Bahrani v. Conagra, Inc.*, 338 F. Supp.2d 1201, 1207 (D. Colo. 2004). The Domestic Defendants did not receive any money or property from the government that gives rise to an obligation to repay or return it to the government. *See, e.g., United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 20 F. Supp. 2d 1017 (S.D. Texas 1998) (interim Medicare reimbursements only become final when the annual cost report is filed and adjusted; any overpayments must be returned to the government). Because there is no specific obligation alleged, or existent, Count III must be dismissed pursuant to Rule 12(b)(6).

## VII.   COUNTS I AND II SHOULD BE DISMISSED BECAUSE THEY FAIL TO ALLEGE VIOLATIONS OF 31 U.S.C. § 3729(a)(1) & (2).

Counts I and II of the amended complaint should be dismissed because they fail to allege viable causes of action under the FCA. Relator has confounded sections 3729(a)(1) and (2) with section (a)(7), the so-called "reverse" false claims provision, discussed above. Sections (a)(1) and (2), which have a long history in the Act, deal with false claims or false statements submitted to the government in order to secure payment from the government. "The difference between § 3729(a)(1) and § 3729(a)(2) is that the former imposes liability for presenting a false claim, while the latter imposes liability for using a false record or statement to get a false claim paid."

*Jana, Inc. v. United States*, 34 Fed. Cl. 447, 449 (1995).

Even a cursory review of Count I (purportedly predicated on section (a)(1)) and Count II (purportedly based on section (a)(2)) indicates that they allege violations of section (a)(7), not sections (a)(1) and (2).   Paragraph 42 substantiates this conclusion, since it speaks in terms of "false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government," in language drawn directly from section (a)(7).   The language of Counts I and II further substantiates that the amended complaint is only alleging an (a)(7) violation.   For example, ¶¶ 43 and 45 assert: "All defendants, and each of them falsely and fraudulently as well as knowingly used false records or statements which **concealed and avoided paying debts and transmitted funds owed to the United States."** (emphasis added) This is exactly the same allegation asserted in Count III of the amended complaint (¶ 47) which ostensibly pleads a violation of section (a)(7).   Therefore, Counts I and II should be dismissed pursuant to Rule 12(b)(6) because they fail to allege violations of sections (a)(1) and (a)(2), and because they fail to allege a violation of section (a)(7) for the same reasons as detailed above for Count III.

## VIII.   COUNT IV SHOULD BE DISMISSED BECAUSE IT FAILS TO PROPERLY ALLEGE A CONSPIRACY CAUSE OF ACTION UNDER THE FCA.

Count IV purports to allege a conspiracy count in violation of 31 U.S.C. § 3729(a)(3).   A properly framed allegation under § 3729(a)(3) must assert: "(1) that the defendant conspired with one or more persons to have a fraudulent claim paid by the United States, (2) that one or more conspirators performed any act to have such a claim paid by the United States, and (3) that the United States suffered damages as a result of the claim." *Bouchey*, 860 F. Supp. at 893.   *See generally, United States v. President & Fellows of Harvard College*, 323 F. Supp. 2d 151, 196

(D. Mass. 2004).

None of these essential components of a viable (a)(3) allegation is asserted in Count IV. In fact, the word "conspiracy" does not even appear in the allegations. This paucity of allegations cannot satisfy § 3729(a)(3). "The essence of conspiracy under the Act is an agreement between two or more persons to commit a fraud." *United States ex rel. Stinson v. Provident Life & Accident Ins. Co.*, 721 F. Supp. 1247, 1259 (S.D. Fla. 1989). Any conspiracy claim under this section "must be supported by an allegation of an agreement among the parties allegedly involved in the conspiracy. Absent such an allegation, a claim under 3729(a)(3) is due to be dismissed for failure to state a claim." *United States ex rel. Sanders v. East Ala. Healthcare Auth.*, 953 F. Supp. 1404, 1410 (M.D. Ala. 1996); *Stinson*, 721 F. Supp. at 1259; *United States ex rel. Durcholz v. FKW Inc.*, 997 F. Supp. 1159, 1173 (S.D. Ind. 1998). Such an agreement must be pled because the burden of proof is on plaintiff to establish "[e]vidence of the alleged agreement to defraud... " *Id.*

Therefore, to properly allege a cause of action under Section 3729(a)(3), the amended complaint must allege "facts showing the existence of an agreement between two or more of the defendants to defraud the government." *Wilkins ex rel. United States v. Ohio*, 885 F. Supp. 1055, 1063 (S.D. Ohio 1995). The instant amended complaint, however, alleges no such agreement. Therefore, due to relator's complete failure to properly state an allegation of conspiracy under the FCA, Count IV must be dismissed pursuant to Rule 12(b)(6). *United States ex rel. El Amin v. George Washington Univ.*, 26 F. Supp. 2d 162, 165 (D.D.C. 1998).

## IX.    RELATOR IS FORECLOSED FROM PURSUING ANY CLAIMS FILED PRIOR TO NOVEMBER 18, 1998.

Relator filed his original complaint on November 18, 2004. Because relator is alleging violations of the FCA, the statute of limitations provision contained within the FCA controls.

-24-

*See* 31 U.S.C. § 3731(b). Under § 3731(b)(1), a six-year statute of limitations provision applies to FCA actions.[16] Therefore, under that provision, any allegations relating to the Domestic Defendants' claims or documents filed with the government prior to November 18, 1998 are statutorily time-barred. *See United States v. Entin*, 750 F. Supp. 512, 517-18 (S.D. Fla. 1990) (FCA statute of limitations begins to run once a claim for payment is submitted to the United States).

In 1986, the FCA was amended to include a second statute of limitations provision, § 3731(b)(2).[17] By its very language ("by an official of the United States"), however, it is evident that this provision is not meant to be applicable in *qui tam* cases where the government has declined to intervene. *See, e.g., United States ex rel. Capella v. Norden Sys., Inc.*, 2000 WL 1336487, at * 12 (D. Conn. Aug. 24, 2000); *George Washington Univ.*, 26 F. Supp. 2d at 172. Since the government declined intervention in this action, this provision does not allow relator in the present case to extend the six-year period specified by § 3730(b)(1). Therefore, the alternative statute of limitations contained in section (b)(2) does not apply and, contrary to the allegation contained in paragraph 39 of the amended complaint, any claims arising before the November 18, 1998 date must be dismissed *with prejudice*.

---

[16] Sec. 3731(b)(1) reads: "A civil action under section 3730 may not be brought: (1) more than 6 years after the date on which the violation of section 3729 is committed...." (Supp. 2002).

[17] A civil action under section 3730 may not be brought:

(2) more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed, whichever occurs last.

-25-

## CONCLUSION

For the reasons stated above, the Domestic Defendants respectfully request that the Court dismiss the amended complaint in its entirety *with prejudice* and award their reasonable attorneys fees and costs as incurred herein, and such other and further relief as the Court deems appropriate.

Respectfully submitted,

*Matthew Porter*

Ronald H. Clark, D.C. Bar No. 283614 (*pro hac vice*)
Randall A. Brater, D.C. Bar No. 475419 (*pro hac vice*)
ARENT FOX PLLC
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5339
Telephone: (202) 857-8911

DECHERT LLP
Matthew A. Porter, BBO #630625
Michael S., Shin, BBO # 658134
200 Clarendon Street, 27th Floor
Boston, MA 02116

*Attorneys for Alaska Airlines, Inc., American Airlines, Inc.,
Continental Airlines, Inc., Southwest Airlines Co.,
Hawaiian Airlines, AirTran Airways, Inc., and JetBlue
Airways Corp.*

Dated: February 13, 2006

## CERTIFICATION OF SERVICE

I certify that on this 13th day of February, 2006, I caused to be placed in the United

States mail (first-class mail, postage prepaid), copies of MOTION TO DISMISS AND

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS by the Domestic Defendants as

follows:

Anita Johnson
Jennifer C. Boal
Assistant U.S. Attorneys
John Joseph Moakley Federal Courthouse
1 Courthouse Way
Suite 9200
Boston, MA 02210

Evans J. Carter, Esq.
Hargraves, Karb, Wilcox & Galvani
2nd Floor, West Wing
550 Cochituate Road
P.O. Box 966
Framingham, MA 01701

Kathleen M. Guilfoyle
Richard P. Campbell
Campbell, Campbell, Edwards & Conroy, PC
One Constitution Plaza
Boston, MA 02129

Daniel M. Esrick
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02115

Ethan G. Shenkman
David Ogden
Adam Raviv
William, Cutler, Pickering, Hale & Dorr LLP
2445 M Street, N.W.
Washington, DC 20037

Curtis C. Pfunder
92 State Street
Boston, MA 02109


_____/s/_____
Ronald H. Clark

LEXSEE 2004 U.S. DIST. LEXIS 28508

**LYNETTE BROWN, for herself and all others similarly situated, Plaintiff, v. DELTA AIR LINES, INC., a corporation, Defendant. ROBERT STEM, for himself and all others similarly situated, Plaintiff, v. NORTHWEST AIRLINES, INC., Defendant. ROBERT STEM, for himself and all others similarly situated, Plaintiff, v. CONTINENTAL AIRLINES, INC., a corporation, Defendant.**

**No. CIV-03-871-L (Canadian County Case No. CJ-2003-309), No. CIV-03-901-L (Canadian County Case No. CJ-2003-337), No. CIV-03-943-L (Canadian County Case No. CJ-2003-332)**

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA**

**2004 U.S. Dist. LEXIS 28508**

**October 8, 2004, Decided**

**COUNSEL:** [*1] For Lynette Brown, for herself and all other similarly situated, Plaintiff: Darrell W Downs, Mark Ramsey, Stratton Taylor, Taylor Burrage Foster Mallett Downs & Ramsey, Claremore, OK; Kandi J Pate, Mark A Wolfe, Pate & Wolfe, Oklahoma City, OK.

For Delta Air Lines Inc, Defendant: Jeff L Todd, John N Hermes, McAfee & Taft, Oklahoma City, OK.

**JUDGES:** TIM LEONARD, United States District Judge.

**OPINIONBY:** TIM LEONARD

**OPINION:**

### ORDER

These related cases were filed in the District Court of Canadian County, Oklahoma in May and June of 2003. Lynette Brown filed her action on May 27, 2003 against Delta Air Lines, Inc. ("Delta"). Robert Stem filed two separate actions: on June 6, 2003 against Continental Airlines, Inc. ("Continental") and on June 11, 2003 against Northwest Airlines, Inc. ("Northwest"). The state court petitions contain virtually identical allegations. In each case, the plaintiff sought an accounting and damages for breach of contract, conversion, and unjust enrichment based on the defendant's "failure to refund monies arising from airfare tickets." Brown v. Delta Air Lines, Inc., Petition at P 18; Stem v. Northwest Airlines, Inc., Petition at P 18; Stem v. Continental [*2] Airlines, Inc., Petition at P 18. Brown alleged that she was

a ticketed passenger on a Delta flight wherein she incurred and paid charges for airfare and for certain additional fees and costs. Brown was unable to use her airline ticket for the particular flight booked for which the airline ticket was issued and paid for. As a result thereof, the Defendant wrongfully failed to refund to Brown certain costs charged to her.

*Brown* Petition at P 7. Stem makes identical allegations with respect to tickets purchased from Northwest and Continental. *Northwest* Petition at P 7; *Continental* Petition at P 7.

Although the petitions asserted only state law claims, the airline defendants separately removed the three actions to this court on the basis of federal question and federal officer jurisdiction. *See* 28 U.S.C. § § 1441, 1442(a)(1). In support of its assertion that removal was appropriate, Delta claimed that:

While the specific "costs" which she alleges Delta did not refund to her are not described in her Petition, Plaintiff's counsel explained to Delta contemporaneously with her service of the Complaint that "the case involves [*3] Delta's refusal to refund certain September 11th Security fees to customers. More specifically, [the plaintiffs contend that] customers who

purchase non-refundable airline tickets and ultimately fail to use said tickets are entitled to receive a refund of all associated September 11th Security Fees." (See June 2, 2003 letter from Stratton Taylor, Exhibit C).

The September 11th Security Fees referred to by counsel for Plaintiffs are federally mandated fees collected by Delta as an agent of the Under Secretary of Transportation for Security and paid to the Transportation Security Administration for the purposes of funding airport and air transportation security initiatives of the federal government. The federal statute and regulations imposing the duty to collect this fee upon air carriers make clear that the carrier is acting as an agent of the federal government in collecting the fee: "Security service fees collected by a direct air carrier . . . are held in trust by that direct carrier for the beneficial interest of the United States in paying for the costs of providing civil aviation security services described in 49 U.S.C. 44940." 49 C.F.R. § 1510.11(b) [*4] . The regulations further provide that "the direct air carrier . . . holds neither legal nor equitable interest in the security service fees . . . ." *Id.* The regulations further require that carriers "must remit all security service fees imposed each calendar month to TSA, as directed by the Under Secretary, by the last calendar day of the month following the imposition." *Id.* § 1510.13(a). Accordingly, the monies for which Plaintiff seeks a refund in this matter are not in Delta's possession, but rather are in the possession of the Transportation Security Administration.

Brown v. Delta Air Lines, Inc., Case No. 03-871-L, notice of removal at P 4-5 (W.D. Okla. filed June 25, 2003). Arguing that Brown's right to relief turns on substantial questions of federal law, Delta claimed that removal pursuant to 28 U.S.C. § 1441 was warranted. Delta also argued that removal was appropriate "for the alternative reason that, in collecting and remitting the September 11th Security Fees to the federal government, Delta was acting under an officer and agency of the United States, and was acting under color of such office within the meaning of 28 U.S.C. § 1442(a)(1) [*5] ." *Brown* Notice of Removal at P 8. The notices of removal

filed by Northwest and Continental mirror Delta's allegations.

This matter is before the court on motions to dismiss or for judgment on the pleadings filed by the airline defendants. n1 Defendants' main argument is that plaintiffs' state law claims are preempted by federal law. Before reaching the merits of defendants' motions, however, the court must determine whether it has subject matter jurisdiction over these actions. If subject matter jurisdiction does not exist, removal of the cases was not proper and remand is warranted. n2 In making this determination, the court is mindful that federal courts are courts of limited jurisdiction and "there is a presumption against removal jurisdiction." Laughlin v. Kmart Corp., 50 F.3d 871, 873 (10th Cir.), *cert. denied,* 516 U.S. 863, 133 L. Ed. 2d 114, 116 S. Ct. 174 (1995).

n1 Delta and Continental filed motions for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). Northwest filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).

[*6]

n2 Although plaintiffs did not file motions to remand, the court has an obligation to ensure that it has subject matter jurisdiction before ruling on the merits of an action. *See* Tuck v. United Services Auto. Ass'n, 859 F.2d 842, 844 (10th Cir. 1988), *cert. denied,* 489 U.S. 1080, 103 L. Ed. 2d 839, 109 S. Ct. 1534 (1989). To assist the court in this endeavor, the court directed the parties to file simultaneous briefs on the issue of federal officer jurisdiction. In response to this directive, defendants not only argued the applicability of federal officer jurisdiction, but also that federal question jurisdiction existed at the time of removal.

Analysis of the jurisdictional issue begins with the concept that removal was proper under § 1441 only if these actions are ones "arising under the Constitution, laws, or treaties of the United States." n3 28 U.S.C. § 1331. In deciding whether plaintiffs' claims arise under federal law, the court is guided

by the "well-pleaded complaint" rule, under which a suit arises under federal law "only when the plaintiff's statement [*7] of his own cause of action shows that it is based" on federal law. The plaintiff's anticipation of a defense based on federal law is not enough to make the case "arise

under" federal law. Nor is a defendant's assertion of a defense based on federal law, such as the federal preemption of the state law on which a plaintiff's claim is based, a proper basis for removal even if both parties agree that the only issue for decision in a case is the validity of a federal preemption defense. The plaintiff is the "master of the claim" and may prevent removal by choosing not to plead a federal claim even if one is available. Under the "artful pleading" doctrine, however, a plaintiff may not defeat removal by failing to plead federal questions that are essential elements of the plaintiff's claim. Similarly, removal is permitted when the plaintiff's right to relief requires resolution of a substantial question of federal law.

Schmeling v. Nordam, 97 F.3d 1336, 1339 (10th Cir. 1996) (citations omitted).

   n3 Defendants do not contend that diversity jurisdiction exists; nor could they, as the jurisdictional amount cannot be met. Plaintiffs all allege that the damages sustained by each member of the purported class is not likely to exceed $ 100.00.

   [*8]

   Defendants argue that removal is appropriate under the substantial federal question doctrine. This doctrine requires that the court analyze plaintiffs' claims against the backdrop of the federal statutes at issue. Because plaintiffs assert only state law claims, n4 removal is proper only if the court finds that resolution of plaintiffs' claims turns on substantial questions of federal law and the applicable federal statutes give rise to a private cause of action. See Rice v. Office of Servicemembers' Group Life Ins., 260 F.3d 1240, 1245 (10th Cir. 2001). "In considering whether a substantial federal question exists, we must exercise 'prudence and restraint.'" Nicodemus, 318 F.3d at 1236 (quoting Merrell Dow Pharmaceuticals Inc. v. Thompson, 478 U.S. 804, 813, 92 L. Ed. 2d 650, 106 S. Ct. 3229 (1986)).

   n4 In their jurisdictional brief, defendants assert that "although Plaintiffs' original petitions purported to allege state law causes of action, their briefing in response to Defendants' motions to dismiss and for judgment on the pleadings makes clear beyond dispute that they are in fact

seeking relief on causes of action they claim arise under federal law." Defendants' Joint Jurisdictional Brief at 2. Whether federal question jurisdiction existed at the time of removal, however, is governed by whether a question of federal law appeared on the face of plaintiffs' well-pleaded complaints. See Nicodemus v. Union Pacific Corp., 318 F.3d 1231, 1235 (10th Cir. 2003). Arguments of counsel cannot be used to alter or supplement the allegations contained in a party's initial pleading. Defendants' citation of Akin v. Ashland Chem. Co., 156 F.3d 1030, 1037 (10th Cir. 1998), cert. denied, 526 U.S. 1112, 143 L. Ed. 2d 788, 119 S. Ct. 1756 (1999), is inapposite. When their motion to remand was denied, the plaintiffs in Akin amended their complaint. The Court of Appeals held that plaintiffs' voluntary amendment of their complaint invoked the court's jurisdiction and "amounted to a waiver of alleged defective removal." Id. at 1036. At no time did plaintiffs in these cases seek to amend their complaints to assert any federal claims.

   [*9]

   The record before the court clarifies that plaintiffs are challenging the airline defendants' failure to refund Passenger Facility Charges ("PFC") and September 11th Security Fees to passengers who were not able to use non-refundable tickets. PFCs are fees that are imposed on each paying passenger who boards an aircraft at a commercial airport controlled by a public agency. The fees are then used by the airport to fund projects approved by the Federal Aviation Administration. Authority for the imposition of such fees is found in 49 U.S.C. § 40117. The statute provides in part that:

   Passenger facility revenues that are held by an air carrier or an agent of the carrier after collection of a passenger facility fee constitute a trust fund that is held by the air carrier or agent for the beneficial interest of the eligible agency imposing the fee. Such carrier or agent holds neither legal nor equitable interest in the passenger facility revenues except for any handling fee or retention of interest collected on unremitted proceeds as may be allowed by the Secretary.

49 U.S.C. § 40117(g)(4). The September 11th Security Fee [*10] was implemented after the horrific events of September 11, 2001 to help defray the costs of providing civil aviation security services. 49 U.S.C. § 44940. The

statute and regulations require imposition of a $ 2.50 fee per flight segment on paying and frequent-flier passengers who board planes that originate at airports located in the United States. Id.; 49 C.F.R. § 1510.5. The fees are collected by the air carriers and paid to the Under Secretary of Transportation for Security on the last day of the month following the month of collection. 49 U.S.C. § 44940(e). The regulations provide that:

> Security service fees collected by a direct air carrier or foreign air carrier are held in trust by that direct carrier for the beneficial interest of the United States in paying for the costs of providing civil aviation security services described in 49 U.S.C. 44940. The direct air carrier or foreign air carrier holds neither legal nor equitable interest in the security service fees except for the right to retain any accrued interest on the principal amounts collected pursuant to § 1510.13(b). [*11]

49 C.F.R. § 1510.11(b).

The court assumes without deciding that analysis of plaintiffs' claims would require interpretation of these statutes and that this would present a substantial question of federal law. n5 Thus, the court assumes that the first prong of the substantial federal question jurisdiction test can be met. The issue is whether the governing federal law provides for a private right of action. As neither statute contains an express private right of action for passengers aggrieved by actions taken under their authority, the court must examine whether an implied private right of action exists.

> N5 The court is mindful that construction of a federal statute, without more, does not confer federal question jurisdiction. *See* Rice, 260 F.3d at 1245.

In determining whether an implied private right of action exists the court focuses on Congressional intent.

> Like substantive federal law itself, private rights of action to enforce federal law must [*12] be created by Congress. The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy.

Statutory intent on this latter point is determinative. Without it, a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute. Raising up causes of action where a statute has not created them may be a proper function for common-law courts, but not for federal tribunals.

Alexander v. Sandoval, 532 U.S. 275, 286-87, 149 L. Ed. 2d 517, 121 S. Ct. 1511 (2001). The court must examine the statutes at issue for language that "explicitly confer[s] a right directly on a class of persons that include[s] the plaintiff." Cannon v. Univ. of Chicago, 441 U.S. 677, 690 n.13, 60 L. Ed. 2d 560, 99 S. Ct. 1946 (1979). There is no such language in either statute. Rather than creating rights for any group of people, the statutes at issue are a specific grant of authority to the executive branch to impose fees on airline passengers to fund improvements at airports and to increase security. Although passengers are the ultimate beneficiaries [*13] of the improved security and airport facilities, this is not sufficient to infer a right of action. As the Seventh Circuit found in Statland v. American Airlines, Inc., 998 F.2d 539, 540 (7th Cir.), *cert. denied,* 510 U.S. 1012, 126 L. Ed. 2d 568, 114 S. Ct. 603 (1993), "if this were enough to infer Congress' intent to give those consumers a private cause of action, then every law regulating a business would give its customers an implied private right to sue. This is not the law." Furthermore, to infer a private right of action on passengers' behalf for the *return* of such fees is nonsensical given the purpose of the statutes. Moreover, although the PFC statute specifies the conditions under which and from whom PFCs may be collected, authority to audit and to ensure compliance with the statute is bestowed on the Secretary of Transportation, not individuals. *See* 49 U.S.C. § 40117(h)-(i). Likewise, nothing in the September 11th Security Fee statute evidences Congressional intent to provide a federal judicial forum for passengers seeking refunds; rather, the statute specifically provides that "the Under Secretary may refund any fee paid by mistake or any [*14] amount paid in excess of that required." 49 U.S.C. § 44940(g).

Based on its analysis of the statutes, the court finds that no private cause of action exists. This finding is in accord with rulings that Congress did not intend to provide for private rights of action under other statutes governing the airline industry. *See, e.g.,* Statland, 998 F.2d 539 (Federal Aviation Act); Wayne v. DHL Worldwide Express, 294 F.3d 1179 (9th Cir. 2002) (Airline Deregulation Act of 1978); Boswell v. Skywest Airlines, Inc., 361 F.3d 1263 (10th Cir. 2004) (Air Carrier Access Act). As there is no private right of action, the substantial fed-

eral question doctrine does not support removal of these cases.

This decision does not complete the court's analysis because defendants also claim that removal was proper under the federal officer removal statute, 28 U.S.C. § 1442(a)(1). This statute permits removal of any civil or criminal action against "any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under [*15] color of such office . . . ." Id. Section 1442 not only confers a right of removal, it also constitutes an independent grant of subject matter jurisdiction. Falls Riverway Realty, Inc. v. City of Niagra Falls, 754 F.2d 49, 55 (2d Cir. 1985). *See also* Isaacson v. Dow Chemical Co., 304 F. Supp. 2d 442, 446 (E.D.N.Y 2004). In order to justify removal under § 1442(a)(1), defendants n6 must show that they were acting under the direction of a federal officer or agency, they have a "colorable federal defense" to plaintiffs' actions, and there is causal connection between plaintiffs' claims and the actions defendants took under color of federal authority. Mesa v. California, 489 U.S. 121, 124-5, 129-31, 103 L. Ed. 2d 99, 109 S. Ct. 959 (1989).

n6 Plaintiffs argue that defendants are not "persons" within the meaning of the removal statute because they are corporations. The court rejects this argument as it is contrary to Congressional intent. The federal statutes begin with the instruction that "in determining the meaning of any Act of Congress, unless the context indicates otherwise . . . the words 'person' and 'whoever' include corporations, companies, . . . as well as individuals." 1 U.S.C. § 1. There is nothing in the statutes at issue that indicates a Congressional intent to exclude corporations from the definition of persons.

[*16]

The court finds that defendants cannot demonstrate that they were acting under the direction of a federal officer or agency when they collected and refused to refund the fees at issue. This element requires defendants to show that their actions

were performed pursuant to an officer's "direct orders or comprehensive and detailed regulations." It is not enough to prove only that "the relevant acts occurred

under the general auspices of a federal officer" or that "a corporation participates in a regulated industry." The official must have *direct and detailed control* over the defendant.

Freiberg v. Swinerton & Walberg Prop. Servs., Inc., 245 F. Supp. 2d 1144, 1152 (D. Colo. 2002) (citations omitted) (emphasis added). Defendants' actions were not subject to the type of direct and detailed control that courts have found justified federal officer removal jurisdiction. *See, e.g.,* Isaacson, 304 F. Supp. 2d 442, 449 (government strictly and precisely regulated formula for Agent Orange and prohibited placement of warnings); Reed v. Fina Oil & Chem. Co., 995 F. Supp. 705, 711-12 (E.D. Texas 1998) ("almost every [*17] aspect of the actual operation of [defendant's] plant was supervised or dictated by the federal government"). Nor is this a case where defendants were deputized by a federal agency to perform official acts, such as in Magnin v. Teledyne Continental Motors, 91 F.3d 1424, 1428 (11th Cir. 1996). Furthermore, notwithstanding defendants' argument, they cannot be considered federal intermediaries, as they do not "perform the day to day work of administering an ongoing federal program under strict official oversight." Ryan v. Dow Chem. Co., 781 F. Supp. 934, 949 (E.D.N.Y 1992) (collecting cases). Rather, defendants merely collected fees that were then transmitted to the federal government for disbursement. If the court were to accept defendants' argument, every corporation that collects a tax or a fee pursuant to a federal statute would be entitled to assert federal officer removal. Much more than this is required.

In sum, the court finds that it does not have subject matter jurisdiction over these actions. Neither the substantial federal question doctrine, nor the federal officer removal statute support removal of these actions to federal court. The [*18] court therefore REMANDS these actions to the District Court of Canadian County, Oklahoma. In light of this ruling, the court expresses no opinion regarding defendants' contention that plaintiffs' claims are preempted by the Airline Deregulation Act. The Clerk of the Court is directed to mail three certified copies of this Order to the Clerk of the District Court of Canadian County, Oklahoma.

It is so ordered this 8th day of October, 2004.

TIM LEONARD

United States District Judge

07/17 '04 10:24 NO.579  02/25

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS
------------------------------------x
JULIE E. HAYES, on behalf of          :
herself and all others similarly      :
situated,                             :
                                      :
                  Plaintiff,          :
                                      :
          - against -                 :
                                      :
AMERICAN AIRLINES, INC.               :
                                      :
                  Defendant.          :
------------------------------------x

Index No. 15178/2004

Purchased and filed on:
July 2, 2004

Plaintiff designates
New York County as
the place for trial

The basis of venue is
place of business of
Defendant

**S U M M O N S**

To the above named defendant:

        YOU ARE HEREBY SUMMONED to answer the complaint in this
action and to serve a copy of your answer, or, if the complaint is
not served with this summons, to serve a notice of appearance, on
the Plaintiff's Attorneys within 20 days after service of this
summons, exclusive of the day of service (or within 30 days after
the service is complete if this summons is not personally delivered
to you within the State of New York); and in case of your failure
to appear or answer, judgment will be taken against you by default
for the relief demanded in the complaint.

Defendant's address:

American Airlines, Inc.
4333 Amon Carter Blvd.
Ft. Worth, TX 76155

Dated: July 1, 2004

                    WECHSLER HARWOOD LLP

          By:  _____
                    Robert I. Harwood
                    Samuel K. Rosen
                    488 Madison Avenue
                    New York, New York 10022
                    (212) 935-7400

                    Attorneys for Plaintiff

04 JUL -2 AM 10:01
RECEIVED
QUEENS COUNTY CLERK

07/17 '04 10:25 NO.579  03/25

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS
-------------------------------------------x
JULIA E. HAYES, individually and on          :
behalf of all others similarly situated,     :
                                             :
                              Plaintiff,     :
                                             :
             -vs-                            :
                                             :
AMERICAN AIRLINES, INC.                      :
                                             :
                              Defendant.     :
                                             :
-------------------------------------------x

Index No. 15178/2004

CLASS ACTION
COMPLAINT

         Plaintiff, individually and on behalf of all others
similarly situated, by her undersigned attorneys, alleges upon
personal information as to herself and upon information and belief
as to all other allegations, for her Class Action Complaint against
defendant American Airlines, Inc. ("AA").

### NATURE OF THE ACTION

         1.   Plaintiff brings this action on behalf of a class
(the "Class") comprised of all persons who, during the period
commencing six years prior to the date of the filing this complaint
and continuing to the present (the "Class Period"), purchased a
ticket to fly on an AA flight and paid to AA, a Passenger Facility
Charge ("PFC") and/or a Passenger Security Service Fee ("PSSF")
and, after the ticket was not used for a flight within the allotted
time period and expired, AA failed to refund the PFC and/or PSSF.

2.   PFCs and PSSFs are not part of the price of a ticket.  PFC's are funds collected by AA for payment over to the airports from which a traveler enplanes; PSSFs are collected by AA, held in trust for the Transportation Security Administration ("TSA"), and when appropriate remitted to the TSA.

3.   Defendant is required to remit to the relevant airports and the TSA the funds collected for the PFCs and PSSFs, respectively, only if the passenger in fact flies on the ticketed, or another, AA flight.  If the passenger does not fly on the ticketed or substituted AA flight, and the ticket expires, AA is required to refund the PFC and PSSC to the ticket purchaser.

4.   However, AA has failed to refund PFCs and PSSFs to plaintiff and the other Class members upon expiration of tickets.

5.   Plaintiff seeks to remedy the harm caused by defendant's wrongful conduct by obtaining in this lawsuit the refund to plaintiff and the Class of the amounts of all PFCs and PSSFs required to be returned to the Class but were instead improperly retained by defendant.  Such improper conduct constitutes breach of contract, unjust enrichment, and violation of New York General Business Law § 349 ("GBL § 349").

## THE PARTIES

6.   Plaintiff, Julia E. Hayes, is a resident of the County of New York.  She purchased a ticket for use by Lucean Straughn on a flight from Dallas-Fort Worth Airport ("DFW") to

LaGuardia Airport ("LGA") on December 23, 2002, with a return to DFW from LGA on December 25, 2002. The ticket was never used and subsequently expired.

7.    Defendant AA is a Delaware corporation with its corporate headquarters located in Fort Worth, Texas. According to its public filings, AA is the largest scheduled passenger airline in the world. AA operates hundreds of flights daily in and out of the airports in this County.

CLASS ACTION ALLEGATIONS

8.    Plaintiff brings this action as a class action, pursuant to Article 9 of the CPLR, on behalf of plaintiff and all other Class members. The Class is comprised of all persons who, during the period commencing six years prior to the filing of this complaint and continuing to the present, purchased a ticket to fly on an AA flight and paid to AA a PFC and/or a PSSF and, after the ticket was not used for a flight within the allocated time period and expired, AA failed to refund the PFC and/or PSSF.

9.    The Class satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of CPLR § 901.

10.    The Class members are so numerous that joinder of all members is impracticable. Although the precise number of Class members is unknown to plaintiff at this time and can be determined only by appropriate discovery, it is reasonably estimated that the

3

Class consists of thousands of members who are geographically dispersed throughout the country.

11. Because plaintiff purchased a ticket from AA that expired without being used and failed to receive from AA reimbursement for the PFC or PSSF, she is a member of the Class. Plaintiff's claims are typical of the claims of the other Class members. The harm suffered by plaintiff and all other Class members was and is caused by the same conduct by defendant, _viz._, defendant's wrongful and inequitable conduct in pocketing the PFC and PSSF owed by defendant to the Class.

12. Plaintiff will fairly and adequately represent and protect the interests of the Class in that plaintiff has no interests antagonistic to, or in conflict with, the Class. Plaintiff has retained competent counsel, experienced in consumer and commercial class action litigation, who will prosecute this action vigorously.

13. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the monetary damages suffered by individual Class members are small, the expense and burden of individual litigation make it virtually impossible for individual Class members to seek redress for the wrongful conduct alleged herein. If class treatment of these claims were not available, defendant would likely continue its wrongful conduct, and unfairly retain

4

millions of dollars in unreimbursed PFCs and PSSFs, or otherwise escape liability for its wrongdoing as alleged in this Complaint.

14.    Common questions of law and fact exist as to all Class members which predominate over any questions that may affect individual Class members.    Among the questions of law and fact common to the Class are the following:

a.    whether AA violated GBL § 349 by retaining the amounts of the PFCs and PSSFs owed to the Class;

b.    whether AA has been unjustly enriched by such practices;

c.    whether AA breached its contracts with the Class; and

d.    the appropriate measure of damages, restitution and/or other relief.

15.    The Class is readily definable, and prosecution of this action as a class action will reduce the possibility of repetitious litigation.    Plaintiff knows of no difficulty to be encountered in the management of this litigation that would preclude its maintenance as a Class action.

5

## BACKGROUND FACTS

### THE PFC PROGRAM

16. Under the PFC program, the Federal Aviation Administration ("FAA") may authorize a public agency to impose a PFC of $1, $2, $3, $4 or $4.50 on passengers enplaned at a commercial service airport controlled by the public agency. See 14 C.F.R. §158.5. The PFC regulations define a "passenger enplaned" as a "domestic, territorial or international revenue passenger enplaned in the States in scheduled or nonscheduled service on aircraft in intrastate, interstate, or foreign commerce." 49 C.F.R. §158.3.

17. The PFC regulations require passenger refunds when a passenger with a ticket neither enplanes on the ticketed nor a substituted flight before the ticket expires. According to FAA regulations:

> Issuing carriers and their agents shall collect the PFC's based upon the itinerary at the time of issuance. Any changes to the itinerary that are initiated by a passenger that require an adjustment to the amount paid by the passenger are subject to collection or <u>refund</u> of the PFC as appropriate.

14 C.F.R. §158.45(a)(3). (Emphasis added.)

18. A PFC Order issued by the FAA contains the following specific guidance regarding the issuance of PFC refunds to passengers:

> Section 3. COLLECTION OF TICKETS ISSUED IN THE UNITED STATES

6-12  **INFORMATION REQUIRED ON TICKETS.** Issuing carriers and their agents shall note as a separate item on each air travel coupon, or equivalent record for which a PFC is collected, the total amount of PFC's paid by the passenger and the airports for which the PFC's are collected.

6-13  **ADJUSTMENTS.** Air carriers must collect PFC's from, or refund PFC's to, passengers for itinerary changes initiated by the passenger, as appropriate, for the new itinerary if the changes require an adjustment to the total amount paid by the passenger.

See Passenger Facility Charge, Order 5500.1, U.S. Dept. of Transportation, Aug. 9, 2001, at 90 (annexed hereto as "Exhibit A").

**THE PSSF PROGRAM**

19.  Effective February 1, 2002, the TSA imposed a $2.50 security service fee per enplanement on passengers of domestic and foreign air carriers in air transportation, foreign air transportation, and intrastate air transportation originating at airports in the United States. See 49 C.F.R. §1510.5. The regulations define "passenger enplanement" as a "person boarding in the United States in scheduled or nonscheduled service on aircraft in intrastate, interstate or foreign air transportation." 49 C.F.R. §1510.3.

20.  The regulations mandate that refunds (or additional collections) are required when a passenger changes his itinerary, and the associated number of enplanements:

Any changes by the passenger to the itinerary that alter the number of enplanements are subject to additional collection <u>or refund</u> of the security

7

service fee by the direct air carrier or foreign
air carrier as appropriate.

See 49 C.F.R. §1510.9(b).  (Emphasis added.)

21.  The refundability to passengers of security service
fees collected by air carriers was the subject of an exchange of
letters between TSA and the Air Transport Association ("ATA") in
late 2002.  The ATA noted that some of its member carriers
"received inquiries regarding the refundability of various
governmentally imposed fees paid by passengers who do not travel on
their scheduled flights (not including changes due to weather,
mechanical problems, etc.)." Letter of James A. Hultquist to
Randall Fiertz, Oct. 9, 2002, at 1 (annexed hereto as "Exhibit B").
The ATA posed the following specific questions:

> If a passenger's ticket expires, and the passenger
> is not entitled to a refund of the fare from the
> airline, is the previously collected Passenger
> Security Service Fee applicable to the unused
> travel refundable to the passenger? If so, from
> whom does the passenger request the refund, since
> in many cases the airline has already remitted the
> funds collected, and it would not otherwise be
> issuing a refund to the passenger?

Id. at 2.

22.  The TSA responded that air carriers are required to
refund security fees to passengers:

> While Part 1510 does not address in detail how
> refunds are to be handled, it clearly indicates
> that air carriers and foreign air carriers are
> responsible for refunding September 11 Security
> Fees to ticket purchasers. Specifically, it
> provides that "[a]ny changes by the passenger to
> the itinerary that alter the number of enplanements

8

<u>are subject to additional collection or refund of
the security service fee by the direct air carrier
or foreign air carrier as appropriate.</u>"(emphasis
added).

Letter of Randall Fiertz to James A. Hultquist, Nov. 21, 2002, at
1-2 (annexed hereto as "Exhibit C").

23. Thus, when a ticket purchased by a Class member is
not used for air travel and the ticket expires, AA is required to
refund the PSSF to the purchaser of the ticket.

24. AA never refunded to plaintiff the PFC or PSSF paid
by her in connection with the expired ticket. Similarly, AA has
never refunded the PFC or PSSF paid by other Class members when
their tickets expired.

### FIRST CAUSE OF ACTION

### (Violation of GBL § 349)

25. Plaintiff repeats and realleges the allegations set
forth in the preceding paragraphs of this Complaint as if set forth
fully herein.

26. Defendant's conduct in refusing to refund the PFCs
and PSSFs owed to plaintiff and the other Class members constitutes
materially deceptive acts or practices in the conduct of business,
trade or commerce or in the furnishing of services that affect the
public interest under GBL § 349.

27. Plaintiff and the Class have been injured by
defendant's conduct.

9

28. Defendants are liable for damages sustained by plaintiff and the Class, as allowable under GBL ¶ 349.

### SECOND CAUSE OF ACTION

### (Unjust Enrichment)

29. Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs of this Complaint as if set forth fully herein.

30. Defendant has been unjustly enriched at the expense and to the detriment of plaintiff and the Class by wrongfully retaining PFC's and PSSFs of Class members under the facts and circumstances alleged herein. As a result of its actions, defendant improperly retained funds due and owing to the Class. Defendant's retention of the monies wrongfully collected from plaintiff and the Class violates fundamental principals of justice, equity and good conscience.

31. Plaintiff and the Class are entitled to recover from defendant as unjust enrichment all amounts that have been wrongfully and improperly collected and retained by defendant, and defendant should be required to disgorge the monies which it has unjustly retained.

10

## THIRD CAUSE OF ACTION

### (Breach of Contract)

32. Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs of this Complaint as if set forth fully herein.

33. AA's airline tickets constitute a contract between AA and the purchasers of such tickets.

34. Part of the contract between the purchasers of a ticket and AA is AA's agreement to comply with all laws, rules, and regulations to which that ticket is subject, including remittance to airports and the TSA of the PFC and PSSF, respectively or, if no one uses that ticket, to refund the PFC and PSSF to the purchaser.

35. AA breached its contract with plaintiff and the Class members by not refunding to them PFCs and PSSFs when the subject tickets were not used for a flight and subsequently expired.

36. As a result of defendant's breach of contract, plaintiff and the Class have been damaged in an amount to be determinated at trial.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of herself and the Class, prays for relief and an order and judgment against defendant as follows:

11

A.   Certifying this case as a class action pursuant to the provisions of Article 9 of the CPLR, with plaintiff certified as Class representative;

B.   Awarding compensatory and/or actual damages, and/or disgorgement and/or restitution in favor of plaintiff and the Class, in an amount to be determined at trial;

C.   Declaring that defendant's actions in retaining PFCs and PSSFs of Class members violate GBL § 349, constitute unjust enrichment, and are breaches of contract;

D.   Enjoining defendant from continuing to improperly retain plaintiff's and the Class member's PFCc and PSSFs;

E.   Awarding the costs and disbursements incurred in connection with this action, including reasonable attorneys' fees and experts' fees and expenses;

F.   Awarding pre- and post-judgment interest; and

G.   Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff and the class demand a trial by jury of all issues.

Dated: July 1, 2004

WECHSLER HARWOOD LLP

By:

Robert I. Harwood
Samuel K. Rosen
488 Madison Avenue
New York, NY 10022
Tel.: (212) 935-7400

Attorneys for Plaintiff

12

07/17 '04 10:29 NO.579  15/25

# EXHIBIT A

07/17 '04 10:29 NO.579 16/25

**ORDER**

| 5500.1 |
| --- |

## PASSENGER FACILITY CHARGE



August 8, 2001

**DEPARTMENT OF TRANSPORTATION**
**FEDERAL AVIATION ADMINISTRATION**

Distribution: ZRP-510; A-FAS-1 (Ltd)          Initiated By: APP-530

5500.1

## SECTION 3. COLLECTION ON TICKETS ISSUED IN THE UNITED STATES

### 6-11. COLLECTION OF PFC'S.

a. Air carriers issuing tickets within the United States must follow procedures specified in Part 158.45. Carriers are responsible for all PFC funds from the time of collection from the passenger to the time of remittance to the public agency. Carriers are responsible for their agents' compliance with PFC collection requirements.

b. Air travel tickets are defined in §158.3 as "...all documents pertaining to a passenger's complete travel itinerary necessary to transport a passenger by air, including passenger manifests."

c. The appropriate charge is the PFC in effect at the airport at the time the ticket is issued, irrespective of when the travel takes place.

d. Issuing carriers, and their agents, shall collect the PFC's based upon the itinerary at the time of ticket issuance:

(1) For each one-way trip shown on the complete itinerary of an air travel ticket, issuing air carriers and their agents shall collect a PFC from an enplaned revenue passenger only for the first two airports where PFC's are imposed. For example, a passenger plans a one-way itinerary from Baltimore to Los Angeles. In order to get the lowest one-way fare, the passenger's itinerary is: Baltimore-Chicago (Midway)-Saint Louis-Phoenix-Los Angeles. Assuming that each stop entailed a new ticket coupon (or equivalent) and all the airports collect PFC's, the passenger would pay a PFC for Baltimore and Chicago (Midway) only.

(2) For each round trip, a PFC shall be collected only for enplanements at the first two enplaning airports (on the outbound leg) and the last two enplaning airports (on the return leg) where PFC's are imposed. For example, a passenger plans a round-trip itinerary from Baltimore to Tucson. In order to meet scheduling requirements, the passenger's itinerary is: Baltimore-Chicago (O'Hare)-Phoenix-Tucson outbound and Tucson-Denver-Chicago (O'Hare)-Baltimore inbound. Assuming that the passenger changed planes for each segment, requiring a new ticket coupon or equivalent record, and each airport collects PFC's, the passenger would pay a PFC for Baltimore and Chicago (O'Hare) outbound, and Denver and Chicago (O'Hare) inbound.

### 6-12. INFORMATION REQUIRED ON TICKETS. Issuing carriers and their agents shall note as a separate item on each air travel coupon, or equivalent record for which a PFC is collected, the total amount of PFC's paid by the passenger and the airports for which the PFC's are collected.

### 6-13. ADJUSTMENTS. Air carriers must collect PFC's from, or refund PFC's to, passengers for itinerary changes initiated by the passenger, as appropriate, for the new itinerary if the changes require an adjustment to the total amount paid by the passenger.

Par 6-11
Chap 6

5500.1

An example would be a passenger who pays for a ticket from New York City (Kennedy) to Los Angeles and return, via a connection in Denver in both directions. All three of these airports collect a $3 PFC. The carrier would collect a total of $12 in PFC's for two points out and two points in return. Subsequently, the passenger, at his or her own request, rebooks on a non-stop flight from New York (Kennedy) to Los Angeles with a return trip the same way for a slight increase in airfare. The passenger would now be required to pay $6 (for New York outbound and Los Angeles on return) and would be entitled to receive a refund of $6 for two of the previously paid PFC's.

PFC's are remitted to public agencies according to the original itinerary for itinerary changes initiated by the air carrier. For example, if the same itineraries in the above example were applied to a case where an air carrier, due to a flight cancellation, overbooking, or other situation, initiates itinerary changes, a refund would not be issued to the passenger and the carrier would remit the PFC's as originally ticketed.

**6-14.  ESSENTIAL AIR SERVICE (EAS).** Issuing carriers and their agents shall not collect PFC's from a passenger on any flight to an eligible point on an air carrier receiving EAS compensation on that route under 49 U.S.C. 41731-41742. The "eligible point" is defined as the airport that is guaranteed air service on an EAS designated route. PFC's are collected from passengers traveling on air carriers not receiving essential air service compensation on that route. The list of approved EAS points is maintained in the DOT, EAS and Domestic Analysis Division, X-53 and is available on its internet website and can also be accessed through the PFC internet website.

The limitation to the collection of PFC's on EAS compensated travel does not effect the ability of public agencies that control EAS-designated airports to collect PFC's. These public agencies are eligible to apply for a PFC and can collect from passengers enplaning at the airport, regardless of an EAS designation or subsidy.

**6-15.  FREQUENT FLYER AWARDS.** Section 204 of the Federal Aviation Administration Authorization Act of 1994, Public Law No. 103-305, enacted on August 23, 1994, [codified at 49 U.S.C. 40117(e)(2)(C)], precludes collection of a PFC from a passenger enplaning at an airport if the passenger did not pay for the air transportation which resulted in such enplanement, including any case in which the passenger obtained the ticket for the air transportation with a frequent flyer award coupon without monetary payment.

The FAA interprets this provision to prohibit the collection of PFC's from passengers considered to be nonrevenue passengers under existing DOT Regulations and from passengers who obtained their ticket with an award coupon issued under a frequent flyer or similar bonus award program ("frequent flyer award coupon"). For purposes of this provision, the FAA considers a "frequent flyer award coupon" to be a zero-fare award of air transportation that an air carrier or foreign air carrier provides to a passenger in exchange for accumulated travel mileage or trip credits in a customer loyalty program. The definition of "frequent flyer award" does not extend to redemption of accumulated credits for awards of additional or upgraded service on trips for which

Par 6-13                                                                     Page 91
Chap 6

07/17 '04 10:30 NO.579  19/25

# EXHIBIT B

10/10/02  13:40 FAX 202 626 4884        ATA O.C.C.                        ☑003/003

196465

DEPT. OF TRANSPORTATION
DOCKETS

02 OCT 10 PM 3: 2☐



AIR TRANSPORT ASSOCIATION

JAMES A. HULTQUIST
Managing Director, Taxes

October 9, 2002

Randall Fiertz
Acting Director of Revenue
Transportation Security Administration
Department of Transportation
400 Seventh St. SW.
Washington, DC 20590            TSA - 2001 - 11120 - 57

Re: Application of Passenger Civil Aviation Security Service Fees

Dear Mr. Fiertz:

This letter is on behalf of the member airlines of the Air Transport Association of America
(ATA). The ATA is the United States' oldest and largest airline trade association. Our members
include 22 U.S. and five associate (non-U.S.) airlines.[1] U.S members account for more than 95
percent of the passenger and cargo traffic carried by scheduled U.S. airlines.

Recently, several ATA members received inquiries regarding the refundability of various
governmentally imposed fees paid by passengers who do not travel on their scheduled flights (not
including changes due to weather, mechanical problems, etc.). Under the rules applicable to
certain tickets, if a passenger does not travel as scheduled, the tickets for the unused travel will
expire and the amount paid for the unused travel will not be refunded and will have no value
toward future travel. Depending upon the ticket, the timing of this expiration may be as early as
the originally scheduled date of transportation or as much as 12 months after that date.

The airlines are seeking guidance as to the proper treatment of the Passenger Security Service
Fee administered by the TSA when tickets expire.[2]  Airlines are required to collect this fee from

---

[1] The members are Airborne Express, Alaska Airlines, Aloha Airlines, America West Airlines, American Airlines,
American Trans Air, Atlas Air, Continental Airlines, Delta Air Lines, DHL Airways, Emery Worldwide Airlines,
Evergreen International Airlines, FedEx, Hawaiian Airlines, JetBlue Airways, Midwest Express Airlines, Northwest
Airlines, Polar Air Cargo, Southwest Airlines, United Airlines, UPS Airlines, and US Airways. Associate members
are Aeromexico, Air Canada, Air Jamaica, KLM Royal Dutch Airlines, and Mexicana.

[2] Similar guidance is also being requested from the Agriculture Department, Immigration and Naturalization Service,
Customs Service and Department of Transportation, all of which either impose or administer fees on certain
passengers.

AIR TRANSPORT ASSOCIATION OF AMERICA, INC.
1301 PENNSYLVANIA AVENUE, NW  SUITE 1100  WASHINGTON, DC 20004-1707
4514800  www.airlines.org

10/10/02 13:40 FAX 202 626 4884        ATA O.G.C.                                ☑003/003

Randall Fiertz
October 9, 2002
Page 2

certain passengers at the time a ticket is sold and they remit the fees within a prescribed time period to the agency. If a passenger's ticket expires, and the passenger is not entitled to a refund of the fare from the airline, is the previously collected the Passenger Security Service Fee applicable to the unused travel refundable to the passenger? If so, from whom does the passenger request the refund, since in many cases the airline has already remitted the funds collected, and it would not otherwise be issuing a refund to the passenger?

The Internal Revenue Service previously considered an analogous situation. In Revenue Ruling 89-109, the IRS held that "to the extent the airline does not refund to the passenger the amount paid for the air transportation, the collected transportation tax attributable to such nonrefunded amount is to be remitted to the Government"

Because of multiple inquiries to ATA members concerning such fees, we would appreciate receiving the requested guidance as soon as possible. If you have any questions or need additional information, I can be reached at 202-626-4213.

Sincerely,

James A. Hultquist
Managing Director, Taxes

CC: Steven Cohen, Transportation Security Administration

RECEIVED TIME OCT. 10. 12:39PM        PRINT TIME OCT. 10. 12:40PM

# EXHIBIT C



United States Department of Transportation
TRANSPORTATION SECURITY ADMINISTRATION

400 Seventh Street, S.W.
Washington D.C. 20590

NOV 2 1 2002

Mr. James A Hultquist                                    Docket No. 11120
Managing Director, Taxes
Air Transport Association
1301 Pennsylvania Ave., N.W., Suite 1100
Washington, DC 20004-1707

TSA·02·1120-59

Dear Mr. Hultquist:

Thank you for your letter of October 9, 2002, on behalf of the members of the Air Transport Association (ATA) requesting guidance on the refundability of the Transportation Security Administration's (TSA) September 11th Security Fee to ticket purchasers who do not travel on their scheduled flights, particularly where the tickets are nonrefundable and have no value toward future travel. In addition, you inquire as to whether carriers or TSA should provide refunds of September 11th Security Fees to ticket purchasers, as it is common for carriers to have already remitted to TSA the actual fees collected from ticket purchasers. You note that ATA is also seeking guidance from the U.S. Department of Agriculture, the Immigration and Naturalization Service, and the Customs Service on their passenger fee refund requirements. Finally, you refer to Revenue Ruling 89-109, in which the Internal Revenue Service hold that, to the extent that airlines do not refund the cost of airline tickets to passengers, the attributable taxes are due to be remitted to the Government.

On October 10, TSA placed a copy of your letter in the Department of Transportation's Docket Management System (DMS) for public review. The DMS is accessible online at http://dms.dot.gov and your letter is identified as item 57 in Docket No. TSA-2001-11120. TSA also placed a copy of this response in that docket.

Under 49 CFR Part 1510, air carriers and foreign air carriers are required to collect September 11th Security Fees, hold them in trust for TSA, and remit them to TSA by the end of the month following the calendar month in which the transportation was sold. These carriers are responsible for the safekeeping and accounting of these fees. While Part 1510 does not address in detail how refunds are to be handled, it clearly indicates that air carriers and foreign air carriers are responsible for refunding September 11th Security Fees to ticket purchasers. Specifically, it provides that "[a]ny changes by the passenger to the itinerary that alter the number of enplanements are subject to additional collection or refund of the security service fee by the direct air carrier or foreign air carrier as appropriate." 49 CFR § 1510.9(b) (emphasis added). When a ticket purchaser does not use a ticket for air transportation and the ticket then expires or loses its value, the September 11th Security Fee involved is subject to a refund by the collecting carrier to the ticket purchaser. If such a ticket purchaser requests a refund of the September 11th Security Fee collected, the carrier must provide the requester with a full refund of the fee.

TSA is considering promulgating further details concerning refunding September 11th Security Fees, as will be reflected in the Final Rule for 49 CFR Part 1510. In any case where an air carrier does not refund September 11th Security Fees to the ticket purchaser, the fees must be remitted to or remain with TSA.

Where a carrier remits a September 11th Security Fee to TSA and then refunds the fee to a ticket purchaser, the carrier may offset the refund by deducting it from the September 11th Security Fees remitted to TSA for the month in which the refund is provided. In such circumstances, the carrier must keep auditable records of the refund, as required by 49 CFR 1510.15. The carrier must also accurately denote the refund in its quarterly report of September 11th Security Fees imposed, collected, refunded and remitted, as required by 49 CFR 1510.17, as amended.

If you need further assistance, please contact me at (202) 385-1209. You may also contact Steven Cohen in the Office of the Chief Counsel at (202) 493-1216.

Sincerely,

Randall Fiertz
Acting Director of Revenue

2

07/17 '04 10:32 NO.579  25/25

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS

JULIA E. HAYES, on behalf of herself
and all others similarly situated,

           Plaintiff,

  -against-

AMERICAN AIRLINES, INC.,

           Defendant.

Index No.

15178/2004

SUMMONS AND CLASS ACTION COMPLAINT

*Attorneys for*

WECHSLER HARWOOD LLP
Plaintiff
488 MADISON AVENUE
NEW YORK, N.Y. 10022
(212) 935-7400

To:

Service of a copy of the within
is hereby admitted.

Dated _____

Attorney(s) for

PLEASE TAKE NOTICE:
☐ NOTICE OF ENTRY
that the within is a (certified) true copy of an
duly entered in the office of the clerk of the within named court on
☐ NOTICE OF SETTLEMENT
that an
be presented for settlement to the Hon.
one of the judges of the within named Court, at
      on

Dated:

, of which the within is a true copy, will

, at

Yours, etc,

*Attorneys for*  WECHSLER HARWOOD LLP
488 MADISON AVENUE
NEW YORK, N.Y. 10022

To:
*Attorneys for*

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION NO. 04-_____

**04-4410**

ROBERT J. HARRINGTON, FAYE BYRON,
CRAIG BUCK, VALERIE L. PAWSON, RAY
DRASNIN, WANDA MILLS, JEFF
GOLUMBUK CAROLINE MARSHALL-
SMITH, ANESIA KALAITZIDIS, KENNETH
IVANOVITZ, ATHANASE KARAGIORGOS,
HARRIET ZALWANGO, MICHAEL BLAU,
KENNETH MICCICHE and JENNIEE
TSOUVRAKAS on behalf of themselves and
others,

Plaintiffs

v.

DELTA AIR LINES, INC., AMERICAN
AIRLINES, US AIRWAYS GROUP, INC.,
d/b/a US AIRWAYS, NORTHWEST
AIRLINES, UNITED AIRLINES, INC.
ALASKA AIRLINES, CONTINENTAL
AIRLINES, AIR CANADA, CHINA EASTERN
AIRLINES CORPORATION LIMITED, CHINA
SOUTHERN AIRLINES COMPANY LIMITED,
DEUTSCHE LUFTHANSA, A.G., d/b/a
LUFTHANSA AIRLINES, SWISS
INTERNATIONAL AIRLINES LTD, d/b/a
SWISSAIR, BRITISH AIRWAYS, PLC, d/b/a
BRITISH AIRWAYS, MIDWAY AIRLINES
CORP., d/b/a MIDWAY AIRLINES;
ALITALIA-LINEE AEREE ITALIANE S.p.A,
d/b/a ALITALIA AIRLINES, SOUTHWEST
AIRLINES, CO., d/b/a SOUTHWEST
AIRLINES, OLYMPIC AIRWAYS-SERVICES,
SA, d/b/a OLYMPIC AIRWAYS and AIR
TRANSPORT ASSOCIATION,

Defendants

FILED
IN THE OFFICE OF THE
CLERK OF THE COURTS
FOR _____ ESSEX

NOV 04 2004

_Edward J. Sullivan_
CLERK

**COMPLAINT, JURY CLAIM AND**
**REQUEST FOR CLASS CERTIFICATION**

1836E000011/04/04CIVIL        240.00
1836E000011/04/04SUR CHARGE    15.00
1836E000011/04/04SECC          20.00

## I. INTRODUCTION AND OVERVIEW OF ACTION

1.    The plaintiffs bring this action on behalf of themselves and on behalf of all others similarly
situated, specifically, people who have forfeited airline tickets and/or had nonrefundable

tickets for airline travel and who paid one or more of the following fees or taxes to the defendant airlines:

a.    Passenger facility charge user fee;
b.    Zip tax user fee; and
c.    Foreign landing tax or user fee.

The defendant airlines collect these taxes and fees as a fiduciary in order to pay them to the applicable government agencies but the plaintiff class did not use the airline tickets and the defendant airlines did not pay these fees and taxes to the government agencies but, rather, they wrongfully and unjustly enriched themselves by keeping said funds. The plaintiffs claims are of the "negative value" type as the value of each Class Member's claim is minimal and equitable restitution is being sought. The defendant airlines have hidden and concealed from the plaintiff class the fact that said fees and taxes collected have not been paid to the respective governmental agencies.

## II.  PARTIES AND FACTS

2.    The plaintiff, Robert J. Harrington ("Harrington"), has a usual place of business at 7 Central Street, Framingham, Middlesex County, Massachusetts. Harrington purchased an electronic airline ticket on US Airways in September, 2002 and this was a nonrefundable ticket which he did not use.

3.    The plaintiff, Faye Bryon ("Bryon"), has a usual place of business at 7 Central Street, Framingham, Middlesex County, Massachusetts. Bryon purchased an electronic airline ticket on US Airways in September, 2002 and this was a nonrefundable ticket which she did not use.

4.    The plaintiff, Valerie L. Pawson ("Pawson"), has a usual place of business at 88 Black Falcon Avenue, Boston, Suffolk County, Massachusetts. Pawson purchased an airline ticket on Continental Airlines in November, 2002 and this was a nonrefundable ticket which she did not use.

5.    The plaintiff, Jeff Golumbuk ("Golumbuk"), resides at 7889 Clairemont Mesa Boulevard., San Diego, California 92111. Golumbuk purchased an airline ticket on China Eastern Airlines in September, 2002 on China Southern Airlines in September, 2002 and these were nonrefundable tickets which he did not use.

6.    The plaintiff, Craig Buck ("Buck'), resides at 3078 Quince Street, San Diego, State of California. Buck purchased airline tickets on Alaska Airlines in March, 2002 and on American Airlines in March, 1999 and these were nonrefundable ticket and he did not use them.

7.    The plaintiff, Wanda Mills ("Mills") resides at 4 Mises Road Lady's Island, State of Carolina. Mills purchased airline tickets on Northwest Airlines in August, 2001 and these were nonrefundable tickets which she did not use.

8.   The plaintiff, Michael L. Blau ("Blau") resides in La Jolla, State of California. Blau purchased multiple airline tickets on United Airlines in December, 1998 and these were nonrefundable tickets which he not use.

9.   The plaintiff, Ray Drasnin ("Drasnin"), resides at 4330 Witherby Street, State of California. Drasnin purchased airline tickets on Air Canada in May, 2001 and on Continental in August, 2002 and these were nonrefundable tickets which he not use.

10.  The plaintiff, Caroline Marshall-Smith ("Marshall-Smith"), resides in West Yarmouth, Barnstable County, Massachusetts. Marshall-Smith purchased five (5) airline tickets on Delta Airlines, Inc., in May, 2004 and these tickets were nonrefundable tickets which she did not use.

11.  The plaintiff, Anesia Kalaitzidis ("Kalaitzidis") resides in Boston, Suffolk County, Massachusetts. Kalaitzidis purchased an airline ticket on Alitalia Airlines January, 2004 and this ticket was a nonrefundable ticket which she did not use.

12.  The plaintiff, Athanase Karagiorgos ("Karagiorgos") resides in Newton, Middlesex County, Massachusetts. Karagiorgos purchased an airline ticket on British Airways in March, 2002 and this was a nonrefundable ticket which he did not use.

13.  The plaintiff, Harriet Zalwango ("Zalwango") resides in Boston, Suffolk County, Massachusetts. Zalwango purchased an airline ticket on Midway Airlines in March, 2002 and this ticket was a nonrefundable ticket which she did not use.

14.  The plaintiff, Kenneth Ivanovitz ("Ivanovitz") resides in Springfield, Hampden County, Massachusetts. Ivanovitz purchased an airline ticket on Swiss Air on November 12, 1998 and this was a nonrefundable ticket which he did not use.

15.  The plaintiff, Kenneth Micciche ("Micciche") resides in Natick, Middlesex County, Massachusetts. Micciche purchased an airline ticket on Southwest Airlines in March 2000 and this was a nonrefundable ticket which he did not use.

16.  The plaintiff, Jenniee Tsouvrakas ("Tsouvrakas"), resides in Boston, Suffolk County, Massachusetts. Tsouvrakas purchased an airline ticket on Olympic Airways in March, 2000 and this was a nonrefundable ticket which she did not use.

17.  The defendant, Delta Air Lines, Inc. ("Delta"), is a Delaware corporation with its executive offices located at 1030 Delta Boulevard, Atlanta, State of Georgia. Delta does business and has qualified to do business in the Commonwealth of Massachusetts.

18.  The defendant, American Airlines, Inc. ("American"), is a Delaware corporation with its executive offices at 4333 Amon Carter Boulevard, Fort Worth, State of Texas, and it does business and has qualified to do business in the Commonwealth of Massachusetts.

19.    The defendant, US Airways Group, Inc., d/b/a US Airways ("US Airways"), is a Delaware corporation with its executive offices located at 2345 Capital Drive, Arlington, State of Virginia, and it does business and has qualified to do business in the Commonwealth of Massachusetts.

20.    The defendant, Continental Airlines, Inc. ("Continental"), is a Delaware corporation with its executive offices located at 1600 Smith Street, Houston, State of Texas, and it does business and has qualified to do business in the Commonwealth of Massachusetts.

21.    The defendant, Northwest Airlines, Inc. ("Northwest"), is a Minnesota corporation with its executive offices located at 2700 Lone Oak Parkway, Eagan, State of Minnesota, and it does business and has qualified to do business in the Commonwealth of Massachusetts.

22.    The defendant, United Airlines, Inc. ("United"), is a Delaware corporation with its executive offices located at 1200 E. Algonquin Road, Elk Grove Township, State of 2700 Lone Oak Parkway, Eagan, State of Minnesota, and it does business and has qualified to do business in the Commonwealth of Massachusetts.

23.    The defendant, Air Canada ("Air Canada") is a Canadian corporation with its executive offices located in Montreal, Province of Quebec, Dominion of Canada, and it does business and has qualified to do business in the Commonwealth of Massachusetts.

24.    The defendant, China Eastern Airlines Corporation Limited ("China Eastern") is a corporation organized in China with its executive offices located at 2550 Hoqqiao Road, Shanghai, China and it does business and has qualified to do business in the Commonwealth of Massachusetts.

25.    The defendant, China Southern Airlines Corporation Limited ("China Southern") is a corporation organized in China with its executive offices located at Baiyon International Airport, Guang Zhuu, Guangdong 510405, China and it does business and has qualified to do business in the Commonwealth of Massachusetts.

26.    The defendant, Deutsche Lufthansa, A.G., d/b/a Lufthansa Airlines (Lufthansa Airlines) is a corporation organized in Germany, with its executive offices located at Cologne, Germany and it does business and has qualified to do business in the Commonwealth of Massachusetts.

27.    The defendant, Swiss International Airlines Ltd, d/b/a Swissair ("Swiss air") is a corporation organized in Switzerland with executive offices in Basel, Switzerland, and it does business and has qualified to do business in the Commonwealth of Massachusetts.

28.    The defendant, British Airways, PLC d/b/a British Airways ("British Airways"), is a corporation organized in Great Briton with executive in Harmondsworth, Great Britain and it does business and has qualified to do business in the Commonwealth of Massachusetts,

29.  The defendant, Midway Airlines Corp., d/b/a Midway Airlines ("Midway Airlines") is a corporation with executive offices at Durham, North Carolina and it does business and has qualified to do business in the Commonwealth of Massachusetts.

30.  The defendant, Alitalia-Linee Aeree Italiane S.p.A, d/b/a Alitalia Airlines ("Alitalia Airlines'), is an Italian corporation with executive offices in Rome, Italy and it does business and has qualified to do business in the Commonwealth of Massachusetts.

31.  The defendant Southwest Airlines Co., d/b/a Southwest Airlines ("Southwest Airlines") is a Texas corporation with executive offices in Dallas, Texas and it does business and has qualified to do business in the Commonwealth of Massachusetts.

32.  The defendant, Olympic Airways-Services, SA, d/b/a Olympic Airways, is a Greek corporation with executive offices in Athens, Greece and it does business and has qualified to do business in the Commonwealth of Massachusetts.

33.  The defendant, Air Transport Association ("ATA"), is a corporation with its executive offices at 1301 Pennsylvania Avenue, N.W., Washington, D.C. ATA is the primary trade group for airlines and it assists airlines in looking for ways to reduce costs, maximize efficiency and increase profitability of its member airlines, which is most of the passenger airlines that fly in or to the USA. ATA provides expertise, guidance and assistance to its member airlines and Bruce Bishins, CTC, on behalf of travel agents and passengers, on several occasions, requested that ATA rectify and clarify the matter of airlines' refusal to return unused foreign taxes and user fees on nonrefundable or forfeited tickets but to no avail. ATA saw this as a matter which could have potentially serious implications and refused to take any position or responsibility for this "unjust enrichment' except to advise its members that there would be no policy covering these matter. As a result of ATA's position (or lack thereof), even though its officers knew that its members were violating the law, it has steadfastly refused to advise its members as to what should be done or to establish any policies. ATA was advised by Mr. Bishins that it was aiding and abetting unfair trade practices.

### III.  CLASS ACTION ALLEGATIONS

34.  Plaintiffs file this action as a Class Action pursuant to M.R.C.P. 23 on their own behalf and on behalf of all other purchasers of airline tickets that were not used and/or non refundable.

35.  It is estimated that there are tens of thousands of people and entities who purchased airline tickets that they did not use them and/or purchased nonrefundable tickets. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class Members can be determined only by appropriate discovery, the plaintiffs believe that such Class Members number in excess of tens of thousands of separate people or entities.

36.  There are three (3) categories of Class Members, people or entities who, during the Class Period, November 1, 1998 to date, forfeited and/or purchased nonrefundable airline tickets and paid one or more of the following taxes:

      a.     Passenger facility charge user fee;

      b.     Zip tax user fee; and

      c.     Foreign landing tax or user fee.

37. The plaintiffs' claims are typical of the claims of the Members of the Class. The plaintiffs and all members of the Class sustained damages as a result of the defendants' wrongful conduct, as described in this complaint.

38. The plaintiffs will fairly and adequately protect the interests of the Members of the Class, and they have retained counsel competent and experienced in class action litigation.

39. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The losses suffered by all of the Class Members are relatively small, albeit significant, and of so-called negative value variety where it would not make sense to file a complaint individually. Thus, the expense and burden of individual litigation makes it impractical for most Class Members, individually, to seek redress for the wrongful conduct alleged in this action.

40. Common questions of law and fact exist as to all Members of the Class and predominate over any questions solely affecting individual Members of the Class. Among the questions of law and fact common to the Class are:

      a.     Did the defendant airlines wrongfully retain for their own use the collected passenger facilities charge user fees instead of paying said funds to the appropriate governmental agencies and/or refunding said funds to the Class Members?

      b.     Did he defendant airlines wrongfully retain for their own use the collected zip tax user fees instead of paying said funds to the appropriate governmental agencies and/or refunding said funds to the Class Members?

      c.     Did he defendant airlines wrongfully retain for their own use the collected foreign landing tax or user fees instead of paying said funds to the appropriate governmental agencies and/or refunding said funds to the Class Members?

41. The plaintiffs know of no difficulty which will be encountered in the management of this litigation that would preclude its maintenance as a class action.

42. Certifying this as a class action would resolve these issues for all potential plaintiffs without the necessity of litigating individual lawsuits. Additionally, class certification in this matter would not impose any undue burden upon the court and will foster judicial economy. In this case, the certification of the class is appropriate as it would not complicate or delay disposition of the case, the defendants would suffer no prejudice as a result of certification and where certification would assure the Class Members that the defendant airlines would not evade their responsibilities in implementing any court orders.

43.    The names and addresses of all Class Members are available from the defendant airlines and notice will be provided to Class Members via first-class mail using techniques and a notice approved by this court.

## IV. CAUSES OF ACTION

### COUNT I

### (Declaratory Judgment, G.L. Chapter 231A, Section 2)

The plaintiffs incorporate by reference and reallege paragraphs 1 through 43, inclusive, as if fully set forth herein.

44.    As defined by G.L. Chapter 231A, Section 2, an actual dispute and controversy exists as to whether the defendant airlines owe the plaintiffs' and the Class Members' refunds and equitable restitution for the following taxes and/or fees paid to the airlines but not paid by the airlines to the appropriate governmental agency. These fees and taxes include:

   a.    Passenger facility charge user fees;
   b.    Zip tax user fees; and
   c.    Foreign landing tax or user fees.

### COUNT II

### (Civil Conspiracy and Unjust Enrichment)

The plaintiffs incorporate by reference and reallege paragraphs 1 through 44, inclusive, as if fully set forth herein.

45.    The defendant airlines and ATA have joined together and committed a civil conspiracy to unjustly enrich themselves with a manifest common plan of not informing the plaintiffs and the Class Members of their rights to refunds and the airline defendants were willing participants of the common plan and its execution to wrongfully retain said funds and each took affirmative steps required in order to achieve this desired result. On several occasions, ATA has been contacted as to the claims made herein of the airlines' refusal to return unused foreign taxes and user fees on nonrefundable or forfeited ticket but to no avail.

46.    As a result of the defendants' conduct, the plaintiffs and the Class Members have suffered monetary losses and the defendants are, or should be, jointly and severally liable to the plaintiffs and the Class Members for making restitution as prayed for herein.

## COUNT III

### (Breach of Fiduciary Duty)

The plaintiffs incorporate by reference and reallege paragraphs 1 through 46, inclusive, as if fully set forth herein.

47.    Each of the defendant airlines' actions, voluntarily undertaken, induced a fiduciary relationship with the plaintiffs and the Class Members.

48.    Each of the defendants knew, or should have known, that the plaintiffs and the Class Members did not understand that they were entitled to a refund.

49.    With regard to the plaintiffs and the Class Members purchasing airline tickets, each of the defendants dominated them, causing special circumstances which created or contributed to a fiduciary relationship.

50.    Each of the defendant airlines owed a fiduciary duty to the plaintiffs and the Class Members whereby they were obligated to:

a.    Disclose information they would otherwise have no duty to disclose.
b.    Refrain from self-dealing.
c.    Do nothing which could hurt the interests of the plaintiffs and the Class Members.
d.    Generally owe a duty of utmost good faith and loyalty.

51.    By the above-stated conduct, each of the defendant airlines breached these duties owed to the plaintiffs and the Class Members who incurred damages as a result thereof.

## COUNT IV

### (Breach of Contract)

The plaintiffs incorporate by reference and reallege paragraphs 1 through 51, inclusive, as if fully set forth herein.

52.    By the above stated actions, each of the defendant airlines have breached their agreement with the plaintiffs and the Class Members who, as a direct result, have incurred monetary damages plus interest, costs and attorneys' fees.

## COUNT V

### (Breach of Good Faith and Fair Dealing)

The plaintiffs incorporate by reference and reallege paragraphs 1 through 52, inclusive, as if fully set forth herein.

53.    Each of the defendant airlines owed to the plaintiffs and the Class Members a covenant of good faith and fair dealing and the defendants breached said covenant as more fully described above.

54.    As a result of each of the defendant airlines' breach of the covenant of good faith and fair dealing, the plaintiffs and the Class Members have incurred monetary damages plus interest, costs and attorneys' fees.

## VI.  **PRAYERS FOR RELIEF**

Wherefore, plaintiffs, on their own behalf and on behalf of others similarly situated (Class Members), pray for judgement as follows:

1.    Declare this action to be a Class Action;

2.    Enter a declaratory judgment determining that the defendant airlines have wrongfully retained taxes and fees from the plaintiffs and the Class Members.

3.    Award to the plaintiffs and to all Class Members restitution of all monies paid and wrongfully retained by the defendant airlines.

4.    Treble the restitutionary amounts awarded;

5.    Issue a permanent injunction to prevent the defendant airlines from retaining said fees and taxes in the future.

6.    Appoint an independent authority to review and assess the restitutionary claims of all Class Members.

7.    Award plaintiffs their costs and expenses incurred in this action, including reasonable attorney, accountant and expert fees.

8.    Award to plaintiffs and to all Class Members such other and further relief as this court may deem meet, just and proper.

## VI.  **CLASS ACTION STATUS**

The plaintiffs and Class Members request that this matter be certified as a class action pursuant to Mass. R. Civ. P. 23.

## VIII.  JURY CLAIM

The plaintiffs and the Class Members demand a trial by jury on all issues so triable.

> Robert J. Harrington, Faye Byron, Craig Buck, Valerie L.
> Pawson, Jeff Golumbuk, Ray Drasnin, Wanda Mills,
> Caroline Marshall-Smith, Anesia Kalaitzidis, Kenneth
> Ivanovitz, Athanase Karagiorgos, Harriet Zalwango,
> Michael Blau and Kenneth Micciche, individually and on
> behalf of themselves and Class Members,
> Plaintiffs
> By their Attorney,
>
>
> Evans J. Carter (BBQ #076560)
> HARGRAVES, KARB, WILCOX & GALVANI, LLP
> 550 Cochituate Road - P.O. Box 966
> Framingham, MA  01701-0966
> (508) 620-0140

Dated: November 4, 2004

# United States District Court
## District of Massachusetts

Civil Action No. 04–12558–NMG

CRAIG BUCK, KENNETH MICCICHE, VALERIE L.
PAWSON, CAROLINE MARSHALL-SMITH,
WANDA MILLS; JEFF GOLUMBUK, ANESIA
KALAITZIDIS, ATHANASE KARAGIORGOS; AND
JENNIFER TSOUVRAKAS, on behalf of
themselves and others,

   *Plaintiffs,*

 *v.*

ALASKA AIRLINES, AMERICAN AIRLINES,
CONTINENTAL AIRLINES, DELTA AIR LINES,
INC., NORTHWEST AIRLINES, SOUTHWEST
AIRLINES CO., d/b/a SOUTHWEST AIRLINES,
CHINA EASTERN AIRLINES CORP. LTD., CHINA
SOUTHERN AIRLINES CO. LTD., AER LINGUS
LIMITED, ALITALIA-LINEE AEREE ITALIANE
S.P.A, d/b/a ALITALIA AIRLINES, BRITISH
AIRWAYS, PLC, d/b/a BRITISH AIRWAYS,
DEUTSCHE LUFTHANSA, A.G., d/b/a
LUFTHANSA AIRLINES, OLYMPIC AIRWAYS-
SERVICES, SA, d/b/a OLYMPIC AIRWAYS, AIR
TRANSPORT ASSOCIATION OF AMERICA, INC.,
AIRLINES REPORTING CORP., and the FEDERAL
AVIATION ADMINISTRATION,

   *Defendants.*

**AMENDED COMPLAINT, JURY CLAIM,
AND REQUEST FOR CLASS
CERTIFICATION**

## I. INTRODUCTION AND OVERVIEW OF ACTION

1. The plaintiffs (collectively "Air Passengers" or "Passengers") bring this action on

behalf of themselves and all others similarly situated, specifically persons—

     a.    who purchased nonrefundable airline tickets that included domestic or foreign taxes, fees, and charges.

     b.    who forfeited, cancelled, failed to use, made changes to, or did not complete travel using the airline tickets; and

     c.    who did not receive a refund of the taxes, fees, or charges paid, even when those taxes, fees, or charges—

     (1)    were not owed by the Air Passenger to the levying authority and not paid to the levying authority by the Airline Industry; or

     (2)    were overpaid, when they were paid by the Airline Industry to the levying authority, but were not owed by the Air Passenger.

2.    The airline industry defendants (collectively the "Airline Industry" or the "Industry") collect these taxes, fees, and charges as a fiduciary in order to pay them to the applicable levying authorities.

3.    When Air Passengers do not use airline tickets, the Airline Industry, as a matter of business practice, often fails to remit the collected funds to the levying authorities, instead wrongfully and unjustly enriching itself by keeping the money, in a manner that is contrary to law or against public policy, or both.

4.    The Airline Industry failed to disclose, in a way meaningful to Air Passengers—

     (a)    whether the prepaid funds the Industry collected were due to the levying authorities, even though the travel may not have been completed;

(b)     that any collected funds that were not due to the levying authorities were therefore due as refunds to the Passengers who paid those funds; or

(c)     that the collected funds that were not due to the levying authorities but that were nevertheless withheld by the Industry were treated by the Industry as an undisclosed penalty on Passengers.

**Definitions of Terms Used in this Action**

5.     In this action:

(a)     The term "taxes, fees, and charges" refers generally to PFCs, Federal user fees, and foreign taxes, fees, and charges.

(b)     The term "Passenger Facility Charge" (or "PFC") refers to a charge under 14 C.F.R. part 158 and 49 U.S.C. § 40117. On ARC-compliant travel documents, this charge is designated "XF". (The charge is a $1, $2, $3, $4, or $4.50 charge assessed by an regional or local public agency for approved airport improvements. These fees are authorized by the Federal Aviation Administration to be imposed by the public agency under Federal law.)

(c)     The term "Federal user fees" refers collectively to the following federally imposed fees:

(1)     A U.S. customs user fee under 19 C.F.R. part 24 (particularly § 24.22(g)(1)). On ARC-compliant travel documents, this charge is designated "YC". (The fee is $5 on tickets originating outside the U.S., Canada, Mexico, and the Caribbean area.)

(2)     An immigration user fee under 8 C.F.R. part 286. On ARC-compliant travel documents, this charge is usually designated "XY" if it is designated. (The fee is $7 on international tickets into the U.S., Puerto Rico, Guam, St. Croix, St. John, or St. Thomas.)

(3)     An agricultural quarantine and inspection (AQI) user fee (also known as an APHIS fee) under 7 C.F.R. § 354(f). On ARC-compliant travel documents, this charge is usually designated "XA" if it is designated. (The fee is $3.10, indexed after Oct. 1, 2001, for international travel into the U.S. or Puerto Rico, other than from Canada.)

(4)     A U.S. security service fee (also called the "September 11th Security Fee") under 49 C.F.R. part 1510. On ARC-compliant travel documents, this charge is usually designated "AY" if it is designated. (The fee is $2.50 per enplanement at a U.S. airport, up to 2 per one-way trip or 4 per round trip.)

(d)     The term "foreign charges" refers to foreign charges, in the form of taxes and fees, as required by pan-national authorities, national, regional, and local governments, or other levying authorities outside the United States, including territories or possessions of the United States not subject to U.S. excise taxes (under § 4261 *et seq.* of the Internal Revenue Code of 1986 (26 U.S.C. § 4261 *et seq.*)) on domestic tickets.

### Description of Taxes, Fees, and Charges

6.      Several types of taxes and fees are collected from Air Passengers by the Airline Industry on behalf of the United States Government agencies, State, local, and regional authorities, and foreign governments. These include PFCs, Federal user fees, and foreign charges.

7.    Air carriers are required to collect PFCs and Federal user fees, which must be held in "trust" by the collecting air carrier.

8.    The air carrier collecting the funds must also periodically remit the fees to the appropriate fee-levying authorities, maintain accounting systems and methods and submit to external audits, and submit regular reports or statements about their fee-collecting and remitting activities.

## User fees due when 'service' is 'used'

9.    The nature of user fees is to become due (that is, the fee is required to be paid to the fee-levying authority) only if or when the passenger actually 'uses' the 'service.' PFCs and Federal user fees are due as follows:

(a)    PFCs and U.S. security services fees (September 11th Security Fees) are due upon passenger "enplanement."

(b)    Agricultural inspection user fees are due "upon arrival" of the passenger from abroad.

(c)    Immigration user fees are due for passengers "arriving" from abroad.

(d)    U.S. Customs user fees are paid for "services provided in connection with arrival of each passenger" from outside the Customs territory of the United States.

10.    What constitutes 'use' varies slightly from fee to fee, but all amount to the same thing: If a passenger doesn't use the fee, the fee does not have to be paid to the fee-levying authority.

11.    Consequently, in the context of the refund and trust regulatory language discussed above, if the fee never becomes due to the levying authority, it should be returned to the person who paid the fee.

F:\CARTER\HARRINGTON\Amended Complaint.doc

5

12.    This is especially true where the collecting carrier 'holds neither legal nor equitable interest' in the fees. (*See* 14 C.F.R. § 158.5 (PFCs); 49 C.F.R. § 1510.9(a) (U.S. security service fees); 7 C.F.R. § 354.3(f)(1) (agricultural inspection user fees); 8 C.F.R. § 286.2(a) (immigration user fees); 19 C.F.R. § 24.22(g)(1)(i)–(ii) (U.S. Customs user fees).)

## II. PARTIES AND FACTS

### Plaintiffs

13.    Plaintiff Craig **Buck** resides in **San Diego, California**.

14.    Plaintiff Kenneth Micciche resides in Natick, Massachusetts.

15.    Plaintiff Valerie Pawson resides in and does business from Boston, Massachusetts.

16.    Plaintiff Caroline Marshall-Smith resides in West Yarmouth, Massachusetts.

17.    Plaintiff Wanda Mills resides in Lady's Island, South Carolina.

18.    Plaintiff Jeff Golumbuk resides in San Diego, California.

19.    Plaintiff Anesia Kalaitzidis resides in Boston, Massachusetts.

20.    Plaintiff Athanase Karagiorgos resides in Newton, Massachusetts.

21.    Plaintiff Jennifer Tsouvrakas resident in Boston, Massachusetts.

### Defendants

### Domestic Airlines

22.    Defendant **Alaska Airlines, Inc.** ("Alaska Airlines")—

(a)    is an Alaska corporation;

    (b)    has its principal offices in Seattle, Washington; and

    (c)    has been registered with the Secretary of the Commonwealth of Massachusetts as a foreign corporation since January 25, 2002.

23.    Defendant **American Airlines, Inc.** ("American Airlines")—

    (a)    is a Delaware corporation;

    (b)    has its principal offices in Forth Worth, **Texas**;

    (c)    has been registered with the Secretary of the Commonwealth of Massachusetts as a foreign corporation since May 22, 1934;

    (d)    is registered with the states of California and South Carolina at all times material hereto.

24.    Defendant **Continental Airlines, Inc.** ("Continental Airlines")—

    (a)    is a Delaware corporation;

    (b)    has its principal offices in Houston, Texas; and

    (c)    has been registered with the Secretary of the Commonwealth of Massachusetts as a foreign corporation since January 19, 1988.

25.    Defendant **Delta Air Lines, Inc.** ("Delta Air Lines")—

    (a)    a Delaware corporation;

    (b)    has its principal offices in Atlanta, Georgia; and

    (c)    has been registered with the Secretary of the Commonwealth of Massachusetts as a foreign corporation since March 21, 1972.

26.    Defendant **Northwest Airlines, Inc.** ("Northwest Airlines")—

    (a)    is a Minnesota corporation;

    (b)    has its principal offices in Magan, Minnesota; and

    (c)    has been registered with the Secretary of the Commonwealth of Massachusetts as a foreign corporation since May 21, 1992.

27.    Defendant **Southwest Airlines Co., d/b/a Southwest Airlines ("Southwest Airlines")**—

    (a)    is a Texas corporation;

    (b)    has its principal offices in Dallas, Texas; and

    (c)    on information and belief, is not registered with the Secretary of the Commonwealth of Massachusetts.

28.    Each of the defendant domestic airlines operates at least one Internet Web site through which the general public (including residents of Massachusetts, California, and South Carolina) may purchase air tickets on the airline. The Internet Web sites are as follows:

    (a)    Alaska Airlines operates http://www.alaskaair.com/.

    (b)    American Airlines operates http://www.aa.com/.

    (c)    Continental Airlines operates http://www.continental.com/.

    (d)    Delta Air Lines operates http://www.delta.com/.

    (e)    Northwest Airlines operates http://www.nwa.com/.

    (f)    Southwest Airlines operates http://www.southwest.com/.

F:\CARTER\HARRINGTON\Amended Complaint.doc

8

    (g)    United Air Lines operates http://www.united.com/.

**Foreign Airlines**

29.    Defendant **Aer Lingus Limited Airlines—**

    **(a)**    is a foreign corporation organized in Ireland;

    (b)    has its principal offices in Dublin, Ireland;

    (c)    has been registered with the Secretary of the Commonwealth of Massachusetts as a foreign corporation since October 4, 2004.

30    Defendant **Alitalia-Linee Aeree Italiane S.p.A, d/b/a Alitalia Airlines—**

    (a)    is a foreign corporation organized in Italy;

    (b)    has its principal offices in Rome, Italy; and

    (c)    on information and belief, is not registered with the Secretary of the Commonwealth of Massachusetts.

31.    Defendant **British Airways, PLC, d/b/a British Airways—**

    (a)    is a foreign corporation organized in the United Kingdom;

    (b)    on information and belief, has its principal headquarters in London, England, and has its principal U.S. offices in Jackson, New York; and

    (c)    has been registered with the Secretary of the Commonwealth of Massachusetts as a foreign corporation since October 5, 2000.

32.    Defendant **China Eastern Airlines Corp. Ltd.—**

F:\CARTER\HARRINGTON\Amended Complaint.doc

9

(a)     is a foreign corporation organized in the People's Republic of China ("China");

(b)     has its principal offices in Shanghai, China; and

(c)     on information and belief, is not registered with the Secretary of the Commonwealth of Massachusetts.

33.     Defendant **China Southern Airlines Corp. Ltd.**—

(a)     is a foreign corporation organized in China;

(b)     has its principal offices in Guangzhou, Guangdong, China; and

(c)     on information and belief, is not registered with the Secretary of the Commonwealth of Massachusetts.

34.     Defendant **Deutsche Lufthansa, A.G., d/b/a Lufthansa [German] Airlines**—

(a)     is a foreign corporation organized in Germany;

(b)     on information and belief, has its principal offices in Cologne, Germany; and

(c)     on information and belief, is not registered with the Secretary of the Commonwealth of Massachusetts.

35.     Defendant **Olympic Airways-Services, SA, d/b/a Olympic Airways**—

(a)     is a foreign corporation organized in Greece;

(b)     has its principal offices in Athens, Greece; and

(c)     on information and belief, is not registered with the Secretary of the Commonwealth of Massachusetts.

F:\CARTER\HARRINGTON\Amended Complaint.doc

36.    Each of the defendant foreign airlines operates at least one Internet Web site through which the general public (including residents of Massachusetts, California, and South Carolina) may purchase air tickets for travel on the airline. The Internet Web sites are as follows:

(a)    Aer Lingus Limited operates http://www.aerlingus.com/

(b)    Alitalia Airlines operates http://www.alitaliausa.com/.

(c)    British Airways operates http//www.britishairways.com/travel/home/ public/en_us.

(d)    China Eastern Airlines operates http://www.ce-air.com/cea/en_US/homepage.

(e)    China Southern Airlines operates http://www.cs-air.com/en/.

(f)    Lufthansa German Airlines operates http://cms.lufthansa.com/fly/us/en/index.

(g)    Olympic Airways operates http://www.olympicairlines.com/.

## Air Transport Association of America

37.    Defendant Air Transport Association of America, Inc. ("ATA")—

(a)    is a District of Columbia corporation; and

(b)    has its principal offices in the City of Washington, in the District of Columbia.

38.    ATA is the primary trade group for airlines and it assists airlines in looking for ways to reduce costs, maximize efficiency, and increase profitability of its member airlines, which include most of the passenger airlines that fly in or to the United States.

39.     ATA provides expertise, guidance, and assistance to its member airlines and Bruce Bishins, CTC, on behalf of travel agents and passengers, on several occasions, requested that ATA rectify and clarify the matter of airlines' refusal to return unused foreign taxes and user fees on nonrefundable or forfeited tickets but to no avail.

40.     ATA saw this as a matter which could have potentially serious implications and refused to take any position or responsibility for this "unjust enrichment," except to advise its members that there would be no policy covering these matters.

41.     As a result of ATA's position (or lack thereof), even though its officers knew that its members were violating the law, it has steadfastly refused to advise its members as to what should be done or to establish any policies.

42.     ATA was aware that it was aiding and abetting unfair trade practices.

43.     ATA operates at least one Internet Web site available to the general public (including residents of Massachusetts, California, and South Carolina). ATA operates http://www.airlines.org/.

**Airlines Reporting Corp.**

44.     Defendant Airlines Reporting Corp. ("ARC")—

(a)     is a close corporation owned by scheduled airline members of ATA that sign ARC's Carrier Services Agreement;

(b)     on information and belief, is a corporation established under the laws of Delaware.

(c)     on information and belief, has its principal offices in Arlington, Virginia;

(d)    on information and belief, is not registered with the Secretaries of the Commonwealth of Massachusetts, California or South Carolina.

45.    ARC is an airline-owned company offering travel products and services, ticket distribution, and settlement through a variety of channels in the United States, Puerto Rico, and the U.S. Virgin Islands.

46.    ARC provides ticket distribution, reporting, and settlement services for over 130 air carriers and over 30,000 ARC-accredited travel agency locations and corporate travel departments.

47.    ARC describes itself as "the information hub of the $85 billion Travel industry."

48.    Each    of    the    airline    defendants    is    a    member    of    ARC.    (*See* http://www.arccorp.com/participants/part_carriers.html.)

49.    ARC operates at least one Internet Web site available to the general public (including residents of Massachusetts, California, and South Carolina). ARC operates http://www.arccorp.com/.

50.    In 1997, ARC launched its Interactive Agent Reporting (IAR) system, which is an all-electronic sales reporting system for travel agents.

51.    In 2001, the use of IAR electronic sales reporting surpassed 90 percent and in 2002, its use surpassed 99 percent and with ARC-related travel agents, it is 100 percent usage.

52.    As the primary entity providing ticket distribution, reporting, and settlement services for the Airline Industry, and as the originator of the IAR system, ARC has the unique ability to facilitate or hinder the proper calculation, collection, payment or remittance, and refund of taxes, fees, and charges due from, paid by, or owing to Air Passengers.

53.    ARC's member airlines have signed ARC's Carrier Services Agreement.

**Federal Aviation Administration**

54.     The defendant, the **Federal Aviation Administration ("F.A.A.")**, is an agency within the U.S. Department of Transportation and has significant regulatory authority over the Airline Industry.

55.     The defendant, the **Federal Aviation Administration ("F.A.A.")**, in changing the "collection compensation" rule with respect to PFCs to provide for compensation to the Airline Industry, in the form of a percentage of each PFC *collected* by the Airline Industry (rather than each PFC *remitted* to the PFC-levying authority)—

      (a)     exceeded the authority granted to the Secretary of Transportation or the Administrator of the F.A.A. by the Congress by  levying PFCs (or the portion thereof consisting of the "collection compensation" paid to the Airline Industry) directly on Air Passengers, even when such PFCs would otherwise be uncollectible by the actual PFC-levying authority due to a change of an Air Passenger's itinerary (including cancellation, no-show, or missed travel);

      (b)     conspired with the Airline Industry to levy directly on Air Passengers (though purportedly on behalf of the actual PFC-levying authorities) charges not due to such levying authorities, which charges would not otherwise be subject to collection compensation by the Airline Industry;

      (c)     may reduce the total amount of PFCs collected by the levying authority and therefore reduce the amount of such funds available for F.A.A.-authorized improvements;

      (d)     will reduce (or has reduced) the amount of each PFC collected on behalf of the levying authority by the amount of the "collection compensation", thereby enriching the

Airline Industry at the expense of PFC-levying authorities and Air Passengers, thereby

making the levying authority affirmatively pay for the collection of the PFCs;

(e)    will reduce (or has reduced) the quality or amount of facilities and services

for Air Passengers who use the affected airports.

### III. JURISDICTION

56.    Jurisdiction in the Federal courts is proper under the following provisions:

(a)    28 U.S.C. § 1331 (Federal question), as the plaintiffs' claims arise under the

laws of the United States, including the following:

(1)    7 C.F.R. § 354(f) (relating to agricultural inspection user fees).

(2)    8 C.F.R. part 286 (relating to immigration user fees).

(3)    14 C.F.R. part 158 and 49 U.S.C. § 40117 (relating to Passenger

Facility Charges).

(4)    19 C.F.R. part 24 (particularly § 24.22(g)(1)) (relating to U.S.

Customs user fees).

(5)    49 C.F.R. part 1510 (relating to U.S. security service fees, also called

the "September 11th Security Fee").

(c)    28 U.S.C. § 1332(a) (diversity of citizenship and amount in controversy), as

"the matter in controversy exceeds [or is expected to exceed] the sum or value of $75,000 ...

and is between ... citizens of different States and in which citizens or subjects of a foreign

state are additional parties."

F:\CARTER\HARRINGTON\Amended Complaint.doc

(d)     28 U.S.C. § 1340 (cases involving customs duties), as 19 C.F.R. § 24.22(j)(2) specifies the U.S. Customs fee imposed under 19 C.F.R. § 24.22(g) (which forms part of the plaintiffs' claims) is treated for jurisdictional purposes as a Customs duty.

(e)     28 U.S.C. § 1367 (supplemental jurisdiction), with respect to the plaintiffs' related claims under State law.

## IV. VENUE

57.     Venue is proper in the District of Massachusetts under U.S.C. § 3732 and 28 U.S.C. § 1391(b) and (c) because at least one of the defendants transacts business in this District.

## V. ADDITIONAL FACTS

### Retention of Prepaid Taxes, Fees, and Charges

58.     Each defendant airline sold one or more tickets for air travel to one or more of the individual plaintiffs (for the use of the plaintiff or another person) for domestic or international travel.

59.     The plaintiffs each purchased (and may purchase in the future) nonrefundable airfare from one or more defendant airlines for domestic or foreign travel, which provided (or may provide) the basis for the plaintiffs' advance payment (or prepayment) of anticipated domestic or foreign taxes, fees, or charges.

60.     The plaintiffs each paid (or prepaid) one or more of domestic or foreign taxes, fees, or charges.

61.    The plaintiffs each did not use the purchased airfare and therefore the advance payment (or prepayment) of certain taxes, fees, or charges became an overpayment of such taxes, fees, or charges.

62.    The airlines kept, for their own benefit, the plaintiffs' overpayments of prepaid anticipated taxes, fees, or charges.

### Undisclosed Contract Provisions

63.    The Airline Industry violated 14 C.F.R. part 253 and 49 U.S.C. § 41707 by, among other things, seeking to impose on Air Passengers certain contract terms, incorporated by reference into the contract of carriage, without providing Passengers conspicuous written notice of the salient features of those terms on or with the ticket, including—

(a)    terms restricting refunds of the ticket price;

(b)    terms imposing monetary penalties on Passengers; and

(c)    terms permitting the carrier to raise the price.

### VI. CLASS ACTION REQUEST

64.    Plaintiffs file this action as a Class Action pursuant to Fed. R. Civ. P. 23 on their own behalf and on behalf of all other similarly situated Air Passengers.

65.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class Members can be determined only by appropriate discovery, the plaintiffs believe that such Class Members number in excess of tens of thousands of separate persons.

66.    The taxes, fees, and charges—separate from the nonrefundable airfare purchased by the plaintiffs—for which the plaintiffs seek compensation, are the following:

(a)    Unrefunded prepaid domestic fees or charges, including PFCs and Federal user fees.

(b)    Unrefunded prepaid foreign taxes, fees, or charges.

(c)    Interest (on the principal amount of the fees collected) wrongfully retained as a result of the Airline Industry's failure to return unearned taxes, fees, and charges to Air Passengers.

67.    The Class Period is November 1, 1998, to the present.

68.    The plaintiffs' claims are typical of the claims of the Members of the Class. The plaintiffs and all Members of the Class sustained damages as a result of the defendants' conduct, as described in this action.

69.    The representative plaintiffs each sustained damages as a result of the wrongful conduct of the Airline Industry and the claims of individual named plaintiffs are representative of the claims of other members of the class of such plaintiffs.

70.    The representative plaintiffs will fairly and adequately protect the interests of the Class Members and they are represented by counsel competent and experienced in class action litigation.

71.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The loss suffered by each individual class member is relatively small, albeit significant, so it would be neither economical nor efficient for each to file a complaint

individually. Thus, the expense and burden of individual litigation makes it impractical for most putative Class Members individually to seek redress for the wrongful conduct alleged in this action.

72.    Common questions of law and fact exist as to all putative Class Members, and these common questions predominate over any questions solely affecting individual Class Members. Among the questions of law and fact common to the putative class are the following:

(a)    Did the Airline Industry wrongfully retain prepaid governmental fees and charges that never became due to the levying authority because the Air Passengers (the plaintiffs) never used the underlying airfare on which those prepayments had been based?

(b)    Was the Airline Industry obligated to pay, and did it pay, to the levying authorities the domestic and foreign taxes, fees, and charges collected from the plaintiffs, notwithstanding the fact that such fees were not due under the applicable provisions of law governing such fees and charges?

(c)    Are any overpayments of domestic and foreign taxes, fees, and charges refundable to the Airline Industry or to the Air Passengers from whom the overpayments were collected?

(d)    Is the Airline Industry liable to Air Passengers for overpayment to governmental authorities with respect to domestic and foreign taxes, fees, and charges paid by passengers but not actually due to such authorities (because of nonuse of the airfare that formed the only basis for collection of such taxes, fees, and charges)?

(e)    When airfare (on the one part) and governmentally imposed (or authorized) taxes, fees, and charges (on the other part) are separately allocated on a ticket for air travel,

what effect does that separation have on the nonrefundability of the airfare, or of the taxes, fees, and charges?

(f)     To what extent is Airline Industry retention of prepaid domestic and foreign taxes, fees, and charges unlawful when an Air Passenger has not used the nonrefundable airfare which was the only basis for collection of such prepaid taxes, fees, and charges?

(g)     When did the obligation to hold the collected funds in trust for the fee levying authority cease?

(h)     Did the Airline Industry give Air Passengers adequate notice of all the salient terms of their contracts of carriage, including the extent of nonrefundability, the additional penalty imposed due to the nonrefund of prepaid taxes, charges, and fees that were based on, but not a part of, the nonrefundable airfare?

73.     The plaintiffs know of no difficulty to be encountered in the management of this litigation that would preclude its maintenance as a class action.

74.     Certifying this action as a class action would resolve these issues for all potential plaintiffs and defendants without the necessity of litigating individual lawsuits. Additionally, class certification of this matter would not impose any undue burden upon the court and will foster judicial economy.

75.     Certification of the class is appropriate, since it would not complicate or delay disposition of the case, the defendants would suffer no prejudice as a result of certification, and it would assure the putative Class Members that the Airline Industry would not evade its responsibilities in implementing any court orders.

76.     The names and addresses of all Class Members are available from the Airline Industry and notice can be provided to putative Class Members via first class mail using techniques and a notice approved by the Court.

## IV. CAUSES OF ACTION

### Count I

### (Declaratory Judgment)

77.     The plaintiffs seek a declaratory judgment, under 28 U.S.C. § 2201(a) and Fed. R. Civ. P. 57, to "declare the rights and other legal relations" of the parties with respect to the questions of law described in paragraph 72.

### Count II

### (Rescission of Contract)

78.     By the actions described above, the defendant airlines violated 14 C.F.R. part 253 (notice of terms of contract of carriage) and are therefore entitled to rescission of the portions of the contract that are in such violation.

79.     The defendants failed to give sufficient notice of the incorporation of contract terms as required by 14 C.F.R. § 253.5 (general notice of incorporated terms) and § 253.7 (direct notice for certain terms, including terms "restricting refunds" and "imposing monetary penalties"), and therefore such terms are in violation of those federally imposed contract requirements.

80.     The effect of retaining fees to which the Airline Industry was not entitled was to impose a 'monetary penalty' in the amount of the unrefunded taxes, charges, and fees that were not

F:\CARTER\HARRINGTON\Amended Complaint.doc

21

due the levying authorities when Air Passengers' nonrefundable tickets went unused or were forfeited.

81.    Even though a ticket purchased by an Air Passenger might have stated that it was "nonrefundable" or had a "change fee" (which amounts to a 'penalty'), Air Passengers were not informed of the *additional* penalty that would be imposed on them if they failed to use their nonrefundable tickets.

82.    The Air Passengers incurred monetary damages as a direct result of the defendant airlines' unlawful conduct.

## Count III

### (Breach of Contract)

83.    By the actions described above, each of the defendant airlines has breached its agreement with the Air Passengers who purchased tickets for travel via the airline.

84.    The Air Passengers incurred monetary damages as a direct result of such breaches of contract.

## Count IV

### (Unjust Enrichment)

85.    By the actions described above, each of the defendant airlines has been unjustly enriched by its unlawful conduct, at the expense of Air Passengers who purchased tickets for travel via the airline.

86.    Certain charges or fees are refunded to the Airline Industry for fees *collected in conjunction with unused tickets* or travel documents.

F:\CARTER\HARRINGTON\Amended Complaint.doc

22

87.    The Airline Industry wrongfully retains (or withholds from Air Passengers) prepaid taxes, charges, and fees (and the interest thereon) even when—

(a)    the collected fees are not due to the levying authority;

(b)    the collected funds are not paid by the Airline Industry to the levying authority; and

(c)    the collected funds are refunded to the Airline Industry by the levying authority.

88.    The Air Passengers have incurred monetary damages as a direct result of such unjust enrichment.

## Count V

### (Breach of the Covenant of Good Faith and Fair Dealing)

89.    Each of the defendant airlines owed to the Air Passengers a covenant of good faith and fair dealing in the execution of the contracts between them.

90.    By the actions described above, each of the defendant airlines breached that covenant of good faith and fair dealing.

91.    As a result of each of the defendant airlines' breach of the covenant of good faith and fair dealing, the plaintiffs and the Class Members have incurred monetary damages plus interest, costs and attorneys' fees.

## Count VI

### (Breach of Fiduciary Duty)

92.    of the defendant airlines was legally required to hold certain of the domestic and (on information and belief) foreign taxes, fees, and charges in trust for the benefit of the authority levying the taxes, fees, or charges.

93.    the Air Passengers failed to use their tickets or complete their travel, thus (potentially) removing any basis for the Airline Industry to hold the prepaid funds in trust for the levying authority, the obligation to hold the collected funds in trust shifted, or should have shifted, from an obligation to hold the funds in trust for the levying authority to an obligation to hold the funds for the Air Passengers who paid the unearned taxes, fees, or charges.

94.    Each of the defendant airlines owed a fiduciary duty to the plaintiffs and the Class Members whereby they were obligated to:

(a)    Disclose information they would otherwise have no duty to disclose.

(b)    Refrain from self-dealing.

(c)    Do nothing which could hurt the interests of the plaintiffs and the Class Members.

(d)    Generally owe a duty of utmost good faith and loyalty.

95.    By the above-stated conduct, each of the defendant airlines breached their fiduciary duty to the Air Passengers.

96.    The Air Passengers have incurred monetary damages as a direct result of these defendants' breach of their fiduciary duty to the Air Passengers with respect to unearned taxes, fees, and charges prepaid by Passengers (and any interest thereon).

## Count VII

### (Civil Conspiracy)

97.    By the actions described above and herein, the defendant members of the Airline Industry (including the airline defendants, ATA, and ARC) have joined together and committed a civil conspiracy to unjustly enrich the Airline Industry with a manifest common plan of not informing (or misinforming) Air Passengers of their rights to refunds.

98.    These defendants were willing participants in the common plan and in its execution to wrongfully retain such funds, and each took affirmative steps required in order to achieve this desired result.

99.    Defendant ATA describes itself, at least in part, as "serv[ng] its member airlines … by developing and coordinating industry actions…." and "serv[ing] as a focal point for industry efforts to standardize practices … of the air transport system." These statements may describe a sinister purpose with respect to ATA's role in guiding or setting Airline Industry policy, especially if the "industry actions" it coordinates or the "standardize[d] practices" it seeks to establish are unlawful, as alleged in this action.

100.    Defendant ARC similarly coordinates and standardizes policy, procedures, systems, and other aspects of the Airline Industry.

101.    Air Passengers *must* pay user fees, and ostensibly they make payment of those fees to the Airline Industry to hold in trust pending payment to the authorities levying the fees.

102.    These user fees are paid *in addition to the airfare* charged by the airlines and are separately enumerated on receipts passengers receive. Yet Airline Industry policy appears to be uniform in the failure or refusal to refund those fees to Air Passengers who have purchased and not used (or have forfeited) nonrefundable tickets.

103.    The plaintiffs assert that this practice is unlawful, and facts tending to show that the Airline Industry has acted in concert to prevent such passengers from receiving refunds support the plaintiffs' civil conspiracy and breach of fiduciary duty claims.

104.    The Air Passengers have incurred monetary damages as a result of these defendants' unlawful conduct, and these defendants are, or should be, jointly and severally liable to the Air Passengers for making restitution.

## V. PRAYERS FOR RELIEF

*Wherefore*, plaintiffs, on their own behalf and on behalf of others similarly situated (Class Members), pray for judgment as follows:

1.    Declare this action to be a class action.

2.    Enter a declaratory judgment determining that the Airline Industry has wrongfully retained taxes, fees, and charges from Air Passengers.

3.    Enter a declaratory judgment determining that the Airline Industry violated 14 C.F.R. part 253 and 49 U.S.C. § 41707 by giving improper notice of certain contract provisions and that "an air carrier may not claim the benefit as against the passenger of, and the passenger shall not be bound by, any contract term" in such violation. (*See* 14 C.F.R. § 253.4(a).)

4.    Award to the Air Passengers Air Passengers restitution of all amounts paid and wrongfully retained by the Airline Industry and treble the restitutionary amounts awarded.

5.    Issue a permanent injunction to prevent the Airline Industry from retaining taxes, fees, and charges in the future.

6.    Declare the Federal Aviation Administration's "collection compensation" rule change to be unlawful and issue an injunction preventing its enforcement.

7.    Appoint an independent authority to review and assess the restitutionary claims of all Class Members.

8.    Award the Air Passengers their costs and expenses incurred in this action, including reasonable attorney, accountant, and expert fees.

9.    Award to the Air Passengers such other and further relief as this Court may deem meet, just, and proper.

## IV.  REQUEST FOR CLASS CERTIFICATION

The plaintiffs and Class Members request that this matter be certified as a class action pursuant to Fed. R. Civ. P. 23.

## VII.  Jury Claim

The plaintiffs and the Class Members demand a trial by jury on all issues so triable.


Plaintiffs,

By their Attorney,



/s/ Evans J. Carter
Evans J. Carter (BBO #076560)
HARGRAVES, KARB, WILCOX & GALVANI, LLP
550 Cochituate Road - P.O. Box 966
Framingham, MA 01701-0966
(508) 620-0140

Dated: May 31, 2005



2 Wooster Street
New York, NY 10013 USA
Tel: 416-822-6332
Fax: 416-822-0039
E-Mail: postmaster@ustar.com

10 December 2002

Mr. J. Howard Beales III, Director
Bureau of Consumer Protection
Federal Trade Commission
600 Pennsylvania Ave. N.W.
Washington, DC 20580

<u>Via Electronic Delivery
and Fax: 202-326-3799</u>

<u>Complaint Regarding Consumer Refunds
of Air Transportation Tax and Fee Amounts
Processed and Retained by the
Airlines Reporting Corporation
and its Participating Air Carriers</u>

Dear Mr. Beales:

The distribution of airline tickets through 30,000 travel agency locations in the United States is largely facilitated by the Airlines Reporting Corporation (ARC) on behalf of its shareholder carriers and more than 115 other U.S. and international airlines.

ARC maintains operational control over the Area Settlement Plan (ASP), a program implemented by ARC's predecessor, the Air Traffic Conference in 1964. The ASP facilitates the weekly settlement of airline ticket sales by U.S. travel agencies, reporting and remitting nearly $70 billion in 2002 to ARC's participating air carriers.

In addition to the actual accounting of transactions, ARC also provides written instructions to travel agencies regarding proper ticketing procedures, including those procedures which travel agents are required to follow regarding the collection of a wide variety of air transportation taxes, fees, and related charges. These instructions are conveyed in the *ARC Industry Agents' Handbook* and other communications issued by ARC from time to time.

<u>Executive Summary of the Complaint</u>

With the advent of non-refundable fares, consumers who purchase air transportation avail themselves of discount air fares which air carriers will not refund, and in some cases, not exchange for future air transportation. Consumers are aware that these non-refundable fares present a certain risk if the traveler is unable to meet the travel requirements as set forth by the rules which relate to their fare purchase. In many cases, consumers actually do lose the entire value of the fare they have paid for non-compliance with travel rules or alternatively consumers choose to forfeit the value of their fare paid when they voluntarily choose not to travel at all.

While consumers are prepared to trade-off the acquisition of lower fares for the risk of fare non-refundability, consumers do expect to receive a complete refund on any taxes and fees which would no longer be applicable should the air transportation never be flown.

In many cases, airlines which participate in the ASP refuse to provide refunds for these consumption-based taxes and fees, resulting in consumers being deprived of legitimate refunds and carriers being unjustly enriched by taxes and fees never paid to the taxing authorities.

On this basis, the United States Travel Agent Registry (USTAR) herewith submits its complaint to the Commission wherein USTAR seeks the Commission's intervention in assuring that consumers of air transportation are not deprived of rightful refunds on tax and fee amounts which carriers are allegedly retaining unlawfully.

USTAR wishes to stress that the present complaint does not seek to question or address the refundability of fares. The complaint focuses solely on the matter of the refundability of taxes and fees which would otherwise be collected on the basis that the air transportation would actually be flown.

## The Parties

USTAR is a not-for-profit business cooperative of travel agents throughout the United States and is chartered under Article II of the Cooperative Corporation Law of the State of New York. USTAR maintains its principal offices at 2 Wooster Street, New York, New York 10013, and additional offices in Toronto, Canada, and represents the interests of more than one thousand U.S. travel agents in a variety of domains including automation, technology, sales and marketing, and distribution.

ARC is a close corporation established in 1984 and is based in Arlington, Virginia. Only passenger carrying, scheduled airline members of the Air Transport Association of America (ATA), which are also party to ARC's Carrier Services Agreement, are eligible to be shareholders. There currently are thirteen shareholders of ARC. In 2002, ARC's Board of Directors included Air Canada, Alaska Airlines, America West Airlines, American Airlines, British Airways, Continental Airlines, Delta Airlines, Hawaiian Airlines, Lufthansa German Airlines, Northwest Airlines, Southwest Airlines, United Airlines, and U.S. Airways.

## Principal Elements of the Complaint

1. Taxes and fees applicable to transportation by air can be divided into two categories:

a) taxes and fees which are attracted by the purchase of air transportation (excise taxes)
b) taxes and fees which are attracted by the use of air transportation (consumption taxes)

2. U.S. excise tax laws currently provide for only two taxes which are applicable to the purchase of passenger air transportation:

a) a percentage tax (7.5%) and a related domestic-segment tax ($3.00)

- 2 -

b) an international air travel facilities (arrival and departure) tax ($13.20 or $6.60 Alaska/Hawaii)

3. In September 1989, the IRS issued revenue ruling 89-109, which in part, stipulated that excise taxes on air transportation are attracted by the purchase of air transportation; not the actual use of air transportation. Accordingly, refunds of these excise taxes would only be lawful to the extent that a commensurate amount of air fare was actually refunded to the purchaser. Any amount of fare not refunded would result in the applicable portion of excise tax not being refunded either.

4. All other taxes and fees are imposed and collected based on the actual usage of air transportation. These include, but are not limited to, U.S. Customs Fee, U.S Immigration Fee, U.S. APHIS Fee, U.S. Passenger Facility Fee, U.S. Security Service Fee, and literally hundreds of Canadian, Mexican, and other international taxes and fees levied on the emplanement of airline passengers or their usage of air transportation.

The list of taxes and fees is so extensive that the International Air Transport Association (IATA) maintains a listing service which details more than 1500 variations of 650 taxes and fees which are collectable on air transportation.

5. In some cases, airlines impose separately detailed fees and charges which are actually cost recoveries of their passenger operations. Examples of these include fuel surcharges, insurance surcharges, and navigation fees, to name a few. Unlike taxes and fees imposed by third parties, these surcharges are imposed by the air carriers themselves as line item cost recoveries.

One notable exception is the Canadian Airport Improvement Fee (AIF). While this fee is portrayed as if it were a government-mandated tax, the AIF is actually a fee which is collected on tickets sold in the USA where the airports and airlines in Canada have jointly agreed to charge passengers for using airport facilities in Canada. Unlike the U.S. Passenger Facility Charge, the Canadian AIF is not government imposed.

6. When a passenger is in possession of a ticket wherein the fare is not refundable, and where that passenger elects not to travel, thus forfeiting his fare, USTAR believes that the passenger is entitled to a refund of any non-excise taxes and all other fees and charges which were collected predicated on the basis that the passenger would actually fly on the transportation purchased.

7. Air carriers are routinely refusing to provide refunds for these refundable taxes and fees despite the fact that they were collected on the basis that air transportation would actually be flown.

8. The refusal by air carriers to provide refunds for these refundable taxes and fees is even more odious in that the taxing authority, airport, or foreign government has not been paid their respective levies, as no passenger was ever emplaned on air services for which the carrier would actually pay out the amount collected.

9. The result of the carriers' refusal to provide refunds for these refundable taxes and fees is that airline passengers have been deprived of their consumer right to an appropriate refund and that carriers have unjustly enriched themselves through deceptive monetary collection and retention policies.

-3-

10. While ARC, on behalf of its 128 participating airlines, is quick to communicate to and enforce the requirement by travel agents to properly collect these taxes and fees at the time of ticket issuance, it has not responded adequately to the vast array of conflicting refund policies communicated directly to travel agents by its participating airlines. USTAR has attempted several times to compel ARC to assure that tax refund policy was properly clarified, consistently applied, and erring carriers corrected.

ARC has refused all such efforts by USTAR. ARC continually states that each airline is responsible to communicate its own policy and that ARC will not intercede when these policies are different from carrier to carrier.

11. USTAR finds it highly disingenuous, if not completely curious, that ARC is front and center in the communication of the proper collection of taxes and fees, but conveniently refrains from taking a position when it comes to tax and fee refunds.

Similar attempts by USTAR to raise this issue with the Air Transport Association of America also proved unsuccessful. It has become patently clear that the airlines are sitting on millions of dollars of taxes and fees unjustly withheld from consumers.

12. The following provides some sizing of the approximate amounts of various refundable-type U.S. taxes and fees collected annually by U.S. carriers as of September 2002:

|                                   |              |
|-----------------------------------|--------------|
| - U.S. Customs Fee                | $238 million |
| - U.S. Immigration Fee            | $438 million |
| - U.S. APHIS Fee                  | $139 million |
| - U.S. Passenger Facility Charges | $ 1.6 billion |
| - U.S. Security Service Fee       | $ 1.7 billion |

Add to the above amounts the multitude of non-U.S. airlines collecting these same fees, and the millions, if not billions of dollars collected for foreign entities, and the enormity of the collections becomes obvious and clear.

## Remedies Sought in the Complaint

13. USTAR asks the Commission to protect the rights of air travel consumers to the refund of any and all taxes, fees, and charges which were collected by airlines based on the actual consumption of air transportation or emplacement therein and where such transportation will not be flown or is forfeited by the traveler.

14. USTAR asks the Commission to compel ARC and its participating airlines to communicate and facilitate clear and consistent procedures regarding the proper handling and processing of any and all refunds of taxes, fees and charges which were collected by airlines based on the actual consumption of air transportation or emplacement therein and where such transportation will not be flown or is forfeited by the traveler; this to specifically include procedures for both paper tickets and electronic tickets.

15. USTAR asks the Commission to compel ARC and its participating airlines to amend and visibly publish and distribute refund rules so that consumers are properly and efficiently informed as to their rights to a refund as described above.

16. USTAR asks the Commission, to the extent possible, to compel airlines to honor requests for refunds as described above for a period retroactive to 01 January 2000.

USTAR thanks the Commission for its attention to this matter.


Respectfully submitted,

*Bruce Bishins*

Bruce Bishins, CTC
President and
Chief Executive Officer



## AIRPORTS

### The Weekly for Airport Managers, Users and Suppliers

*AVAILABLE ONLINE WORLDWIDE*

From the Publisher of Aviation Daily

Vol. 12  No. 29 | July 18, 1995 | Page 281

## INTELLIGENCE

**Greece's Ministry of Public Works** expected to sign a formal agreement this month with a consortium led by German firm Hochtief to build a new international airport at Spata to serve Athens. The Hochtief consortium was originally selected for the project in 1993, but a change in government led to a review and a reselection earlier this year under substantially new terms.

**Malaysia** expects by yearend to award all construction packages for the $3.6 billion (U.S.) new Kuala Lumpur International Airport, now being built at Sepang. Kuala Lumpur International Airport Berhad has awarded contracts for 62 projects. The airport is scheduled to be complete by September 1997 and operational by early 1998.

**John Wayne Airport** Director Janice Mittermeier has been named interim chief executive for Orange County, Calif., replacing William Popejoy, effective Aug. 1. Assistant Airport Director O.B. Schooley will assume Mittermeier's position until a new chief executive can be found. During his term, Popejoy urged the county board of supervisors to issue a request for proposals for the possible sale of the airport (*AIRPORTS*, April 11).

### DOT/FAA Lay Out Compliance Policy On Airlines' PFC Remittance

DOT and FAA last week warned airlines that failure to remit to airports passenger facility charges they have collected may be viewed as an unfair and deceptive practice and, in certain circumstances, could lead to criminal prosecution. In a July 10 notice to U.S. and foreign carriers, officials from the FAA chief counsel and DOT general counsel offices said that some airlines may be collecting PFCs but failing to remit them to airports as required by regulation. PFCs must be collected, held in trust, reported, separately accounted for and remitted monthly to the appropriate airports, DOT and FAA said. An FAA official said that the notice stemmed from informal complaints by airports but that currently there are no enforcement actions under way.

Conversion of trust proceeds to unauthorized purposes may result in criminal prosecution, the agencies said, adding that they had recently referred to the DOT Inspector General for appropriate action two airlines that had failed to comply with the PFC regulations. "We note further that not only may individual officers and employees be prosecuted, but they may also bear personal liability for breach of fiduciary duties."

In addition, withholding PFCs could subject airlines to civil penalties of as much as $1,000 per violation and $1,000 per day for each continuing violation. "We believe that any air carrier that is collecting money from passengers ostensibly for PFCs, but is not remitting that money to airports as required by law, is involved in an unfair and deceptive practice and unfair method of competition in violation of 49 U.S.C. 41712." DOT and FAA also said that failure to properly collect, account for and remit PFCs "reflects negatively upon an air carrier's fitness to operate, raising serious questions regarding its financial viability, managerial expertise, and compliance disposition." The agencies further noted that FAA has authority to enforce PFC requirements by issuing orders of compliance and cease and desist orders and by seeking injunctions.

### Denver Files Letter Of Credit For Disputed Amount In TWA Rates And Charges Complaint

City and County of Denver last week filed a letter of credit for $102,420 — the amount in dispute in TWA's rates and charges complaint with DOT (*AIRPORTS*, June 27). Earlier last week, DOT denied Denver's request for a waiver from filing a letter of credit. The City had argued that the amount in dispute was "minuscule." (Continued)

AIRPORTS 1200 G Street, N.W., Suite 200, Washington, D.C. 20005-3802 EDITORIAL TELEPHONE 202-383-2367 FAX 202-383-2438 SALES 1-800-636-3438 **Avery Vise/** Editor, **Holly Arthur/Assistant Editor, James Baumgarner/Senior Editor, Martin Sibley/Copy Editor, Ingrid Lee/Production, Dave Bond/Editorial Director, Edmund Pinto/Publisher.** Published weekly by the Aviation Week Group, a unit of the McGraw-Hill Companies, Inc., 1221 Avenue of the Americas, New York, N.Y. 10020. (ISSN No. 1050-5245). Kenneth E. Gazzola, Executive Vice President; and Don Fink, Editorial Director, Aviation Week Group. **Officers of The McGraw-Hill Companies, Inc.:** Joseph Dionne, Chairman and Chief Executive Officer; Harold W. McGraw, III, President and Chief Operating Officer; Robert Landes, Senior Executive Vice President, General Counsel and Secretary; Kenneth Vittor, General Counsel and Senior Vice President; Frank D. Penglase, Senior Vice President, Treasury Operations; Norbert Schumacher, Executive Vice President, Publication Services; COPYRIGHT © 1995 by The McGraw-Hill Companies, Inc. All rights reserved. None of the content of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means (electronic, mechanical, photocopying, recording or otherwise) without the prior written permission of the publisher.

**DOT/FAA Lay Out Compliance Policy On Airlines' PFC Remittance**
18 July 1995
SECTION: Vol. 12, No. 29; Pg. 281
*Airports(R)*

DOT and FAA last week warned airlines that failure to remit to airports passenger facility charges they have collected may be viewed as an unfair and deceptive practice and, in certain circumstances, could lead to criminal prosecution. In a July 10 notice to U.S. and foreign carriers, officials from the FAA chief counsel and DOT general counsel offices said that some airlines may be collecting PFCs but failing to remit them to airports as required by regulation. PFCs must be collected, held in trust, reported, separately accounted for and remitted monthly to the appropriate airports, DOT and FAA said. An FAA official said that the notice stemmed from informal complaints by airports but that currently there are no enforcement actions under way.

Conversion of trust proceeds to unauthorized purposes may result in criminal prosecution, the agencies said, adding that they had recently referred to the DOT Inspector General for appropriate action two airlines that had failed to comply with the PFC regulations. "We note further that not only may individual officers and employees be prosecuted, but they may also bear personal liability for breach of fiduciary duties."

In addition, withholding PFCs could subject airlines to civil penalties of as much as $ 1,000 per violation and $ 1,000 per day for each continuing violation. "We believe that any air carrier that is collecting money from passengers ostensibly for PFCs, but is not remitting that money to airports as required by law, is involved in an unfair and deceptive practice and unfair method of competition in violation of 49 U.S.C. 41712." DOT and FAA also said that failure to properly collect, account for and remit PFCs "reflects negatively upon an air carrier's fitness to operate, raising serious questions regarding its financial viability, managerial expertise, and compliance disposition." The agencies further noted that FAA has authority to enforce PFC requirements by issuing orders of compliance and cease and desist orders and by seeking injunctions.



# PASSENGER FACILITY CHARGE
# AUDIT GUIDE FOR AIR CARRIERS

**Federal Aviation Administration**
**Passenger Facility Charge Branch**
**APP-530**

**Interim - July 1999**

# TABLE OF CONTENTS

Applicability and Purpose                                    Page ii

I.     Introduction and Requirements                           1

II.    PFC Program Requirements and Recommended
       Internal Controls Audit Procedures                       3

       A.  Public Agency/FAA Notification to Collect
           PFCs and Collection Changes                          3
       B.  Collection of PFCs on Tickets Issued in
           the United States                                    5
       C.  Collection of PFCs on Tickets Issued Outside
           the United States                                    8
       D.  Handling of PFCs                                    10
       E.  Remittance of PFCs                                  11
       F.  Collection Compensation                             12
       G.  Reporting Requirements                              13
       H.  Recordkeeping and Auditing Requirements             13

III.   PFC Program - Agreed-upon Procedures                    14

IV.    Reporting Criteria and Format                           17

Appendices                                                     18

       Appendix A
       Introduction-Passenger Facility Charges                 18
       Illustrative Reports on PFC Schedules                   18
       Illustrative Report on Internal Control
           Used in Administering PFCs                          20

       Appendix B -  Illustrative Report - Agreed-Upon
           Procedures                                          22

# APPLICABILITY AND PURPOSE

This guide provides auditors with a comprehensive set of procedures for examining air carrier's Passenger Facility Charges (PFC) collection, remittance, and reporting practices in accordance with 14 Code of Federal Regulations (CFR) Part 158, "Passenger Facility Charges" requirements.

The use of this guide by auditors on behalf of the air carriers provides the Federal Aviation Administration (FAA) and airports collecting PFCs with an acceptable level of assurance that the air carrier has followed regulatory procedures. The importance of this level of assurance is reflected in the FAA's approach to resolving alleged collection and remittance discrepancies raised by airports through their monitoring of PFC revenue on a local basis.

This guide is not intended to define the sole method of complying with the audit requirements of section 158.69. However, the FAA has determined that the use of the procedures in this audit guide by the auditors for an air carrier will provide sufficient assurance that the air carrier has met the requirements of 14 CFR 158 such that the FAA would not normally require additional reports, undertake an audit of the carrier, or request Department of Transportation, Office of the Inspector General (DOT OIG), intervention on the FAA's behalf. The FAA would not normally initiate further monitoring efforts unless an airport or other source subsequently substantiates a significant violation of the regulation.

The FAA will not have the same level of confidence with a carrier whose auditors have not used the procedures outlined in this guide. Accordingly, alleged collection and remittance discrepancies raised by airports through their monitoring of local PFC revenue against carriers whose auditors have not used this guidance are more likely to trigger additional FAA monitoring activities, including requiring additional reports, the undertaking of an audit, or a request for DOT OIG intervention. This guidance shall not, however, foreclose other FAA options for responding to allegations of improper collection and remittance practices and enforcing correct collection and remittance procedures. The FAA expects carriers to attain a reasonable level of accuracy with regard to PFC remittances.

This guide also recommends that auditors produce an additional report on applying the agreed upon procedures set forth in section III of this guide to the air carriers' PFC accounting records, in addition to the two reports required by section 158.69. These reports, and illustrative samples of each, are more fully explained in this guide and its appendices.

ii

# PASSENGER FACILITY CHARGE AIR CARRIER AUDIT GUIDE

## I. INTRODUCTION AND REQUIREMENTS

Title 49, United States Code (U.S.C.), Section 40117, authorizes the Secretary of Transportation (further delegated to the Federal Aviation Administration (FAA) Administrator) to approve the local imposition of a PFC of $1, $2, or $3 per enplaned passenger for use on certain airport projects.  On May 29, 1991, the FAA issued 14 CFR Part 158 outlining policies and procedures for the PFC program.  Under Part 158, public agencies controlling commercial service airports can apply to the FAA for authority to impose a PFC for use on eligible projects. The proceeds from such PFCs are to be used to finance approved, eligible airport-related projects.  Prior to submitting an application to the FAA, a public agency must provide for consultation with the air carriers serving the airport(s) it controls, including the receipt of air carrier comments and the public agency's response indicating reasons for proceeding with projects in the face of air carrier certifications of disagreement.

Once a public agency's application for the imposition of a PFC is approved, it must notify air carriers and foreign air carriers required to collect PFCs at its airport(s) of the approval.  Once notified, an air carrier is required to collect PFCs on tickets it issues showing an enplanement at that airport (with certain exceptions).  The air carrier is also required to notify its agents, including other issuing carriers, of the collection requirements.  Air carriers or their agents collect PFCs from passengers on behalf of the public agency at the time of air travel ticket (or its equivalent) issuance.  The air carriers are responsible for all PFC funds from the time of collection to remittance to the public agency and must provide quarterly reports to the public agency showing the total amounts of PFC revenue collected and refunded, as well as any amount withheld by the air carrier as collection compensation in accordance with section 158.53 of 14 CFR Part 158.  For the purposes of an audit under section 158.69, collection is defined as the point when agents or other intermediaries remit PFC revenue to the carrier.

An air carrier collecting PFCs from at least 50,000 passengers annually is required to provide for an annual audit of its PFC accounts by an accredited independent public accountant.  The audits shall be made available to the public agency, upon request.  Although not specifically required by the regulation, the audit should also be submitted to the FAA, upon request.  Auditors engaged to audit the air carrier's PFC accounts are required to report "on the fairness and reasonableness of the carrier's procedures for collecting, holding, and dispersing PFC revenues" (section 158.69(b)(1)).  In addition, auditors are required to report whether the quarterly reports of PFC accounts that the air carriers must provide to airports "fairly represent the net transactions in the PFC account" (section 158.69(b)(1)).  As a matter of policy, the FAA expects these

1

audits to be filed in a timely manner and should normally coincide with the carrier's fiscal year and annual corporate audit cycle.

These requirements are generally satisfied as follows:

1. An audit in accordance with generally accepted auditing standards (GAAS) of the schedule of PFCs collected, withheld, refunded/exchanged, and remitted by the carrier for the year and each quarter ended during the year; and

2. An internal control structure attestation examination engagement in accordance with American Institute of Certified Public Accountants (AICPA) Statements of Standards for Attestation Engagements.

The procedures contained in this guide for testing and reporting on PFCs collected, withheld, refunded/exchanged, and remitted during the year are intended to assist the auditor in accomplishing the audit and internal control structure attestation. This guide is not intended to supplant the auditor's judgment of procedures to be performed. The auditor should use professional judgment to tailor the procedures so that the audit objectives are achieved. However, the auditor must address all applicable internal control requirements. If the auditor desires technical assistance pertaining to the PFC program, its regulations or operations, or the use of the procedures outlined in this guide, the auditor should contact the FAA Office of Airport Planning and Programming, Airport Financial Assistance Division, Passenger Facility Charge Branch (APP-530), 800 Independence Avenue, SW, Room 619, Washington, DC, 20591, telephone (202) 267-3845, or the appropriate local FAA airports office.

This guidance also provides for the testing of nonstatistical samples of lifted tickets or equivalent records as an agreed-upon procedure for providing an airport-level assessment of air carrier compliance with Part 158 collection and remittance requirements. These procedures are outlined in section III of this guide. An air carrier utilizing these procedures should provide copies of the agreed upon procedures report to requesting public agencies. The carrier should also provide a copy of the reports to the FAA, if requested. In addition, the carrier should provide the name, address, and telephone number of a contact person within its organization who may be contacted concerning questions on PFC issues and the audit report.

## II. PFC PROGRAM REQUIREMENTS AND RECOMMENDED INTERNAL CONTROLS AUDIT PROCEDURES

### A. PUBLIC AGENCY/FAA NOTIFICATION TO COLLECT PFC'S AND COLLECTION CHANGES

#### Program Requirements

Program requirements are provided in section 158.43, "Public agency notification to collect PFCs." Public agencies are required to notify the air carriers and foreign air carriers required to collect PFCs upon approval of collection authority by the FAA. Correspondingly, each notified carrier is required to notify its agents, including other issuing carriers (other carriers that issue tickets on their own ticket stock for transportation provided by the air carrier), of the collection requirements.

In addition, air carriers are required by section 158.85(f) to terminate or modify PFC collection no later than 30 days after receiving notification from the FAA under termination procedures. In other cases, the public agency is responsible for notifying the air carriers of changes in collection requirements after receiving FAA approval. In all cases, the carrier should have a system for receiving and tracking all collection notices (either through its computer reservation system or by other alternative means), both from public agencies and the FAA.

The section 158.43 notification requirements, as a practical matter, have been facilitated through the establishment of a notification "clearinghouse" by the Air Transport Association of America (ATA). The ATA clearinghouse notifies all its member carriers, other air carrier associations, the Airline Reporting Corporation, and the major computer reservation systems. The FAA acknowledges that this process effectively meets the requirements of section 158.43 for air carriers. In turn, each individual carrier notified by the collecting public agency and/or the ATA is responsible for ensuring that all its ticket agents that issue tickets on its ticket stock are directly notified. This is generally accomplished through the carrier's computer reservation system. However, many carriers do not own or control computer reservation systems themselves and must provide an alternative method for notifying their ticket agents.

These notification requirements have not been further refined in section 158.43 for the carrier's notification of its agents. However, the following information constitutes the minimum required under section 158.43(b) to be provided to the air carrier by the public agency:

    1. The level of PFC to be imposed;

    2. The total revenue to be collected;

3

3. The charge effective date (which will be the first day of a month which is at least 60 days from the date the public agency notifies the carriers of approval to impose the PFC unless altered by unanimous consent of the carriers); and

4. The proposed charge expiration date.

At a minimum, the information in items 1, 3, and 4 above should be provided by the air carrier to its ticket agents, either through its computer reservation system or by alternative means. In addition, the air carrier should provide instructions for ticket agents enabling the responsible carrier to fulfill its regulatory collection and reporting requirements.

In the case where another carrier issues tickets on its own ticket stock for transportation provided by the air carrier, it is the other issuing carrier that is required to remit the PFC to the public agency. An air carrier should provide other issuing carriers with the information in 1, 3, and 4 above, as well as instructions for remittance of the collected PFCs to the public agency, including the remittance address given by the public agency.

Although section 158.43(b) requires that this notification be done in writing, equivalent electronic notification (including computer reservation system notification) is acceptable, but must be documented to the satisfaction of the FAA. The previously outlined notification process also applies in cases when the public agency makes changes to the PFC charge expiration date. The notified carriers are required to provide notification to their ticket agents of such changes.

## Objectives

The air carrier maintained an effective internal control structure for notifying its ticket agents in accordance with the requirements of section 158.43(a) and (b), relative to PFC imposition authority.

The air carrier maintained an effective internal control structure over the requirements in section 158.85(f) relative to notice of termination of authority to impose a PFC and other collection notices received from the public agency or the FAA.

## Recommended Internal Controls Procedures

Review the process for notification of collection requirements from the carrier to its agents. For those carriers utilizing the ATA clearinghouse, verify that the computer reservation system used by the carrier and its agents provides

4

sufficient information to fulfill PFC collection requirements as noted above. For those carriers not utilizing the ATA clearinghouse:

1. Verify that the carrier's method of notification meets the requirements of Part 158 and includes sufficient information for the carrier and its agents to fulfill their collection requirements as noted above; and,

2. Review the process for notifying agents (including computer reservation system notification) regarding changes in the PFC collection requirements.

Test a sample of computer reservation system notifications or review a sample of actual notifications to agents to determine that the carrier has an effective notification process in accordance with section 158.43. Alternatively, when the carrier relies heavily on computer reservation system notification, the auditor may test the computer reservation system.

Determine whether the carrier has received prompt notifications for modification or termination of PFC collections.

Test to determine that collections for those public agencies for which collection notices were received were implemented or effected no later than 60 days after notification (unless altered by unanimous consent of the carriers).

## B. COLLECTION OF PFC'S ON TICKETS ISSUED IN THE UNITED STATES

### Program Requirements

The requirements outlined in section 158.45 pertain to the collection of PFCs on tickets issued in the United States. Tickets (or equivalent records such as electronic ticketing documents) issued in the United States on or after the charge effective date shall include the required PFC except in the cases of multiple itinerary legs, essential air service compensation, frequent flier award travel (discussed further below), and other non-revenue travel. Issuing carriers are responsible for PFC revenue from the time of collection to remittance to the public agency. For the purposes of an audit under section 158.69, collection is defined as the point when agents or other intermediaries remit PFC revenue to the carrier. The amount collected is the PFC in effect at the time the ticket (or equivalent record) is issued and is based on the itinerary at the time of issuance. Itinerary changes initiated by the passenger that require a fare adjustment are subject to collection or refund of the PFC as appropriate.

A carrier may issue a flight interruption manifest or accept one issued by another carrier (or other routing change document issued by that carrier or another

5

carrier) for a routing change not initiated by the passenger. In such a case, the manifest or routing would not require additional PFC collection(s). PFC collection, in that case, would be as originally ticketed.

Each ticket (or equivalent record) issued by a carrier or its agents shall note the total amount of PFCs paid by the passenger and the airports for which the PFCs are collected.

The collection of PFCs by the air carriers is limited or not required in certain situations as noted above. Carriers are limited to collecting PFCs from passengers only for the first two airports where PFCs are imposed on a one-way itinerary and only for the first two enplaning airports and the last two enplaning airports where PFCs are imposed on a round trip itinerary. Carriers shall not collect PFCs from passengers on any flight to an eligible point on an air carrier that receives essential air service compensation on that route under Title 49 U.S.C. Chapter 417, Subchapter II, "Small Community Air Service."

Title 49 U.S.C. 40117(e)(2)(C), precludes collection of a PFC from a passenger enplaning at an airport if the passenger did not pay for the air transportation which resulted in such enplanement. The FAA interprets this provision to prohibit the collection of PFCs from passengers considered to be non-revenue passengers under existing Department of Transportation Regulations and from passengers who obtained their ticket with an award coupon issued under a frequent flier or similar bonus award program ("frequent flier award coupon"). This prohibition does not apply to frequent flier upgrades, two-for-ones, contests, or other promotional plans.

For those passengers from whom a PFC is collected, air carriers are required to distribute the collected PFCs as noted on the ticket (or its equivalent record).

Issuing carriers and their agents are required to stop collecting PFCs at an airport on the charge expiration date stated in a notice from the public agency or as required by Part 158.43(c).

## Objective

The air carrier maintained an effective internal controls structure over PFC collection to ensure that the carrier met the requirements of section 158.45 for tickets issued in the United States.

## Recommended Internal Controls Procedure

Review the carrier's internal controls structure, policies, and procedures for recording PFC collections and refunds, including key controls to be tested, in

accordance with the requirements of section 158.45, and evaluate the design effectiveness of the policies and procedures.

Test and evaluate the operating effectiveness of the internal controls structure, policies, and procedures by selecting a nonstatistical sample of tickets issued by the air carrier (or equivalent sales records) in the United States. Also, test and evaluate the operating effectiveness of the internal controls structure, policies, and procedures for recording agency remittances made in the United States. The following items should be considered for tickets issued by the air carrier:

1. Determine that for each one-way trip, the carrier recorded PFCs only from the first two enplaning airports collecting PFCs;

2. Determine that for each round trip, the carrier recorded PFCs only from the first two enplaning airports collecting PFCs on the outbound flight and, conversely, from the last two enplaning airports collecting PFCs on the return;

3. Test whether the carrier recorded PFC charges appropriately, based on the charge in effect at the time the ticket (or equivalent record) was issued;

4. Test whether the system properly adjusted PFC records for passenger-initiated itinerary changes that resulted in additional PFC charges or PFC refunds;

5. Test whether tickets (or equivalent records) reflecting PFC charges also listed the total amount of PFCs paid and the airports for which each was collected;

6. Test whether PFC charges were not collected where exceptions applied, including essential air service passengers, non-revenue passengers, and frequent flier award coupon passengers;

7. Trace PFC records from tickets (or equivalent records) to accounting records, and test that PFCs were credited to the correct airport subaccounts; and

8. For tickets issued by an agency, test that agency remittances to the air carrier were credited to the correct airport subaccounts.

## C. COLLECTION OF PFC'S ON TICKETS ISSUED OUTSIDE THE UNITED STATES

**Program Requirements**

The requirements outlined in section 158.47 pertain to the collection of PFCs on tickets issued outside the United States. Carriers may follow either section 158.45 or section 158.47 for tickets issued outside the United States; however, they may not vary between these methods. Moreover, a carrier that issues tickets outside of the United States solely for travel within the United States must follow section 158.45. If the carrier opts for or is required to follow the method under section 158.45, it must follow the audit procedures described in section B above.

Under section 158.47, carriers are only required to collect PFCs on tickets for the public agency controlling the last airport at which the passenger is enplaned prior to departure from the United States. Carriers issuing tickets outside the United States must collect the PFC either at the time of ticket (or equivalent record) issuance or at the time of enplanement, from the last airport at which the passenger enplaned prior to departure from the United States. The section 158.47 collection option may be varied among the carrier's flights. The carrier is responsible for providing the passenger with a record of the transaction in either case. Additionally, if the carrier chooses to collect PFCs at the time of ticket issuance, the carrier is not required to collect PFCs at the time of enplanement for tickets sold by other carriers or their agents. Issuing carriers are responsible for PFC revenue from the time of collection to remittance to the public agency. For the purposes of an audit under section 158.69, collection is defined as the point when agents or other intermediaries remit PFC revenue to the carrier. In the event the air carrier collects the PFC at the time of ticket issuance, the amount collected is the PFC in effect at the time the ticket (or its equivalent) is issued and is based on the itinerary at the time of issuance. In the event the air carrier collects the PFC at the time of passenger enplanement, the amount collected is the PFC in effect at the time of enplanement. Itinerary changes initiated by the passenger that require a fare adjustment are subject to collection or refund of the PFC as appropriate.

A carrier may issue a flight interrupt manifest or accept one issued by another carrier (or other routing change document issued by that carrier or another carrier) for a routing change not initiated by the passenger. In such a case, the manifest or routing would not require additional PFC collection(s). PFC collection, in that case, would be as originally ticketed.

Each ticket (or equivalent record) issued by a carrier or its agents (or in the case of a carrier collecting at the gate, the record of transaction) shall note the total amount of PFCs paid by the passenger and the airports for which PFCs are collected.

Although not as common as with domestically issued tickets, the collection of PFCs by the air carriers on tickets issued outside the United States still may be limited in certain situations. Title 49 U.S.C. 40117(e)(2)(C), precludes collection of a PFC from a passenger enplaning at an airport if the passenger did not pay for the air transportation which resulted in such enplanement. The FAA interprets this provision to prohibit the collection of PFCs from passengers considered to be non-revenue passengers under existing Department of Transportation Regulations and from passengers who obtained their ticket with an award coupon issued under a frequent flier or similar bonus award program ("frequent flier award coupon"). This prohibition does not apply to frequent flier upgrades, two-for-ones, contests, or other promotional plans.

For those passengers from whom a PFC is collected, air carriers are required to distribute the collected PFCs as noted on the ticket (or equivalent record).

Issuing carriers and their agents are required to stop collecting PFCs at an airport on the charge expiration date stated in a notice from the public agency or as required by the FAA.

## Objective

The air carrier maintained an effective internal controls structure over PFC collection to ensure that the carrier met the requirements in sections 158.45 and 158.47, as applicable, on tickets issued outside the United States.

## Recommended Internal Controls Procedures

Determine whether the carrier is using the ticketing method outlined in section 158.45 or section 158.47. If the carrier has used section 158.45 for collection of PFCs on tickets issued outside the United States, then perform the audit procedures outlined in section B above.

If the carrier has used the method in section 158.47, perform the procedures described below.

Review the internal controls structure, policies, and procedures for recording PFC collections and refunds, including key controls to be tested. Note compliance features stipulated under section 158.47, including whether the carrier has provided a written record of the PFC collection to the passenger as required by section 158.47(c)(3). Evaluate the design effectiveness of the internal controls structure, policies, and procedures.

Test the effectiveness of the collection at the gate process for the carrier, when applicable. Ensure that proper controls exist to collect, document, and provide receipts for passengers when the carrier collects PFCs at the gate.

Test and evaluate the operating effectiveness of the internal controls structure, policies, and procedures by selecting a nonstatistical sample of tickets (or equivalent sales records) if possible, issued outside the United States. The following items should be considered for tickets issued by the air carrier:

1. Test whether the carrier recorded PFC charges for the last airport at which the passenger enplaned prior to departure from the United States. NOTE: the carrier may collect the PFC either at the time of ticket issuance (or equivalent record) or at the time of enplanement and that the method may be varied among the carrier's flights;

2. Test whether the carrier recorded PFC charges appropriately based on the charge in effect at the time the ticket (or equivalent record) was issued or, for at the gate collection, when the passenger was enplaned;

3. Test whether the carrier properly adjusted PFC records for passenger itinerary changes which resulted in additional PFC charges or refunds (this procedure is not applicable for PFCs collected at the gate);

4. Test whether the carrier provided the passenger with a record of the PFC transaction;

5. Test whether PFC charges were not collected where exceptions applied for non-revenue passengers, frequent flier coupon passengers, and (if using the enplanement collection method) tickets issued by another carrier required to collect PFCs; and

6. Trace PFC records from tickets (or equivalent records) to accounting records, and test that PFCs were properly credited to the correct airport subaccounts.

## D. HANDLING OF PFC'S

### Program Requirements

Collecting carriers are required to establish and maintain a financial management system to account for PFCs in accordance with the Department of Transportation's Uniform System of Accounts and Reports (14 CFR Part 241, the Form 41 Reporting Process). For carriers not subject to Part 241, such carriers are required by section 158.49(a) to establish and maintain an accounts payable system to handle PFC revenue subaccounts for each public agency to which such carrier remits PFC collections.

PFC revenue must be accounted for separately by a collecting carrier, but the revenue may be commingled with the carrier's other funds. The collecting carrier holds PFC revenue collected as trust funds for the beneficial interest of the public agency imposing the PFC (49 USC §40117(g)(4)). All PFC revenue collected and held by the air carrier is property of public agencies in which the carrier holds neither a legal nor equitable interest except for as provided in 40117(g)(4). Collecting carriers shall disclose the existence and amount of PFC funds held in trust in their financial statements (Section 158.49 b and c). The FAA has determined that carriers may use the Form 41 reporting process to make this disclosure. Alternatively, a carrier may utilize its annual publicly-released financial statements.

## Objective

The air carrier maintained an effective internal controls structure to properly account for, handle, and disclose PFC revenue by the collecting carrier in compliance with 14 CFR Part 241.

## Recommended Internal Controls Procedure

Review the internal controls structure, policies, and procedures relative to accounting for PFCs for compliance with 14 CFR Part 241 standards. Verify that the accounting system properly separates PFC revenue collected into separate accounting records payable to each public agency to which the carrier must remit PFCs (NOTE: these funds may be commingled with the carrier's other funds until remitted, and the carrier is entitled to interest earned while the PFC revenue is in its possession, but only until remitted to the public agency as defined in section 158.51).

Verify that the carrier has identified PFC funds as held in trust in either Form 41 or annual publicly-released financial statements.

## E. REMITTANCE OF PFC'S

## Program Requirements

Air carriers collecting PFCs are required by section 158.51 to remit the revenue collected to the appropriate public agency on a monthly basis. PFC revenue collected by the carrier shall be remitted to the public agency no later than the last day of the calendar month following the month in which the PFC was collected (or if that date falls on a weekend or holiday, the first business day thereafter).

## Objective

The air carrier maintained an effective internal controls structure over the remittance of PFC revenue with respect to the requirements in section 158.51.

## Recommended Internal Controls Procedure

Review the air carrier's internal controls structure, policies, and procedures for remitting PFC revenue collected and evaluate the design effectiveness of the policies and procedures.

Evaluate the operating effectiveness of the policies and procedures by testing whether the carrier's remittance procedures ensure that PFC revenue collected is remitted to public agencies no later than the last day of the month following collection (or next business day).

Test by a substantive method that PFC revenue collected is remitted no later than the last day of the calendar month following collection (or if that date falls on a weekend or holiday, the first business day thereafter).

## F. COLLECTION COMPENSATION

## Program Requirements

As compensation for collecting, handling, and remitting PFC revenue, air carriers are entitled to retain $0.08 of each PFC remitted. Air carriers are also entitled to any interest or other investment return earned on PFC revenue between the time of collection and the date of required remittance to the public agency.

## Objective

The air carrier maintained an effective internal controls structure over collection compensation with respect to the requirements in section 158.53.

## Recommended Internal Controls Procedure

Review the air carrier's internal controls structure, policies, and procedures for withholding PFC collection compensation and evaluate the design effectiveness of the policies and procedures.

## G. REPORTING REQUIREMENTS

**Program Requirements**

Carriers collecting PFCs on behalf of public agencies are required by section 158.65 to file quarterly reports to those agencies, unless otherwise agreed upon by the carrier and public agency, providing an accounting of funds collected and funds remitted to the public agency. These reports, unless otherwise agreed upon by the carrier and public agency, shall state the collecting carrier and public agency involved, the total PFC revenue collected, the total amount of PFC revenue refunded to passengers, and the amount of collected revenue withheld by the collecting carrier as collection compensation. This report must contain the dates and amounts of each remittance for the quarter or other agreed upon timeframe. Although Part 158 allows latitude concerning the timeframes and the presentation of the information on the quarterly reports, the reporting requirement cannot be waived.

**Objective**

The air carrier maintained an effective internal controls structure over financial reporting with respect to the requirements outlined in section 158.65 for quarterly reporting.

**Recommended Procedures**

Review the internal controls structure, policies, and procedures for collection and remittance reporting requirements and evaluate the design effectiveness of the policy and procedures.

On a test basis, reconcile items and amounts listed on the quarterly reports with accounting records to ensure that the reports accurately reflect PFC transactions.

## H. RECORDKEEPING AND AUDITING REQUIREMENTS

**Program Requirements**

Each carrier that collects PFCs from at least 50,000 passengers annually is required to provide for an audit of its PFC account at least annually. The carrier is required to provide a copy of this audit to each public agency upon request.

**Objective**

The air carrier provided a copy of its annual PFC audit to all requesting public agencies.

**Recommended Procedures**

Review the internal controls structure, policies, and procedures for recordkeeping and auditing requirements, and evaluate the design effectiveness of the policy and procedures.

## III.    PFC PROGRAM - AGREED-UPON PROCEDURES

The following agreed-upon procedures have been developed as an integral part of this audit guide in order for these audit guidelines to provide airport-level assurance that the air carrier utilizing the guidelines has complied with the PFC statute and regulation.  The FAA will use its discretion in evaluating whether results of the agreed-upon procedures conform to a reasonable level of compliance with the PFC statute and regulation.  Reasonable compliance does not preclude the presence of minor or occasional errors in PFC collections.

These procedures involve the examination of lifted ticket samples and other boarding records for a group of airports served by the carrier (to be defined further below) to provide further assurance that the carrier is in compliance with PFC statutory and regulatory requirements with regard to specific airports.

The auditor should be familiar with the sampling guidelines contained in the AICPA publication "Audit and Accounting Guide - Audit Sampling," sections 3.28 and 3.29 for a "haphazard sample."

For air carriers classified as "Majors" or "Nationals" under the Bureau of Transportation Statistics, U.S. Department of Transportation reporting criteria[1], the procedures include items 1 and 2 below:

1. Select one flight during the year from each of the five PFC collecting airports based on prior year revenues with the greatest number of PFC payments for the carrier; and

2. Select one flight during the year from each of five PFC collecting airports served by the carrier not selected in (1) above with at least $30,000 in annual PFC payments for the carrier.   This selection should be rotated until all other airports have been selected at least once.

---

[1] Majors are identified as having $1 billion in annual operating revenue or higher.  Nationals are identified as having between $100 million to $1 billion in annual operating revenue.

For air carriers classified as "Large Regionals" or "Medium Regionals" under the Bureau of Transportation Statistics, U.S. Department of Transportation reporting criteria[2], the procedures include items 1 and 2 below:

1. Select one flight during the year from each of the two PFC collecting airports based on prior year revenues with the greatest number of PFC payments for the carrier; and

2. Select one flight during the year from each of two collecting airports served by the carrier not selected in (1) above with at least $15,000 in annual PFC payments for the carrier.   This selection should be rotated until all other airports have been selected at least once.

In the case where a wholly-owned subsidiary air carrier is not audited, from a PFC perspective, separately from its parent air carrier, at least one of the flights selected above for the parent must be provided by the subsidiary carrier.   This flight would typically be selected from the rotating sample of airports (see 2 above) unless the subsidiary provides the preponderance of PFC collections at the highest collection airports (see 1 above).

For all air carriers:

3. For each flight selected in 1 and 2 above (either case), obtain all of the lifted tickets, passes, or equivalent records for all of the passengers on that flight, including non-revenue passengers, and perform the following:

   (a) Organize passenger records for the flight into groups as follows:

   (1) Lifted tickets or equivalent records sold by other airlines and passengers traveling on documents issued by other airlines such as flight interruption manifests.  (Note:  In the case of an air carrier which is wholly- or partly-owned by another air carrier, and for which the owning air carrier issues, under the owning carrier's name, some or all of the tickets, passes, or equivalent records used by passengers for travel on the owned carrier, such records must be treated as issued by the owned carrier, and are categorized under (a)(4) below.  In such instances, the procedures under section (c) should be applied, either by or in coordination with, the owning air carrier);

   (2) Non-revenue passengers;

---

[2] Large Regionals are identified as having between $20 million and $100 million in annual operating revenue.  Medium Regionals are identified as having less than $20 million in annual operating revenue.

    (3)  Passengers using frequent flier or similar bonus award program coupons to obtain their ticket; and

    (4)  Lifted tickets or equivalent records sold by the carrier.

(b)  For lifted tickets or equivalent records in (a)(1), determine if the record contains information about PFC payment. If so, determine if a PFC was or was not collected, but without determining if the collection or non-collection was appropriate by comparison to the code of Federal Regulations Part 158, "Passenger Facility Charges" requirements.

(c)  For lifted tickets or equivalent records in (a)(4), determine the following:

    (1)  If a PFC was collected, determine that the collection was appropriate by comparison to the code of Federal Regulations Part 158, "Passenger Facility Charges" requirements;

    (2)  If no PFC was collected, determine that the non-collection was appropriate by comparison to the code of Federal Regulations Part 158, "Passenger Facility Charges" requirements; and

    (3)  For lifted tickets and equivalent records where no PFC was collected, but deemed appropriate to be collected, provide commentary if considered relevant, such as the ticket was sold by a travel agent and no PFC was collected.

    (4)  The report on agreed-upon procedures should include by flight the composition of the lifted tickets, passes, or equivalent records as determined in (a)(1), (a)(2), (a)(3) and (a)(4) above.

Auditors are referred to AICPA Statement on Auditing Standards - 75, "Engagements to Apply Agreed-Upon Procedures to Specified Elements, Accounts, or Items of a Financial Statement" for guidance on reporting the results of the agreed-upon procedures. An illustrative report is included as Appendix B to this publication.

16

## IV.  REPORTING CRITERIA AND FORMAT

The FAA requests that an auditor utilizing these guidelines issue reports in the prescribed format outlined in the appendices.  In addition to the appendices, auditors may refer to examples of representative reports contained in the "AICPA Industry Audit Guide - Audits of Airlines" most recent issue.  Two example reports, as well as a short narrative, are provided on pages 7 through 9 of that document and are reproduced herein as Appendix A.  The reproduced example reports have been modified to include language indicating that the audit was performed in accordance with GAAS and the FAA Passenger Facility Charge Audit Guide for Air Carriers.

In addition to the reports issued as above, auditors are to issue a report on the agreed upon procedures performed in accordance with section III of this guide. An example of this report is attached as Appendix B.

17

# APPENDIX A

*The following illustrative reports and associated guidance were reproduced with permission from the AICPA Industry Audit Guide "Audits of Airlines." The FAA has modified these reports to reference the recodified PFC legislation and year date and the Federal Aviation Administration Passenger Facility Charge Audit Guide for Air Carriers. The FAA has also reworded the reports to reference the FAA and to note that the reports are a matter of public record.*

## Passenger Facility Charges

The FAA issued final rules establishing a PFC program in 1991. The PFC program authorizes local airport authorities to impose specified per-passenger charges at commercial service airports to finance airport improvements. Beginning in 1992, the rules require carriers (including non-U.S. airlines) that collect more than 50,000 passenger facility charges to provide for an annual audit of their PFC accounts. Auditors engaged to audit PFC accounts are required to report "on the fairness and reasonableness of the carrier's procedures for collecting, holding, and disbursing PFC revenue." In addition, auditors are required to report whether the quarterly reports that must be filed by the carriers "fairly represent the net transaction in the PFC account." The AICPA has worked with the FAA and industry representatives to develop the following illustrative reports that satisfy both existing professional literature and the FAA's requirements.

## Illustrative Report on PFC Schedules

<u>Report of Independent Accountants</u>

*XYZ Inc.*

We have audited the accompanying Schedules of Passenger Facility Charges Collected, Withheld, Refunded/Exchanged, and Remitted by *XYZ Inc.* (the Company) for the year and each quarter during the year ended December 31, xxxx (the Schedules). The Schedules are the responsibility of the Company's management. Our responsibility is to express an opinion on the Schedules based on our audit.

We conducted our audit in accordance with generally accepted auditing standards and the Federal Aviation Administration Passenger Facility Charge Audit Guide for Air Carriers. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the Schedules are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the Schedules. An audit also includes assessing the accounting principles used and significant estimates

18

made by management, as well as evaluating the overall presentation of the Schedules. We believe that our audit provides a reasonable basis for our opinion.

The Schedules were prepared for the purpose of complying with the regulations issued by the Federal Aviation Administration of the U.S. Department of Transportation [14 CFR 158] to implement 49 U.S.C. 46110 and 40117, as amended.  Those regulations define collection as the point when agents or other intermediaries remit passenger facility charges to the airlines.  Accordingly, our audit did not encompass tests of the underlying documentation supporting the reports submitted by such agencies and intermediaries to the Company.

In our opinion, the Schedules referred to above present fairly, in all material respects, the passenger facility charges collected, withheld, refunded/exchanged, and remitted by *XYZ Inc.* for the year and each quarter during the year ended December 31, xxxx, as defined in regulations issued by the Department of Transportation.

This report is intended solely for the information and use of the Board of Directors and management of XYZ Airline, Inc., the appropriate airport authorities, and the Federal Aviation Administration and is not intended to be and should not be used by anyone other than these specified parties.  However, this restriction is not intended to limit the distribution of this report, which is a matter of public record.

[Signature]

[Date]

**Illustrative Report on Internal Control Used in
Administering PFCs (Attestation Standards)**

<u>Report of Independent Accountants</u>

*XYZ Inc.*

We have examined management's assertion included in its representation letter, dated
January 18, xxxx, that *XYZ Inc.* (the Company) maintained effective internal control
over administering passenger facility charges collected, withheld, refunded/exchanged,
and remitted during the year ended December 31, xxxx, for the purpose of complying
with the regulations issued by the Federal Aviation Administration of the U.S.
Department of Transportation [14 CFR 158] to implement 49 U.S.C. 46110 and 40117,
as amended, based on criteria established in *Internal Control - Integrated Framework*
issued by the Committee of Sponsoring Organizations of the Treadway Commission.
Management is responsible for maintaining effective internal control over administering
passenger facility charges collected, withheld, refunded/exchanged, and remitted. Our
responsibility is to express an opinion on management's assertion based on our
examination.

Our examination was conducted in accordance with standards established by the
American Institute of Certified Public Accountants and the Federal Aviation
Administration Passenger Facility Charge Audit Guide for Air Carriers, and,
accordingly, included obtaining an understanding of internal control over
administering passenger facility charges collected, withheld, refunded/exchanged,
and remitted, testing, and evaluating the design and operating effectiveness of
internal control, and performing such other procedures as we considered
necessary in the circumstances. We believe that our examination provides a
reasonable basis for our opinion.

Because of limitations inherent in any internal control, misstatements due to
error or fraud may occur and not be detected. Also, projections of any
evaluation of internal control over administering passenger facility charges
collected, withheld, refunded/exchanged, and remitted to future periods are
subject to the risk that internal control may become inadequate because of
changes in conditions, or that the degree of compliance with the controls may
deteriorate.

In our opinion, XYZ Airline, Inc. maintained, in all material respects, effective
internal control over administering passenger facility charges collected, withheld,
refunded/exchanged, and remitted during the year ended  December 31, xxxx,
based on criteria established in *Internal Control - Integrated Framework* issued
by the Committee of Sponsoring Organizations of the Treadway Commission.

This report is intended solely for the information and use of the Board of Directors and management of XYZ Airline, Inc., the appropriate airport authorities, and the Federal Aviation Administration and is not intended to be and should not be used by anyone other than these specified parties.  However, this restriction is not intended to limit the distribution of this report, which is a matter of public record.

[Signature]

[Date]

21

**APPENDIX B**

*The following illustrative report was reproduced with permission from the AICPA Statement on Auditing Standards 75 "Engagements to Apply Agreed-Upon Procedures to Specific Elements, Accounts, or Items of a Financial Statement" and is included here for the convenience of auditors using this guide. The FAA has reworded the report to reference the FAA's participation in the development of the procedures and to note that the report is a matter of public record.*

**Illustrative Report**

<u>Independent Accountant's Report on Applying Agreed-Upon Procedures</u>

We have performed the procedures enumerated below, which were agreed to by the Federal Aviation Administration (FAA), [the carrier], and the applicable airport, solely to assist you with respect to your evaluation of [the carrier's] compliance with the requirements of 14 Code of Federal Regulations Part 158, "Passenger Facility Charges." This engagement to apply agreed-upon procedures was performed in accordance with standards established by the American Institute of Certified Public Accountants. The sufficiency of the procedures is solely the responsibility of the FAA, [the carrier], and the applicable airport of the report. Consequently, we make no representation regarding the sufficiency of the procedures described below either for the purpose for which this report has been requested or for any other purpose.

[Include paragraphs to enumerate procedures and findings.]

We were not engaged to, and did not, perform an audit, the objective of which would be the expression of an opinion on the specified elements, accounts, or items. Accordingly, we do not express such an opinion. Had we performed additional procedures, other matters might have come to our attention that would have been reported to you.

This report is intended solely for the information and use of the Board of Directors and management of XYZ Airline, Inc., the appropriate airport authorities, and the FAA and should not be used by those who have not agreed to the procedures and taken responsibility for the sufficiency of the procedures for their purposes. However, this restriction is not intended to limit the distribution of this report, which is a matter of public record.

[Signature]

[Date]

# ORDER

$\boxed{\textbf{5500.1}}$

# PASSENGER FACILITY CHARGE



August 9, 2001

## DEPARTMENT OF TRANSPORTATION
### FEDERAL AVIATION ADMINISTRATION

---

Distribution:  ZRP-510; A-FAS-1 (Ltd)                    Initiated By: APP-530

5500.1

# TABLE OF CONTENTS

CHAPTER 1. INTRODUCTION ...........................................................................................1
   SECTION 1. GENERAL..................................................................................................1
      1-1. Overview ...........................................................................................................1
      1-2. Distribution .......................................................................................................1
      1-3. Authorizing Legislation ....................................................................................1
      1-4. Policy and Guidance Principles .......................................................................1
      1-5. Order Format ....................................................................................................1
      1-6. Definitions ........................................................................................................3
      1-7 to 1-10. Reserved .............................................................................................8
   SECTION 2. TITLE 49, UNITED STATES CODE ...........................................................8
      1-11. PFC Authority-Section 40117 .......................................................................8
      1-12. Reduction in AIP Apportionments-Section 47114(f) .....................................10
      1-13. Use of Funds Recovered Under Section 47114(f) ........................................11
      1-14 to 1-15. Reserved .........................................................................................11
   SECTION 3. DELEGATION OF AUTHORITY ................................................................11
      1-16. Overview .......................................................................................................11
      1-17. Delegation of Limited Authority to FAA Airports Offices .............................11
      1-18 to 1-20. Reserved .........................................................................................12
   SECTION 4. OVERVIEW OF THE PFC PROCESS........................................................12
      1-21. The PFC Process ..........................................................................................12
      1-22. PFC Program and Its Relationship to AIP ....................................................12
      1-23 to 1-25. Reserved .........................................................................................13
   SECTION 5. REDUCTION IN AIP APPORTIONMENTS................................................13
      1-26. Apportionment Reduction for Collection Levels of $3 or Below ...................13
      1-27. Apportionment Reduction for Collection Levels Above $3............................13
      1-28. Implementation of Apportionment Reduction ...............................................14
      1-29. Adjustments to Apportionment Reduction ...................................................14
      1-30 to 1-35. Reserved.........................................................................................14

CHAPTER 2. ADVANCE COORDINATION .......................................................................21
   SECTION 1. BACKGROUND .........................................................................................21
      2-1. Overview .........................................................................................................21
      2-2 to 2-5. Reserved .............................................................................................21
   SECTION 2. OPTIONAL APPLICATION FORMULATION MEETING ............................21
      2-6. Overview .........................................................................................................21
      2-7. Project Description, Eligibility, Objectives, and Justification .........................22
      2-8. Project Cost and Funding Strategies .............................................................22
      2-9. Project Schedules and Environmental, Airspace, and ALP Requirements ....23
      2-10. Alternative Projects (for impose-only projects).............................................23
      2-11. Preparation for and Timing of Carrier Consultation ....................................23
      2-12. Application Forms .........................................................................................24
      2-13. Public Agency PFC Assurances ..................................................................24

iii

5500.1

2-14. Exemption of a Class or Classes of Carriers .................................................. 25
2-15. Additional Requirements for Imposing a PFC Level Above $3 ..................... 25
2-16. Identification of Additional Information.......................................................... 25
2-17 to 2-20. Reserved.......................................................................................... 26
SECTION 3. CONSULTATION MEETING ..................................................................... 26
2-21. Requirement to Consult ............................................................................... 26
2-22. Content of Notice to Carriers ....................................................................... 26
2-23. Carrier Written Acknowledgment .................................................................. 27
2-24. Consultation Meeting .................................................................................... 27
2-25. Carrier Written Certification of Agreement or Disagreement ....................... 28
2-26. Carrier Failure to Provide Written Acknowledgment or Certification............ 28
       of Agreement/Disagreement
2-27. Summary of Meeting ..................................................................................... 28
2-28. Changes by Public Agency after the Consultation........................................ 29
2-29 to 2-35. Reserved.......................................................................................... 29
SECTION 4. DRAFT PFC APPLICATION REVIEW ...................................................... 29
2-36. Overview ....................................................................................................... 29
2-37 to 2-40. Reserved.......................................................................................... 30

CHAPTER 3. APPLICATION SUBMITTAL ...................................................................... 35
SECTION 1. GENERAL................................................................................................ 35
3-1. Overview .......................................................................................................... 35
3-2. Flow Chart of Approval/Disapproval Process.................................................. 35
3-3 to 3-5. Reserved .............................................................................................. 35
SECTION 2. PROCEDURES FOR SUBMITTAL ............................................................ 35
3-6. Form ................................................................................................................. 35
3-7. Timing of Submission ...................................................................................... 35
3-8. Application File ................................................................................................. 37
3-9 to 3-15. Reserved ............................................................................................ 38
SECTION 3. APPLICATION COMPLETENESS REVIEW ............................................... 38
3-16. Overview ........................................................................................................ 38
3-17. Receipt of Application .................................................................................... 39
3-18. Determination of Completeness .................................................................... 39
3-19. Processing of Application Supplement .......................................................... 42
3-20. Public Agency Coordination .......................................................................... 42
3-21 to 3-25. Reserved.......................................................................................... 42

CHAPTER 4. PROJECT AND APPLICATION REVIEW ................................................. 49
SECTION 1. GENERAL................................................................................................ 49
4-1. Overview .......................................................................................................... 49
4-2. Application Evaluation ..................................................................................... 49
4-3 to 4-5. Reserved .............................................................................................. 50
SECTION 2. EVALUATION CRITERIA .......................................................................... 50
4-6. Project Eligibility .............................................................................................. 50
4-7. Project Objective ............................................................................................. 55
4-8. Project Justification ......................................................................................... 56
4-9. Amount and Duration of PFC .......................................................................... 61
4-10. Collection Process ......................................................................................... 62
4-11. Exclusion of Class or Classes of Carriers .................................................... 63
4-12. Compliance with the ANCA ........................................................................... 65
4-13. Compliance with Airport Revenue Use Requirements .................................. 66
4-14. Alternative Uses ............................................................................................ 66
4-15. Consultation Procedures ............................................................................... 67

5500.1

4-16. Air Carrier Consultation Comments .................................................. 68
4-17. ALP/Airspace/NEPA Requirements ................................................... 69
4-18. Schedule for Project Implementation ............................................... 69
4-19. Financial Viability ................................................................... 70
4-20 to 4-25. Reserved ..................................................................... 71

CHAPTER 5. APPROVAL/DISAPPROVAL OF APPLICATIONS ............................... 75

SECTION 1. GENERAL ....................................................................... 75
5-1. Overview .............................................................................. 75
5-2 to 5-5. Reserved ....................................................................... 75
SECTION 2. DECISIONMAKING AUTHORITY .................................................. 75
5-6. Determining Delegation of Record of Decision ................................... 75
5-7 to 5-10. Reserved ..................................................................... 77
SECTION 3. ROD PREPARATION PROCESS .................................................. 77
5-11. Application Approval/Disapproval Documentation ............................... 77
5-12. ROD Language to Address Exceptional Circumstances .......................... 77
5-13. Treatment of Federal Register Comments in ROD's ............................ 80
5-14. Notification of Approval/Disapproval ............................................ 82
5-15 to 5-20. Reserved .................................................................... 82

CHAPTER 6. COLLECTION, HANDLING, AND REMITTANCE OF PFC'S ................... 87

SECTION 1. GENERAL ....................................................................... 87
6-1. Overview .............................................................................. 87
SECTION 2. PUBLIC AGENCY COLLECTION ISSUES ......................................... 87
6-2. Public Agency Notification to Carriers ........................................... 87
6-3. Public Agency Notification to Excluded Carriers ................................ 88
6-4. Beginning Collection ............................................................... 88
6-5. Adjustments to the Duration of Collection ...................................... 88
6-6. Expiration of Collection ........................................................... 89
6-7 to 6-10. Reserved ...................................................................... 89
SECTION 3. COLLECTION ON TICKETS ISSUED IN THE UNITED STATES .................. 90
6-11. Collection of PFC's ................................................................ 90
6-12. Information Required on Tickets ................................................. 90
6-13. Adjustments ........................................................................ 90
6-14. Essential Air Service (EAS) ....................................................... 91
6-15. Frequent Flyer Awards ............................................................ 91
6-16. Exemptions for Certain Flights in Hawaii and Alaska .......................... 92
6-17 to 6-20. Reserved .................................................................... 92
SECTION 4. COLLECTION OF PFC'S ON TICKETS ISSUED OUTSIDE THE UNITED STATES ..... 92
6-21. Regulatory Options for Collecting PFC's ......................................... 92
6-22. No Air Service to United States .................................................. 92
6-23. Collection for the Gateway Airport .............................................. 92
6-24. Collection at Ticket Issuance .................................................... 93
6-25. Collection at Time of Enplanement .............................................. 93
6-26. Handling of PFC .................................................................... 93
6-27 to 6-30. Reserved .................................................................... 93
SECTION 5. AIR CARRIER ACCOUNTING AND HANDLING OF PFC REVENUE COLLECTED ..... 94
6-31. Overview ............................................................................ 94
6-32. Air Carrier Remittance of PFC Revenue Collected .............................. 94
6-33. Property Interests ................................................................. 94
6-34. Collection Compensation .......................................................... 95
6-35 to 6-40. Reserved .................................................................... 95

v

5500.1

**CHAPTER 7. REPORTING, RECORDKEEPING, AND AUDITS** ................................................. 99

    SECTION 1. BACKGROUND ............................................................................................. 99
        7-1. Overview ................................................................................................. 99
        7-2 to 7-5. Reserved ....................................................................................... 99
    SECTION 2. PUBLIC AGENCY REPORTING REQUIREMENTS ............................................. 99
        7-6. Quarterly Report .................................................................................... 99
        7-7. Large/Medium Hub Airport Yearly Report ............................................ 100
        7-8. Annual Collections Report .................................................................... 100
        7-9 to 7-10. Reserved .................................................................................... 100
    SECTION 3. AIR CARRIER REPORTING REQUIREMENTS ................................................ 101
        7-11. Quarterly Report .................................................................................. 101
        7-12 to 7-15. Reserved .................................................................................. 101
    SECTION 4. RECORDKEEPING AND AUDITING—PUBLIC AGENCY .................................... 101
        7-16. Account ................................................................................................. 101
        7-17. Accounting Record ............................................................................... 101
        7-18. Audit ..................................................................................................... 102
        7-19. Acceptable Level of Assurance ............................................................ 102
        7-20. FAA Review of Public Agency Audits ................................................... 103
        7-21 to 7-25. Reserved .................................................................................. 103
    SECTION 5. RECORDKEEPING AND AUDIT—AIR CARRIERS ........................................... 103
        7-26. Account ................................................................................................. 103
        7-27. Audit ..................................................................................................... 103
        7-28. Acceptable Level of Assurance ............................................................ 104
        7-29. Review of Air Carrier Audits ................................................................. 104
        7-30 to 7-35. Reserved .................................................................................. 104
    SECTION 6. FEDERAL OVERSIGHT ............................................................................... 104
        7-36. Public Agency ...................................................................................... 104
        7-37. Carriers ................................................................................................ 105
        7-38. Access to Documentation .................................................................... 105
        7-39 to 7-45. Reserved .................................................................................. 105


**CHAPTER 8. APPLICATION OVERSIGHT** ......................................................................... 109

    SECTION 1. GENERAL ................................................................................................. 109
        8-1. Overview ................................................................................................ 109
        8-2 to 8-5. Reserved ....................................................................................... 109
    SECTION 2. DURATION OF AUTHORITY TO IMPOSE PFC'S BEFORE PROJECT IMPLEMENTATION ........ 109
        8-6. Timing .................................................................................................... 109
        8-7. Reserved ............................................................................................... 111
        8-8. Notification of Carriers .......................................................................... 111
        8-9. Restriction on Authorization to Re-Impose a PFC ................................ 111
        8-10 to 8-20. Reserved .................................................................................. 111
    SECTION 3. DURATION OF AUTHORITY TO IMPOSE A PFC AFTER PROJECT IMPLEMENTATION ....... 111
        8-21. Overview .............................................................................................. 111
        8-22 to 8-30. Reserved .................................................................................. 112
    SECTION 4. EXCESS PFC REVENUE ............................................................................. 112
        8-31. Overview .............................................................................................. 112
        8-32. FAA Monitoring of Project Costs .......................................................... 112
        8-33 to 8-34. Reserved .................................................................................. 113
        8-35. Excess PFC Revenue Plan ................................................................. 113
        8-36 to 8-40. Reserved .................................................................................. 114

vi

**CHAPTER 9. EXTENSIONS** ................................................................... 119

SECTION 1. GENERAL .......................................................................... 119
  9-1. Overview ................................................................................. 119
  9-2 to 9-5. Reserved ...................................................................... 119
SECTION 2. NOTICE ............................................................................ 119
  9-6. Public Notice ......................................................................... 119
  9-7 to 9-10. Reserved .................................................................... 119
SECTION 3. REQUEST FOR EXTENSION ................................................ 119
  9-11. Request ................................................................................ 119
  9-12. Description of Progress ........................................................ 119
  9-13. Schedule .............................................................................. 120
  9-14. Explanation for Delay ........................................................... 120
  9-15. Summary Financial Report .................................................... 120
  9-16. Carrier Consultation ............................................................. 120
  9-17. Local Notice Comments ........................................................ 120
  9-18. Confirmation/Validation of Alternative Projects .................... 120
  9-19 to 9-20. Reserved .................................................................. 120
SECTION 4. REVIEW AND APPROVAL/DISAPPROVAL ............................. 120
  9-21. Review ................................................................................. 120
  9-22. Approval/Disapproval ........................................................... 121
  9-23 to 9-30. Reserved .................................................................. 122

**CHAPTER 10. PFC LEVELS ABOVE $3** ............................................... 127

SECTION 1. GENERAL .......................................................................... 127
  10-1. Overview .............................................................................. 127
  10-2 to 10-5. Reserved .................................................................. 127
SECTION 2. PFC LEVELS ABOVE $3 AT SMALL AIRPORTS ..................... 128
  10-6. Method to Evaluate PFC Level Above $3 at Small Airports ..... 128
  10-7. Finding That Projects Cannot Be AIP Funded ....................... 128
  10-8. Finding That Airside Needs Are Met .................................... 130
  10-9. Treatment of a Project Qualifying for PFC Approval ............... 131
    at $1, $2, or $3 Level But Not at Levels Above $3
  10-10. Reserved ............................................................................ 131
SECTION 3. PFC LEVELS ABOVE $3 AT MEDIUM AND LARGE HUB AIRPORTS ......... 131
  10-11. Method to Raise PFC Level Above $3 at Large and Medium Hub Airports ..... 131
  10-12. Determination of Significant Contribution Procedures ........... 131
  10-13. Procedures ......................................................................... 132
  10-14 to 10-15. Reserved ............................................................... 133
SECTION 4. ESTABLISHMENT OF APPLICATION PFC LEVEL .................... 133
  10-16. Overview ............................................................................ 133
  10-17. Setting the PFC Level for a Single Project Application ......... 133
  10-18. Policy on Setting the PFC Level for Multiple Projects with Mixed PFC Levels ........ 133
  10-19. Procedure to Set the PFC Level for a Single Application with Multiple Projects ..... 135
  10-20. Examples of PFC Level Calculations for Single Applications ............... 137
  10-21. Procedure for Multiple RODs ............................................. 138
  10-22. Examples of PFC Level Calculations for Multiple RODs ......... 142
  10-23 to 10-25. Reserved ............................................................... 144
SECTION 5. OTHER MODIFICATIONS TO THE PFC PROGRAM .................. 144
  10-26. Additional Reduction in AIP Apportionments ...................... 144
  10-27. Other Effects of AIR-21 on the PFC Program ..................... 145
  10-28 to 10-30. Reserved ............................................................... 148

5500.1

CHAPTER 11.  AMENDMENTS NOT REQUIRING CONSULTATION ........................................ 153

SECTION 1.  GENERAL.................................................................................................. 153
11-1.  Overview ................................................................................................. 153
11-2 to 11-5.  Reserved................................................................................... 153
SECTION 2.  AMENDMENTS WHICH CAN BE INSTITUTED BY PUBLIC AGENCY NOTICE...................... 153
11-6.  Type and Timing of Amendments ......................................................... 153
11-7.  Notice—Content and Distribution ......................................................... 155
11-8.  FAA Review ............................................................................................ 155
11-9 to 11-15.  Reserved................................................................................. 156


CHAPTER 12.  AMENDMENTS REQUIRING CONSULTATION ............................................. 161

SECTION 1.  GENERAL.................................................................................................. 161
12-1.  Overview ................................................................................................. 161
12-2 to 12-5.  Reserved................................................................................... 161
SECTION 2.  AMENDMENTS WHICH REQUIRE CONSULTATION WITH ................................... 161
AIR CARRIERS AND FORMAL SUBMISSION TO FAA
12-6.  Type and Timing of Amendment ............................................................ 161
12-7.  Notice—Content and Distribution ......................................................... 162
12-8 to 12-10.  Reserved................................................................................. 164
SECTION 3.  NO CARRIER DISAGREEMENT...................................................................... 164
12-11.  FAA Review of Proposal and Approval/Disapproval ............................ 164
12-12.  Public Agency Notice to Carriers ........................................................ 165
12-13 to 12-15.  Reserved............................................................................... 165
SECTION 4.  CARRIER DISAGREEMENT............................................................................ 165
12-16.  FAA Review and Approval/Disapproval ............................................... 165
12-17.  Public Agency Notice to Carriers ........................................................ 166
12-18 to 12-20.  Reserved............................................................................... 166
SECTION 5.  ADMINISTRATIVE AMENDMENTS.................................................................... 166
12-21.  Overview ............................................................................................... 166
12-22.  Administrative Amendment Due to Use Application.............................. 166
12-23.  Administrative Amendment Due to Automatic Expiration .................... 167
12-24 to 12-25.  Reserved............................................................................... 167


CHAPTER 13.  TERMINATION PROCEDURES ................................................................... 171

SECTION 1.  GENERAL.................................................................................................. 171
13-1.  Overview ................................................................................................. 171
13-2.  Identification of Potential Violation ....................................................... 171
13-3.  Investigation of Complaints ................................................................... 172
13-4 to 13-5.  Reserved................................................................................... 172
SECTION 2.  INFORMAL RESOLUTION.............................................................................. 172
13-6.  Letter to Public Agency ......................................................................... 172
13-7.  Meeting Between FAA and Public Agency ............................................ 173
13-8.  Informal Resolution of the Violation ...................................................... 173
13-9 to 13-15.  Reserved................................................................................. 173
SECTION 3.  FORMAL TERMINATION PROCEEDINGS.......................................................... 173
13-16.  FAA Determination That Informal Resolution was Not Successful ...... 173
13-17.  Federal Register Notice of Proposed Termination .............................. 174
13-18.  Public Hearing ..................................................................................... 174
13-19.  Final Decision ...................................................................................... 174
13-20 to 13-25.  Reserved............................................................................... 176
SECTION 4.  IMPACT ON AIP......................................................................................... 176
13-26.  Loss of Federal Grant Funds .............................................................. 176
13-27.  Amount of Reduction ........................................................................... 176

5500.1

13-28.  Impact on Existing Grants ............................................................ 176
13-29 to 13-30.  Reserved ...................................................................... 176
SECTION 5.  SPECIAL INFORMAL RESOLUTION AND TERMINATION ..................... 176
PROTECTION TO FACILITATE PFC STAND-ALONE FINANCING
13-31.  Overview ............................................................................ 176
13-32.  Protracted Informal Resolution ...................................................... 176
13-33.  Termination Protection .............................................................. 177
13-34 to 13-35.  Reserved ...................................................................... 177


CHAPTER 14.  PROJECT COMPLETION AND PFC CLOSEOUT .............................................. 181

SECTION 1.  GENERAL ................................................................................ 181
14-1.  Overview ............................................................................ 181
14-2.  Recordkeeping and Audit ............................................................ 181
14-3 to 14-5.  Reserved ...................................................................... 181
SECTION 2.  PFC PROJECT COMPLETION ............................................................ 181
14-6.  Physical Completion Requirements, No AIP Funds ............................... 181
14-7.  Joint PFC/AIP Funded Projects ...................................................... 182
14-8.  Financial Completion Requirements ................................................ 182
14-9.  FAA Actions Associated with Project Physical Completion ..................... 182
14-10.  FAA Actions Associated with Project Financial Completion ................... 183
14-11.  Project Completion Notification and Record Requirements.................... 183
14-12 to 14-15.  Reserved .................................................................... 184
SECTION 3.  PFC DECISION CLOSEOUT ............................................................. 184
14-16.  Overview ............................................................................ 184
14-17.  Quarterly Reports .................................................................. 184
14-18.  PFC Decision Closeout Report ..................................................... 184
14-19.  Decision Closeout Notification and Record Requirements .................... 185
14-20.  Use of Excess PFC Revenue ........................................................ 185
14-21.  Loss of Federal Airport Grant Funds .............................................. 186
14-22 to 14-25.  Reserved .................................................................... 186


CHAPTER 15.  ASSURANCES ................................................................................ 191

SECTION 1.  GENERAL ................................................................................ 191
15-1.  Overview ............................................................................ 191
15-2 to 15-5.  Reserved .................................................................... 191
SECTION 2.  DISCUSSION OF ASSURANCES .......................................................... 191
15-6.  Responsibility and Authority of the Public Agency............................... 191
15-7.  Compliance with Regulation ........................................................ 192
15-8.  Compliance with State and Local Laws and Regulations ....................... 192
15-9.  Environmental, Airspace, and ALP Requirements .............................. 193
15-10.  Nonexclusivity of Contractual Agreements ..................................... 193
15-11.  Carryover Provisions ............................................................... 195
15-12.  Competitive Access ................................................................. 196
15-13.  Rates, Fees, and Charges .......................................................... 197
15-14.  Standards and Specifications ...................................................... 199
15-15.  Recordkeeping and Audit .......................................................... 200
15-16.  Reports ............................................................................. 200
15-17.  ANCA ............................................................................... 200
15-18 to 15-25.  Reserved .................................................................... 201

5500.1

**APPENDIX 1.  PFC PROCESS FLOWCHARTS** .........................................................................1

    1-1.  Application for Authority to Impose a PFC ........................................................3
    1-2.  Application for Authority to Impose and Use a PFC .........................................5
    1-3.  Application for Authority to Use a PFC .............................................................7


**APPENDIX 2.  ASSURANCES** ........................................................................................1


**APPENDIX 3.  PROJECT CONSTRUCTION OVERSIGHT** ...................................................1

    SECTION 1.  GENERAL.................................................................................................1
        3-1.  Overview ...................................................................................................1
        3-2.  Coordination of Projects ...........................................................................1
    SECTION 2.  PFC/AIP FUNDED PROJECTS ...............................................................1
        3-3.  Oversight of PFC/AIP Funded Projects ....................................................1
        3-4 to 3-6.  Reserved .......................................................................................1
    SECTION 3.  PFC FUNDED PROJECTS—NO AIP FUNDS .............................................1
        3-7.  Preconstruction Conference .....................................................................1
        3-8.  Labor/Disadvantaged Business Enterprise (DBE).....................................2
        3-9.  Design, Construction, and Equipment Standards ......................................2
        3-10.  Notice to Proceed ...................................................................................2
        3-11.  Construction Records .............................................................................2
        3-12.  Safety .....................................................................................................2
        3-13.  Parts 107 and 139 Requirements ..........................................................2
        3-14.  Environmental Compliance ....................................................................3
        3-15 to 3-20.  Reserved ...................................................................................3


**APPENDIX 4.  AIRPORT DEBT FINANCING** ...................................................................1

    4-1.  Overview ...........................................................................................................1
    4-2.  Debt Financing Associated with PFC Applications ...........................................1
    4-3.  Definitions of Financing Terms ........................................................................1
    4-4.  Types of Financing Scenarios ..........................................................................2
    4-5.  The FAA's Role in PFC-Backed Financing .......................................................3
    4-6.  Protracted Informal Resolution ........................................................................3
    4-7.  Termination Protection ....................................................................................4

x

discrepancies raised against public agencies that have not used the guidance are more likely to trigger additional FAA monitoring activities, including requiring additional reports, the undertaking of an audit, or a request for DOT OIG intervention. Such an approach shall not foreclose other FAA options for responding to and enforcing correct holding and use procedures.

**7-20. FAA REVIEW OF PUBLIC AGENCY AUDITS.** The FAA Airports office should request that each public agency subject to the PFC annual audit requirement submit a copy of its audit to the FAA Airport office each year. The FAA Airports office should promptly review each audit to determine whether the auditor has issued an unqualified opinion. If a public agency fails to complete an audit, or if the auditor issues other than an unqualified opinion, the FAA Airports office should notify APP-530. Moreover, APP-530 should be notified if any air carrier or other party reports potential problems with the audit findings. The FAA intranet documents site includes a checklist that is recommended for use in reviewing public agency audits.

**7-21 to 7-25. RESERVED.**


## SECTION 5.  RECORDKEEPING AND AUDIT—AIR CARRIERS

**7-26. ACCOUNT.** Collecting carriers shall establish and maintain, for each public agency for which they collect a PFC, an accounting record of PFC revenue collected, remitted, refunded, and compensation retained under §158.53(a). The accounting record shall identify each airport at which the passengers were enplaned.

**7-27. AUDIT.** Each collecting carrier that collects a PFC from more than 50,000 revenue passengers annually shall provide for an audit, at least annually, of its PFC account.

    **a.** The audit shall be performed by an accredited independent public accountant and may be of limited scope. Limited scope means that the public accountant must perform only those tests and procedures necessary to render the opinions required below. The accountant shall express an opinion on the fairness and reasonableness of the carrier's procedures for collecting, holding, and dispersing PFC revenue (also known as an examination of the air carrier's system of "internal controls"). The opinion shall also address whether the quarterly reports required under §158.65 of the PFC regulation fairly represent the transactions in the PFC account (also known as a "report on PFC schedules"). Transactions are defined as the account transactions required to represent the receiving, holding, and dispersing of PFC revenues by the air carrier.

    **b.** The auditor must, at a minimum, provide the opinions described above. Specific audit guidelines for the PFC program are contained in the <u>Passenger Facility Charge Audit Guide for Air Carriers,</u> (64 FR 44777), also available on the PFC internet document site.

5500.1

     **c.** For the purposes of an audit under this section, collection is defined as the point when agents or other intermediaries remit PFC revenue to the carrier.

     **d.** Upon request, a copy of the audit shall be provided to each public agency for which a PFC is collected.  The FAA may request copies of air carrier audits under the "Federal Oversight" provisions contained in §158.71 of the PFC regulation (see paragraphs 7-28, 7-29, and 7-37).

     **e.** In those cases where the FAA deems that an audit may be necessary for those carriers with less than 50,000 PFC passengers annually, the audit would be performed by the Administrator, the Secretary or the Comptroller General, or their designee, as provided in §158.71.

**7-28. ACCEPTABLE LEVEL OF ASSURANCE.**  The FAA has determined that the use of the procedures in the <u>Passenger Facility Charge Audit Guide for Air Carriers</u> will provide sufficient programmatic assurance that the air carrier has met the requirements of §158.69 or is correcting items noted in its audit report such that the FAA would not normally require additional reports, undertake an audit of the air carrier, or request DOT OIG intervention on the FAA's behalf.  The FAA would not normally initiate further monitoring efforts unless a subsequent alleged gross violation of the regulation is substantiated.

However, the FAA will not have the same level of confidence that a air carrier which has not used the guidance is in compliance with the collection and remittance requirements of §158.69.  Accordingly, alleged collection and remittance discrepancies raised against air carriers that have not used the guidance are more likely to trigger additional FAA monitoring activities, including requiring additional reports, the undertaking of an audit, or a request for DOT OIG intervention.  Such an approach shall not foreclose other FAA options for responding to improper collection and remittance practices and enforcing correct collection and remittance procedures.

**7-29. REVIEW OF AIR CARRIER AUDITS.**  APP-530 will request copies of air carrier annual audits to review them for completeness.  Possible problems in air carrier annual audits identified by public agencies should be promptly reported to APP-530 and the Office of the Secretary of Transportation, Assistant General Counsel for Environmental, Civil Rights, and General Law (C-10).

**7-30 to 7-35.  RESERVED.**

## SECTION 6.  FEDERAL OVERSIGHT

**7-36. PUBLIC AGENCY.**  The FAA may periodically audit and/or review the use of PFC revenue by a public agency.  The purpose of the audit or review is to ensure that

5500.1

the public agency is in compliance with the requirements of the regulation and
49 U.S.C. 40117. As noted in 7-19, the FAA will be less likely to undertake an audit of a
public agency if the public agency follows the steps recommended in FAA's <u>Passenger
Facility Charge Audit Guide for Public Agencies</u>.

**7-37. AIR CARRIERS.** The FAA may periodically audit and/or review the collection
and remittance by the collecting carriers of PFC revenue. The purpose of the audit or
review is to ensure collecting carriers are in compliance with the requirements of the
regulation and 49 U.S.C. 40117. As noted in 7-28, the FAA will be less likely to
undertake an audit of an air carrier if the air carrier follows the steps recommended in
FAA's <u>Passenger Facility Charge Audit Guide for Air Carriers</u>.

**7-38. ACCESS TO DOCUMENTATION.** Public agencies and carriers shall allow any
authorized representative of the Administrator, the Secretary of Transportation, or the
Comptroller General of the U.S., access to any of its books, documents, papers, and
records pertinent to PFC's.

**7-39 to 7-45. RESERVED.**